XAVIER BECERRA
Attorney General of California
SARAH E. MORRISON, SBN 143459
Supervising Deputy Attorney General
JAMIE B. JEFFERSON, SBN 197142
JOSHUA R. PURTLE, SBN 298215
JULIA K. FORGIE, SBN 304701
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Thone: (510) 879-1002
Fax: (510) 622-2270
Jamie.Jefferson@doj.ca.gov
Joshua.Purtle@doj.ca.gov

*Attorneys for Plaintiff State of California*

ROBERT W. FERGUSON
Attorney General of Washington
AURORA JANKE*
ELIZABETH HARRIS*
Assistant Attorneys General
Counsel for Environmental Protection
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104-3188
Phone: (206) 233-3391
Fax: (206) 464-6451
Aurora.Janke@atg.wa.gov
Elizabeth.Harris@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

*[Additional counsel listed on signature page]*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATES OF CALIFORNIA, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, ILLINOIS, MAINE, MARYLAND, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, AND WISCONSIN; PEOPLE OF THE STATE OF MICHIGAN; COMMONWEALTHS OF MASSACHUSETTS AND PENNSYLVANIA; TERRITORY OF GUAM; DISTRICT OF COLUMBIA; HARRIS COUNTY, TEXAS; CITY OF NEW YORK; CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION; AND NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, | Case No. 3:20-cv-06057 **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** (Administrative Procedure Act, 5 U.S.C. §§ 551–559; National Environmental Policy Act, 42 U.S.C. §§ 4321–4347) |
| Plaintiffs, | |

1

2

v.

3    COUNCIL ON ENVIRONMENTAL
     QUALITY AND MARY B. NEUMAYR, in
4    her official capacity as Chairman of the
     Council on Environmental Quality
5
                              Defendants.
6

7

8        1.    Plaintiffs, the State of California by and through Attorney General Xavier Becerra;

9    the State of Washington, by and through Attorney General Robert W. Ferguson; the State of

10   Colorado, by and through Attorney General Philip J. Weiser; the State of Connecticut and the

11   Connecticut Department of Energy and Environmental Protection, by and through Attorney

12   General William Tong; the State of Delaware, by and through Attorney General Kathleen

13   Jennings; the State of Illinois, by and through Attorney General Kwame Raoul; the State of

14   Maine, by and through Attorney General Aaron Frey; the State of Maryland, by and through

15   Attorney General Brian E. Frosh; the People of the State of Michigan, by and through Attorney

16   General Dana Nessel; the State of Minnesota, by and through Attorney General Keith Ellison;

17   the State of Nevada, by and through Attorney General Aaron Ford; the State of New Jersey, by

18   and through Attorney General Gurbir Grewal; the State of New Mexico, by and through

19   Attorney General Hector Balderas; the State of New York and the New York State Department

20   of Environmental Conservation, by and through Attorney General Letitia James; the State of

21   North Carolina, by and through Attorney General Joshua H. Stein; the State of Oregon, by and

22   through Attorney General Ellen Rosenblum; the State of Rhode Island, by and through

23   Attorney General Peter F. Neronha; the State of Vermont, by and through Attorney General

24   Thomas J. Donovan, Jr.; the State of Wisconsin, by and through Attorney General Joshua L.

25   Kaul; the Commonwealth of Massachusetts, by and through Attorney General Maura Healey;

26   the Commonwealth of Pennsylvania, by and through Attorney General Josh Shapiro; the

1   Territory of Guam, by and through Attorney General Leevin Taitano Camacho; the District of

2   Columbia, by and through Attorney General Karl A. Racine; Harris County, Texas, by and

3   through Harris County Attorney Vince Ryan; and the City of New York, by and through

4   Corporation Counsel James E. Johnson (collectively State Plaintiffs) bring this action against

5   Defendants Council on Environmental Quality (CEQ) and Mary Neumayr, in her official

6   capacity as Chairman of CEQ.  State Plaintiffs seek judicial review under the Administrative

7   Procedure Act, 5 U.S.C. §§ 551–559 (APA), of CEQ's final rule revising its longstanding

8   regulations implementing the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321–

9   4347, titled Update to the Regulations Implementing the Procedural Provisions of the National

10  Environmental Policy Act (Final Rule), 85 Fed. Reg. 43,304 (July 16, 2020) (to be codified at

11  40 C.F.R. pt. 1500).

## I.      INTRODUCTION

2.     For more than fifty years, NEPA has served as our nation's bedrock law for environmental protection by directing federal agencies to make well-informed decisions that protect public health and the environment.  NEPA embodies our nation's democratic values by involving states, territories, local governments, and the public in the federal decision making process.

3.     In enacting NEPA, Congress recognized the "critical importance of restoring and maintaining environmental quality to the overall welfare and development of man" and emphasized a national policy of cooperation with state and local governments as well as concerned individuals and private organizations "to use all practicable means … to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

4.     Consistent with this overarching policy, Congress directed federal agencies to implement NEPA "to the fullest extent possible" and to conduct a detailed environmental

review for "major Federal actions significantly affecting the quality of the human environment" that analyzes an action's environmental impacts, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and any irreversible and irretrievable commitment of resources.  42 U.S.C. §§ 4332, 4332(2)(C).  As the Supreme Court explained, Congress intended NEPA's "action-forcing procedures" to help "insure that the policies [of NEPA] are implemented."  *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979) (quoting S. Rep. No. 91-296, at 19 (1969)).

5.      NEPA is a success story of government transparency, meaningful public participation, informed decision making, and environmental and public health protection. Before NEPA, federal agencies often could make decisions without considering an action's environmental impacts or public concerns about those impacts.  NEPA requires that federal agencies engage in a transparent, public, and informed decision making process to comprehensively evaluate the environmental effects of their actions.  NEPA's focus on government transparency and public participation thus ensures that states, territories, local governments, businesses, organizations, and individuals have a role in shaping federal actions. State and territorial agencies, local governments, and the public have long relied on the NEPA process to identify harms from federal actions to state and territorial natural resources (including State Plaintiffs' air, water, public lands, cultural resources, and wildlife) and public health that might otherwise be ignored.  NEPA's public process also provides vulnerable communities and communities of color that are too often disproportionately affected by environmental harms a critical voice in the decision making process on actions that threaten adverse environmental and health impacts.  NEPA thus reflects the nation's democratic principles by elevating the public's role in agency decision making and ensuring that federal agencies thoughtfully review public input before making a decision.

6.      NEPA prioritizes careful, informed decision making over rushed and reckless action, enabling agencies to consider and adopt alternatives to a proposed action or incorporate

1  mitigation measures that protect public health, preserve irreplaceable natural resources for

2  current and future generations, and avoid long-term, irreversible, and costly environmental

3  harms.  NEPA has thus led to more informed decisions and better environmental and public

4  health outcomes for half a century.

5         7.      Promoting better decisions by federal agencies is particularly important when

6  the nation faces the unparalleled threat of climate change, which disproportionately impacts

7  communities already overburdened with pollution and associated public health impacts.

8  Federal actions include coal, oil, and natural gas leasing; timber sales; offshore drilling;

9  interstate transportation of coal, crude oil, and natural gas; and interstate transportation

10  projects, among others.  These actions threaten to exacerbate climate change harms, pollute

11  State Plaintiffs' air and water, disrupt wildlife habitats, and contribute to disproportionate

12  public health harms.  Rigorous environmental review under NEPA identifies these harms,

13  helps to mitigate and avoid them, and ultimately results in more responsible, less harmful

14  federal actions.

15         8.      In 1978, defendant CEQ promulgated regulations that have guided NEPA's

16  success for more than forty years.  These longstanding regulations have directed federal

17  agencies, and, in some situations, state agencies and local governments involved in major

18  Federal actions significantly affecting the environment, on how to comply with NEPA's

19  procedural requirements and its environmental protection policies.  *See* 40 C.F.R. pt. 1500

20  (1978) (1978 regulations).

21         9.      Under the current administration, CEQ now seeks to derail NEPA by issuing a

22  Final Rule that rewrites CEQ's enduring regulations implementing NEPA at the expense of the

23  environment and the people it is meant to protect—including State Plaintiffs' residents,

24  wildlife, and natural resources.  The Final Rule (i) severely limits which federal actions require

25  NEPA compliance; (ii) greatly narrows the scope of federal agencies' obligation to consider

26  environmental impacts; (iii) threatens to render NEPA's public participation process a

1  meaningless paperwork exercise; and (iv) unlawfully seeks to restrict judicial review of agency
2  actions that violate NEPA.

3      10.    The Final Rule strikes at the heart of NEPA—violating NEPA's text and
4  purpose (including NEPA's clear mandate that agencies comply with the statute "to the fullest
5  extent possible," 42 U.S.C. § 4332), and abandoning informed decision making, public
6  participation, and environmental and public health protection.  In the Final Rule, CEQ
7  exceeded its authority by exempting certain actions from environmental review and attempting
8  to place unlawful limits on courts' authority to remedy plaintiffs' injuries from NEPA
9  violations.

10      11.    CEQ failed to provide a rational justification for its sweeping revisions to the
11  1978 regulations.  The Final Rule reverses CEQ's longstanding interpretations of and guidance
12  on NEPA, undercutting decades of reliance by State Plaintiffs on well-established NEPA
13  procedures and policies that allowed states, territories, and local governments to identify
14  potential harms to their natural resources and residents and to advocate for alternatives and
15  mitigation measures to avoid those harms.  CEQ asserted that the Final Rule advances the
16  original objectives of its 1978 regulations to reduce paperwork and delays while asserting that
17  it will "produce better decisions [that] further the national policy to protect and enhance the
18  quality of the human environment."  Final Rule, 85 Fed. Reg. at 43,313 (citing 43 Fed. Reg.
19  55, 978 (Nov. 29, 1978)).  But CEQ failed to explain how the Final Rule will advance these
20  objectives when the Final Rule undercuts informed decision making and environmental
21  protection, and sweeps away decades of agency guidance and case law.  CEQ also failed to
22  comply with the APA's notice-and-comment requirements in promulgating the Final Rule.
23  The Final Rule thus violates the basic requirements of rational agency decision making.

24      12.    Last, the Final Rule is unlawful because CEQ failed to review the Final Rule's
25  significant environmental and public health impacts as required by NEPA itself.

26

13.     For these reasons, the Final Rule is arbitrary, capricious, and contrary to law in violation of the APA and NEPA, was promulgated in excess of statutory authority and without observance of procedure required by law, and should be vacated.

## II.     JURISDICTION AND VENUE

14.     This action raises federal questions and arises under NEPA and the APA.  This Court therefore has jurisdiction over State Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) and 5 U.S.C. §§ 701–06 (APA).  State Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 701–06.

15.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and the Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

16.     CEQ is an agency subject to APA requirements.  5 U.S.C. § 551.  Each of the State Plaintiffs is a "person" authorized to bring suit under the APA to challenge unlawful final agency action.  *Id.* §§ 551(2), 702.  The Final Rule is a final agency action subject to review under the APA.  *Id.* §§ 704, 706.

17.     The United States has waived sovereign immunity for claims arising under the APA.  *Id.* § 702.

18.     State Plaintiffs submitted timely and detailed comments opposing CEQ's proposed rule that preceded the Final Rule, *see* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1,684 (Jan. 10, 2020) (Proposed Rule), and have therefore exhausted all administrative remedies.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is the judicial district in which Plaintiff State of California resides, and this action seeks relief against federal agencies and officials acting in their official capacities.

1

## III.    INTRADISTRICT ASSIGNMENT

2     20.    Although no basis exists under Civil Local Rule 3-2(c) for assigning this action

3 to any particular location or division of this Court, this case is related to *Alaska Community*

4 *Action on Toxics v. Council on Environmental Quality*, Case No. 3:20-CV-05199, which

5 challenges the same Final Rule and is assigned to Judge Richard Seeborg in the San Francisco

6 Division.  To avoid an unduly burdensome duplication of labor and expense or conflicting

7 results, State Plaintiffs intend to promptly file an Administrative Motion to Consider Whether

8 Cases Should Be Related under Civil Local Rule 3-12(b).

9     ## IV.    PARTIES

10 **A.    Plaintiffs**

11     21.    Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney

12 General Xavier Becerra.  The Attorney General is the chief law enforcement officer of the state

13 and has the authority to file civil actions in order to protect public rights and interests,

14 including actions to protect the natural resources of the state.  Cal. Const. art. V, § 13; Cal.

15 Gov't Code §§ 12600–12.  This challenge is brought in part pursuant to the Attorney General's

16 independent authority to represent the people's interests in protecting the environment and

17 natural resources of California from pollution, impairment, or destruction.  Cal. Const. art. V,

18 § 13; Cal. Gov't Code §§ 12511, 12600–12; *D'Amico v. Bd. of Med. Exam'rs,* 520 P.2d 10, 14

19 (Cal. Sup. Ct. 1974).

20     22.    The State of California has a sovereign interest in its natural resources and is the

21 sovereign and proprietary owner of all the state's fish and wildlife resources, which are state

22 property held in trust by the state for the benefit of the people of California.  *People v. Truckee*

23 *Lumber Co.*, 48 P. 374, 374 (Cal. Sup. Ct. 1897); *Nat'l Audubon Soc'y v. Superior Ct.*,

24 658 P.2d 709, 727 (Cal. Sup. Ct. 1983).

25     23.    California has millions of acres of federal land across twenty national forests,

26 nine national parks (including world-renowned Yosemite National Park), thirty-nine national

wildlife refuges, seven national monuments, and numerous Department of Defense facilities, including at least thirty-two military bases.  California is also home to six primary and numerous auxiliary interstate highways, at least nine international airports, and major federal water infrastructure projects, such as the Central Valley Project, which controls a significant proportion of water distribution in the northern and southern regions of the state.  Federal agencies, including the U.S. Navy and the Coast Guard, also routinely engage in activities in California's coastal waters.  Major Federal actions concerning these lands, waters, projects, highways, airports, and other federal facilities are subject to NEPA.

24.     There are currently over 300 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California and its waters—more than any other mainland state.  Examples include the southern sea otter (*Enhydra lutris nereis*) found along California's central coastline, the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the marbled murrelet (*Brachyramphus marmoratus*) in north coast redwood forests, as well as two different runs of Chinook salmon (*Oncorhynchus tshawytscha*) and their spawning, rearing, and migration habitat in the Bay-Delta and Central Valley rivers and streams.  These and other species are affected by federal projects throughout California.  For example, Chinook salmon are threatened by the U.S. Bureau of Reclamation's proposal to raise the level of the Shasta Reservoir in northern California.

25.     California state agencies, including the California Environmental Protection Agency, the State Water Resources Control Board, the Air Resources Board, the California Department of Food and Agriculture, and the Department of Fish and Wildlife have engaged in the federal NEPA process to protect the state's interest in public health, environmental quality, and state natural resources.  For example, California agencies have commented repeatedly on NEPA documents associated with the Bureau of Reclamation's proposal to raise the level of the Shasta Reservoir.  The Bureau recently published a draft Supplemental Environmental Impact Statement (EIS) for this project, which is currently open for public comment.  The

California Department of Water Resources and California Energy Commission also work with federal agencies in preparing NEPA documents. In addition, Caltrans, California's transportation agency, has assumed NEPA responsibilities from the Federal Highway Administration (FHWA), and is thus responsible for complying with all applicable federal environmental laws, including the Final Rule, and with FHWA's NEPA regulations that will be revised under the Final Rule. *See* Memorandum of Understanding Between FHWA and the California Department of Transportation Concerning the State of California's Participation in the Surface Transportation Project Delivery Program Pursuant to 23 U.S.C. § 327 (Dec. 2016).

26. Plaintiff STATE OF WASHINGTON is a sovereign entity and brings this action to protect its sovereign and proprietary rights. The Attorney General is the chief legal advisor to the State of Washington, and his powers and duties include acting in federal court on matters of public concern. This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring suit and obtain relief on behalf of Washington.

27. Washington has a sovereign and propriety interest in protecting its state resources through careful environmental review at both the state and federal level. Washington has statutory responsibility to conserve, enhance, and properly utilize the state's natural resources. Wash. Rev. Code. §§ 77.110.030, 90.03.010, 90.58.020; *see also* Wash. Const. art. XVI, § 1. Washington has over six million acres of forest, range, agricultural, aquatic, and commercial lands and holds proprietary rights for wildlife, fish, shellfish, and tide lands. Wash. Const. art. XVII, § 1; Wash. Rev. Code § 77.04.012. Washington lists thirty-two species as state endangered species and expends significant resources to protect and recover these species, some of which are not federally protected. Wash. Admin. Code 220-610-010. Washington's natural resources generate more than $200 million in annual financial benefits to state public schools, institutions, and county services. They also generate billions of dollars worth of ecosystem services to surrounding communities by filtering drinking water, purifying

air, and providing space for recreation. Washington's natural areas generate commercial and recreational opportunities that put billions of dollars into the Washington economy annually.

28. Washington has over 3,000 miles of coastline and millions of acres of federal lands across ten national forests, three national parks, twenty-three national wildlife refuges, three national monuments, and numerous Department of Defense locations, including at least seven military facilities and training areas. Many of these federal lands abut Washington's state-owned lands. Washington is also home to 145 federally owned or regulated dams, including Grand Coulee Dam, three interstate highways, five international airports, and the Hanford Nuclear Reservation. Federal agencies, including the U.S. Navy and the Coast Guard, also routinely engage in activities in Washington's coastal waters and the adjacent exclusive economic zone and within Puget Sound, one of Washington's most significant ecological, cultural, and economic features. Major Federal actions concerning these lands, waters, projects, highways, airports, and other federal facilities are subject to NEPA.

29. Washington state agencies, including the Department of Ecology, the Department of Fish and Wildlife, the Department of Transportation (WSDOT), the Department of Natural Resources, and the Department of Health regularly engage in the federal NEPA process as cooperating and commenting agencies or as agencies with special expertise highlighting potential impacts to the state's natural resources and public health. For example, WSDOT and FHWA jointly worked on the NEPA process to replace the State Route 99 Alaskan Way viaduct in Seattle, Washington, where rigorous environmental review and meaningful public engagement led to a selected alternative that worked for state and federal agencies, local governments, tribes, and the public, including minority and low-income communities. Federal agency activities and actions requiring federal permits that affect Washington's coastal zone, water quality, wildlife, and cultural resources are subject to NEPA and are also reviewed by state agencies for consistency and compliance with Washington's laws and programs. In some situations, such as certain actions on federal lands, NEPA is the

sole means for state agencies to advocate for protection of Washington's resources, including protection of state (but not federally) listed species and other species of concern and their habitat, and to identify unintended consequences of a proposed action.

30.     Plaintiff STATE OF COLORADO is a sovereign entity that regulates land use, water and air quality, wildlife, and water resources within its borders through duly enacted state laws.  The State of Colorado brings this action in its sovereign and proprietary capacity to protect public health, safety, welfare, its waters and environment, its wildlife and wildlife habitat, and its economy.

31.     Clean air, land, and water provide ecologically vibrant habitats that undergird the state's robust outdoor recreation economy.  For instance, in Colorado, fishing and wildlife watching each contribute $2.4 billion in economic output each year, supporting more than 30,000 jobs within the state.  Hunting supports nearly 8,000 additional jobs and contributes more than $800 million in annual economic output.  The entire outdoor recreation economy, which also includes hiking, skiing, and other activities, accounts for $62.5 billion dollars of economic output in Colorado.  Colo. Parks & Wildlife, *The 2017 Economic Contributions of Outdoor Recreation in Colorado* (July 2018).  Agriculture is also an important economic engine and cultural resource in Colorado.  As of 2019, Colorado's agricultural industry contributed $47 billion in economic output and directly employed more than 195,000 workers. The natural environment influences all aspects of agriculture and food production in Colorado.

32.     As Colorado's population rapidly grows, the state must ensure that projects intended to serve that population also protect the natural environment for current and future generations.  For example, the Colorado Department of Transportation prepares environmental analyses for projects involving state and interstate highways, bridges, and multi-modal transportation.  Similarly, the Colorado Department of Agriculture participates in NEPA reviews for public-land grazing permit renewals and for range improvement projects involving water distribution systems and habitat management.  Colorado's Department of Public Health

and Environment reviews projects for oil and gas leases, transportation, and wastewater infrastructure as part of the NEPA process.  The Colorado Department of Natural Resources utilizes and participates in NEPA processes for land use and water planning, disaster preparedness, and fish and wildlife protection.

33.     Through early and meaningful involvement in the NEPA process, state agencies help ensure that NEPA reviews are informed by accurate technical and scientific analysis and preserve important natural, historic, and cultural resources in Colorado communities.  To this end, Colorado agencies regularly consider direct, indirect, and cumulative impacts on the natural environment and general welfare.

34.     Plaintiff STATE OF CONNECTICUT is a sovereign entity and brings this action to protect its citizens and natural resources.  The Connecticut Attorney General is an elected constitutional official and the chief legal officer of the State of Connecticut.  The Connecticut Attorney General's responsibilities include intervening in various judicial and administrative proceedings to protect the interests of the citizens and natural resources of the State of Connecticut and ensuring the enforcement of a variety of laws of the State of Connecticut.  This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring suit and obtain relief on behalf of the State of Connecticut.

35.     Connecticut has a sovereign interest in protecting the health and safety of its citizens and its natural resources.  Connecticut has a statutory duty to protect, conserve, and properly utilize its natural resources and public trust lands.  Connecticut has over 1.7 million acres of forest, 173,000 acres of wetlands, 437,000 acres of agricultural land, 70,000 acres of shellfishing beds, and 22,000 acres of public trust lands, not including the entire seafloor of Long Island Sound up to the New York border, which Connecticut holds in public trust. Connecticut lists twenty-three species as endangered species and expends significant resources to protect these species.  Connecticut's natural resources generate hundreds of millions of dollars in annual financial benefits to the state and its citizens.

36.     Connecticut has 322 miles of coastline and three major ports (Bridgeport, New Haven, and New London).  Long Island Sound is Connecticut's largest and most important maritime natural resource and is vital to Connecticut's economy.  Maritime business accounts for approximately five billion dollars in state economic output and provides 30,000 jobs and tens of millions of dollars in state and local taxes.

37.     Connecticut is also home to sixteen federally regulated dams, three interstate highways, an international airport, and the Naval Submarine Base in New London.  Major Federal actions concerning these lands, waters, projects, highways, airports, and other federal facilities are subject to NEPA.

38.     Connecticut state agencies, including the Department of Energy and Environmental Protection, the Department of Transportation, and the Department of Health regularly engage in the federal NEPA process, often as agencies with special expertise relevant to the potential impacts to the state's natural resources and public health.  In these cases, the opportunity for rigorous environmental review and meaningful public engagement have been critical for state agencies, local governments, tribes, and the public, particularly for minority and low-income communities.  Federal agency activities and actions requiring federal permits that affect Connecticut's coastal zone, water quality, wildlife, and cultural resources are subject to NEPA and are also reviewed by state agencies for consistency and compliance with Connecticut's laws and programs.  In some situations, NEPA is the sole means for Connecticut agencies to advocate for protection of Connecticut's citizens and natural resources.

39.     Plaintiff STATE OF DELAWARE is a sovereign state of the United States of America.  Delaware brings this action by and through Attorney General Kathleen Jennings, who is the chief law officer of Delaware, *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941), and is empowered and charged with the duty to represent as counsel in all proceedings or actions which may be brought on behalf or against the state and all officers,

agencies, departments, boards, commissions and instrumentalities of state government, Del. Code Ann. tit. 29, § 2504.

40.     As one of the most low-lying states in the nation, Delaware is particularly at risk from the harms of climate change, including sea level rise.  For example, a 2012 Delaware Sea Level Rise Vulnerability Assessment found that sea level rise of only 0.5 meters would inundate either percent of the state's land area.  Areas inundated would include "transportation and port infrastructure, historic fishing villages, resort towns, agricultural fields, wastewater treatment facilities and vast stretches of wetlands and wildlife habitat of hemispheric importance."  The Assessment concluded that "every Delawarean is likely to be affected by sea level rise whether through increased costs of maintaining public infrastructure, decreased tax base, loss of recreational opportunities and wildlife habitat, or loss of community character."

41.     Multiple entities within Delaware rely on NEPA as cooperating agencies.  For example, the Delaware Coastal Management Program uses information provided in the federal consistency determination required under Section 307 of the Coastal Zone Management Act of 1972 to assess impacts to Delaware's coastal uses and resources.  Federal agencies are encouraged to use NEPA material to satisfy the federal consistency determination requirements.  Therefore, any rollback of NEPA obligations may cause the quality of information submitted to degrade, leaving Delaware's coastal uses and resources more vulnerable to federal activities in the state.  Similarly, the Division of Water receives NEPA documents in support of permit applications, such as Water Quality Certification determinations.  Delaware relies on the federal NEPA process to coordinate its protection of the state's interests.

42.     Plaintiff STATE OF ILLINOIS brings this action by and through Attorney General Kwame Raoul.  The Attorney General is the chief legal officer of the State of Illinois (Ill. Const., art. V, § 15) and "has the prerogative of conducting legal affairs for the State." *Envt'l Prot. Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977).  He has

common law authority to represent the People of the State of Illinois and "an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State." *People v. NL Indus.*, 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992).

43.     Illinois has a sovereign interest in protecting its natural resources through careful environmental review at the federal level.  Among other interests, Illinois has "ownership of and title to all wild birds and wild mammals within the jurisdiction of the state." 520 Ill. Comp. Stat. 5/2.1.  Furthermore, federally managed lands in Illinois are vitally important to the state and in need of protection.  The Shawnee National Forest spans over 289,000 acres in southern Illinois and straddles six natural ecological regions; the Midewin National Tallgrass Prairie is the largest open space in the Chicago metropolitan area. Additionally, significant oil and gas pipeline development takes place in Illinois.

44.     Plaintiff STATE OF MAINE, a sovereign state of the United States of America, brings this action by and through its Attorney General Aaron Frey.  The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the state's legal business.  Me. Const. art. IX, § 11; 5 M.R.S.A. §§ 191–205.  The Attorney General's powers and duties include acting on behalf of Maine and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

45.     Maine has a sovereign interest in protecting its natural resources through careful environmental review at both the state and federal level.  Maine has over 3,000 miles of coastline, a coastline that generates millions of dollars in commercial fishing income and tourism income, and recreational opportunities to the residents of the state.  Federal agencies' activities in these vital coastal waters are regulated under NEPA.  Federally protected lands in Maine total 295,479 acres, including Acadia National Park, which includes 47,000 acres, and

1    Katahdin Woods and Waters National Monument, with 87,563 acres.  Maine has eleven

2    National Wildlife Refuges which encompass 76,230 acres, including the renowned Rachel

3    Carson National Wildlife Refuge.  Maine has two federal fish hatcheries, several airports, one

4    military base, 365 miles of federal interstate highways, and ninety-two federally licensed dams.

5         46.    Maine's environmental agencies, including the Department of Environmental

6    Protection, the Department of Marine Resources, the Department of Inland Fisheries and

7    Wildlife, and the Department of Agriculture, Conservation and Forestry, engage in the federal

8    NEPA process to protect the state's natural resources and public health.  NEPA review of

9    Federal agency activities and activities requiring federal permits that affect Maine's natural

10   resources provides essential protection to Maine's environment.

11        47.    Plaintiff STATE OF MARYLAND brings this action by and through its

12   Attorney General, Brian E. Frosh.  The Attorney General of Maryland is the state's chief legal

13   officer with general charge, supervision, and direction of the state's legal business.  Under the

14   Constitution of Maryland and as directed by the Maryland General Assembly, the Attorney

15   General has the authority to file suit to challenge action by the federal government that

16   threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2);

17   Md. Code. Ann., State Gov't § 6-106.1.  Maryland has enacted its own Environmental Policy

18   Act, *see* Md. Code. Ann., Nat. Res. §§ 1-301 *et seq*., which is triggered upon the general

19   assembly's appropriation of funding for major projects.

20        48.    The State of Maryland has a sovereign and proprietary interest in protecting its

21   state resources through careful environmental review of major federal actions.  These resources

22   include the Chesapeake Bay, one of the nation's most productive estuaries with a watershed

23   that spans 64,000 square miles across six states and the District of Columbia.  It is the official

24   policy of the state "to conserve species of wildlife for human enjoyment, for scientific

25   purposes, and to insure their perpetuation as viable components of their ecosystems."

26   Maryland Nongame and Endangered Species Conservation Act, Md. Code. Ann., Nat. Res.

§ 10-2A-02.  To that end, more than 150 species of animals and 340 species of plants are listed as state endangered, threatened, or in need of conservation.  Of these, twenty-eight animal species and nine plant species are also protected by the federal Endangered Species Act.  *See* COMAR 08.03.08 (providing lists of plant and wildlife species with elevated conservation statuses).

49.     The federal government has a large presence in Maryland.  There are more than 480 miles of interstate highways in Maryland, including I-95, I-70, the Baltimore Beltway, and portions of the capital beltway that connects the greater Washington, D.C. Metropolitan Area.  A number of federally owned or operated facilities are also located in Maryland including the Aberdeen Proving Ground, U.S. Naval Academy in Annapolis, and Camp David.  Additionally, the state is home to five National Wildlife Refuges, the Assateague Island National Seashore, and numerous national parks, monuments, and battlefields.  Major federal actions concerning these lands, waters, highways, and parks are subject to NEPA review.

50.     Maryland agencies frequently participate in and rely on the federal NEPA process as cooperating and commenting agencies.  The State Highway Administration, for example, addresses floodplain management for federally funded projects through NEPA, and the Maryland Department of the Environment completes NEPA-like reviews for projects funded through the U.S. Environmental Protection Agency's State Revolving Fund programs for clean water and drinking water.

51.     Plaintiff PEOPLE OF THE STATE OF MICHIGAN brings this action by and through Attorney General Dana Nessel, who is authorized by statute and under common law to initiate litigation in the public interest on behalf of the People of the State of Michigan.

52.     Among other things, the People of the State of Michigan will be harmed by the federal government's dereliction of duty in the Final Rule's treatment of climate change under NEPA.  Michigan is already being harmed by climate change.  Since 1951, the average annual temperature has increased by a range of 0.6-1.3 degrees Fahrenheit across the Lower

Peninsula.  During that same time, annual average precipitation increased by 4.5 percent as well.  Michigan faces extreme heat events, excess rain and flooding, respiratory illnesses, heat-related illnesses, and both waterborne and vector-borne diseases.  As a result, Michigan is tasked with protecting its citizens from temperature-related illness, respiratory diseases, waterborne diseases exacerbated by extreme rain events, and infectious diseases such as Lyme disease and West Nile Virus.  Increased precipitation will also damage Michigan roads, bridges, dams and other physical infrastructure.

53.     Plaintiff STATE OF MINNESOTA brings this action by and through its chief legal officer, Attorney General Keith Ellison, to protect Minnesota's interest in its natural resources and the environment.  This challenge is brought pursuant to the Attorney General's authority to represent the state's interests.  Minn. Stat. § 8.01.  Minnesota has enacted and devotes significant resources to implementing numerous laws concerning the management, conservation, protection, restoration, and enhancement of its natural resources.  *See*, *e.g.*, Minn. Stat. Chs. 116B, 116D.  Minnesota owns its wildlife resources, Minn. Stat. § 97A.025, and manages them for the benefit of all citizens.  Minnesota state agencies, including the Minnesota Pollution Control Agency, the Department of Natural Resources, the Public Utilities Commission, the Department of Commerce, and the Environmental Quality Board regularly engage in the federal NEPA process to protect the state's interest in public health, environmental quality, and state natural resources.  Minnesota has a direct interest in the strength and integrity of NEPA's implementing regulations.

54.     Minnesota is home to Voyageurs National Park, two national monuments, two national forests, three wilderness areas, and one national recreation area.  In 2019, there were 1,099,276 recreational visits to federal lands and facilities in Minnesota, generating over $60 million in visitor spending for the Minnesota economy.  *2019 National Park Visitor Spending Effects Report*, National Park Service, (Apr. 2020), https://www.nps.gov/subjects/ socialscience/vse.htm.  These figures do not include the more than 110,000 visitors who

traveled through the Boundary Waters Canoe Area Wilderness (BWCAW) every year between 2009 and 2016.  *USFS Permit and Visitor Use Trends*, *2009-2016*, USDA Forest Service, (July 7, 2017), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd549672.pdf.  The BWCAW is the most visited wilderness area in the United States.

55.     There are several major infrastructure projects currently proposed in Minnesota that have been or will be subject to NEPA review.  For example, Enbridge Energy, Limited Partnership seeks to replace an oil pipeline that traverses Minnesota, which requires several state and federal permits.  There are also two proposed copper-nickel mining projects in Minnesota—one in the watershed of the Boundary Waters Canoe Area Wilderness—that will require many state and federal permits.  These projects have attracted a great deal of public attention from Minnesotans and millions, including Minnesota state agencies, have participated in the review processes to date.

56.     Plaintiff STATE OF NEVADA is a sovereign entity and brings this action to protect its sovereign and proprietary rights.  Attorney General Aaron Ford is the chief legal advisor to the State of Nevada, and his powers and duties include acting in federal court on matters of public concern.  *See* Nev. Rev. Stat. § 228.170.  This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring suit and obtain relief on behalf of Nevada.

57.     Nevada has a sovereign and propriety interest in protecting its state resources through careful environmental review.  Nevada's natural resources generate more than one hundred million dollars in annual financial benefits to state public schools, institutions, and county services.  Nevada's natural areas also generate commercial and recreational opportunities that put billions of dollars into Nevada's economy annually.

58.     Nevada has tens of millions of acres of federal lands across three national forests, two national parks, three national historic trails, nine national wildlife refuges, three national monuments, two international airports, and numerous Department of Defense and

Department of Energy locations.  Many of these federal lands abut Nevada's state-owned lands.  Major Federal actions concerning these lands, waters, projects, highways, airports, and other federal facilities are subject to NEPA.

59.    Nevada state departments and agencies, including the Department of Conservation and Natural Resources, the Department of Wildlife, the Department of Transportation, the Agency for Nuclear Projects, the Division of Environmental Protection, and the Division of Minerals, regularly engage in the federal NEPA process as cooperating and commenting agencies or as agencies with special expertise highlighting potential impacts to the state's natural resources and public health.  Federal agency activities and actions requiring federal permits that affect Nevada's water quality, wildlife, and cultural resources are subject to NEPA and are also reviewed by state agencies for consistency and compliance with Nevada's laws and programs.  In some situations, NEPA is the sole means for state agencies to advocate for protection of Nevada's resources.

60.    Plaintiff STATE OF NEW JERSEY is a sovereign state of the United States of America and brings this action on behalf of itself and as trustee, guardian and representative of the residents and citizens of New Jersey.  As the most densely developed state in the country, New Jersey has actively pursued conservation programs for land and natural resources.  New Jersey's voters have approved more than $3.3 billion in funding for New Jersey Department of Environmental Protection's (NJDEP) Green Acres program to conserve ecologically-sensitive or natural resource-laden properties.  Similarly, over 230,000 acres of farmland have been conserved through New Jersey's State Agricultural Development Committee.  New Jersey also expends significant resources protecting its natural resources, including eighty-three state-listed threatened or endangered species, and holds all wildlife, fish, shellfish, and tidal waters in trust for its citizens.

61.    New Jersey is home to well over one hundred miles of coastline, which includes the famed Jersey Shore as a significant tourism driver, and federal activities such as seismic

testing and offshore drilling have historically been proposed off of New Jersey's coastline. New Jersey is also home to three primary interstate highways and numerous auxiliary interstate highways, including auxiliary highways running from other states' interstate systems, numerous military installations, including Joint Base McGuire-Dix-Lakehurst, and federal parks and natural areas where a fully functional NEPA process is essential to sound environmental planning.  Due to its geographic location, New Jersey has also become the site for numerous proposed energy transmission infrastructure projects which require federal approvals and are subject to NEPA.  New Jersey agencies and authorities, including but not limited to NJDEP, regularly engage in the federal NEPA process.  NJDEP routinely comments during the NEPA process to inform the relevant federal agency about mechanisms to avoid, minimize, and/or mitigate potential impacts to the environment and public health, as well as to educate the federal agency about New Jersey's own statutory and regulatory requirements. Further, project proponents may use an EIS properly completed under NEPA or properly promulgated categorical exemptions as a substitute for compliance with New Jersey's Executive Order 215 (1989).

62.     Plaintiff STATE OF NEW MEXICO joins in this action by and through Attorney General Hector Balderas.  The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the state requires such action.  N.M. Stat. Ann. § 8-5-2.  New Mexico has a statutory duty to "ensure an environment that in the greatest possible measure will confer optimum health, safety, comfort and economic and social well-being on its inhabitants; will protect this generation as well as those yet unborn from health threats posed by the environment; and will maximize the economic and cultural benefits of a healthy people." *Id.* § 74-1-2.

63.     Federal agencies have an enormous footprint in New Mexico.  More than one-third of New Mexico's land is federally administered, with the United States Department of

Agriculture, Department of the Interior, and Department of Defense playing active roles in land management within the state.  The state is home to the nation's newest national park (White Sands National Park, established 2019); first designated wilderness area (Gila Wilderness, established 1924); and largest military installation (White Sands Missile Range).  It also hosts two National Laboratories, three Air Force Bases, and the nation's only deep geologic repository for nuclear waste (the United States Department of Energy's Waste Isolation Pilot Project or WIPP).  The state contains a significant portion of the Navajo Nation Indian reservation as well as twenty-two other federally recognized Indian tribes.  The U.S. Army Corps of Engineers operates seven dams in New Mexico, and the U.S. Department of Agriculture manages five in-state National Forests, comprising over nine million acres.  The Bureau of Land Management (BLM) also oversees over thirteen million acres of public lands, thirty-six million acres of federal mineral estate, and approximately eight million acres of Indian trust minerals in New Mexico.  BLM has approved over 7,800 oil and gas leases in the state, as well as twenty-one federal coal leases encompassing 42,756 acres.

64.     New Mexico faces serious environmental challenges in the 21st century.  The state is already experiencing the adverse effects of climate change, and average temperatures in New Mexico have been increasing fifty percent faster than the global average over the past century.  According to the Third U.S. National Climate Assessment, streamflow totals in the Rio Grande and other rivers in the Southwest were five percent to thirty-seven percent lower between 2001 and 2010 than the 20th century average flows.  As of August 20, 2020, 100 percent of the state is suffering from drought conditions, with approximately 55.5 percent being in a "severe drought."  (*See* Nat'l Integrated Drought Info. Sys., https://www.drought.gov/drought/states/new-mexico).  It is estimated that forty percent of Navajo Nation residents already lack running water.

65.     New Mexico relies on participation in the NEPA process to protect its proprietary and sovereign interests in its natural resources, including weighing the short-term

benefits of resource extraction against the long-term effects of climate change, and conserving scarce water resources.  In one recent example, the New Mexico State Auditor's Office, the New Mexico Department of Game and Fish, and the New Mexico Department of Agriculture submitted comments to BLM regarding the Farmington Mancos-Gallup Resource Management Plan Amendment, calling BLM's attention to, among other things, the state's land and water conservation planning efforts.  Other EISs the state has recently commented on include those for Los Alamos National Lab (Sitewide EIS); the New Mexico Unit of the Central Arizona Project (regarding diversion of water from the Gila River); and Plutonium Pit Production at the Department of Energy's Savannah River Site (regarding effects from waste shipped to WIPP). The New Mexico Environment Department alone has submitted comments on eleven EISs in 2020 so far.

66.     Plaintiff STATE OF NEW YORK brings this action on its own behalf and on behalf of its environmental agency, the New York State Department of Environmental Conservation (NYSDEC), to protect New York's sovereign and proprietary interests, which include ownership of all wildlife in the state, N.Y. Envtl. Conserv. Law § 11-0105, and numerous waterbodies, including without limitation: the land under the "marginal sea" to a line three miles from the coast, the Great Lakes within the state's territorial jurisdiction, Lake Champlain and the St. Lawrence and Niagara Rivers, as well as the Hudson and Mohawk Rivers, Lake George, Cayuga Lake, Canandaigua Lake, Oneida Lake, and Keuka Lake.  *See Town of N. Elba v. Grimditch*, 98 A.D.3d 183, 188–89 (N.Y. App. Div. 3d Dep't 2012).  The state also owns approximately 4.8 million acres of park and forest lands, including more than 2.8 million acres of "forever wild" forest preserve.  N.Y. Const. art. XIV.

67.     New York is home to nine primary and twenty-two auxiliary interstate highways, six international airports, and several federal military installations, including Fort Drum, the United States Military Academy at West Point, and the Watervliet Arsenal.  New York is also home to the Western New York Nuclear Service Center, a program of the New

1   York State Energy Research and Development Authority (NYSERDA), which owns, in trust

2   for the People of the State of New York, a 3,300-acre former nuclear waste re-processing

3   facility that is the subject of an ongoing joint lead agency supplemental environmental review

4   of decommissioning activities under NEPA and state law.

5        68.    New York state agencies and authorities, collectively, including without

6   limitation the NYSDEC and NYSERDA, regularly engage or are presently engaged in the

7   federal NEPA process.  Federal agency activities and actions requiring federal permits that

8   affect New York's coastal zone, water quality, wildlife, and cultural resources are subject to

9   NEPA, and NEPA analysis is used to support state decision making.  For example, where

10  federal and state environmental reviews of a project are undertaken, the NYSDEC may rely on

11  a NEPA EIS where it is sufficient for the agency to make findings under state law.  Where no

12  EIS is prepared under NEPA, the NEPA record developed to support a Finding of No

13  Significant Impact may inform the record for analysis under state law.  And where state

14  environmental review may be preempted, New York agencies such as NYSDEC may use

15  NEPA analysis to support their decisions, such as water quality certifications.

16       69.    Plaintiff STATE OF NORTH CAROLINA brings this action by and through

17  Attorney General Joshua H. Stein.  The North Carolina Attorney General is the chief legal

18  officer of the State of North Carolina.  The Attorney General is empowered to appear for the

19  State of North Carolina "in any cause or matter … in which the state may be a party or

20  interested." N.C. Gen. Stat. § 114-2(1).  Moreover, the Attorney General is authorized to bring

21  actions on behalf of the citizens of the state in "all matters affecting the public interest." *Id.*

22  § 114-2(8)(a).

23       70.    North Carolina has a sovereign and propriety interest in protecting its state

24  resources through careful environmental review at both the state and federal level.  It is the

25  constitutional policy of North Carolina to conserve and protect its lands and waters for the

26  benefit of all its citizenry.  N.C. Const. Art. XIV, § 5.  Under North Carolina law, "the marine

and estuarine and wildlife resources of North Carolina belong to the people of the state as a whole." N.C. Gen. Stat. § 113-131(a). Furthermore, North Carolina's General Assembly has declared that it is the policy of the State of North Carolina to "encourage the wise, productive, and beneficial use of the natural resources of the State without damage to the environment," and to "maintain a healthy and pleasant environment, and preserve the natural beauty of the State." *Id.* § 113A-3.

71. North Carolina contains over two million acres of federally-owned lands, including lands managed by the U.S. Forest Service, Fish and Wildlife Service, National Park Service, and Department of Defense. North Carolina has ten national parks and forty-one state parks. North Carolina is home to thirty-nine animal and twenty-seven plant species that have been listed as endangered or threatened by the Fish and Wildlife Service.

72. North Carolina agencies regularly engage in the federal NEPA process as cooperating and commenting agencies or as agencies with special expertise highlighting potential impacts to the state's natural resources and public health.

73. Plaintiff STATE OF OREGON brings this suit by and through Attorney General Ellen Rosenblum. The Oregon Attorney General is the chief legal officer of the State of Oregon. The Attorney General's duties include acting in federal court on matters of public concern and upon request by any state officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the Oregon's interests. Or. Rev. Stat. § 180.060(1).

74. The State of Oregon has a sovereign interest in its natural resources and is the sovereign owner of the state's fish and wildlife. Under Oregon law, "[w]ildlife is the property of the State." *Id.* § 498.002. The State of Oregon has enacted numerous laws and rules concerning the conservation and protection of the natural resources of the state. *See, e.g.*, Oregon Endangered Species Act, Or. Rev. Stat. §§ 496.171–.192, 498.026; Fish and Wildlife Habitat Mitigation Policy, Or. Admin. R. 635-415-0000 (creating "goals and standards to

1  mitigate impacts to fish and wildlife habitat caused by land and water development actions");

2  Or. Admin. R. 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(5) ("[l]ocal governments shall adopt programs that will protect

3  natural resources").  Natural resources are the source of substantial economic activity in

4  Oregon.  More than $2.6 billion annually is spent in Oregon by residents and visitors on trips

5  and equipment for wildlife-watching, fishing, and hunting.  The state also owns at least 1.775

6  million acres of land, including land managed by the Department of Forestry and the

7  Department of State Lands.  (That figure generally excludes state-owned waterbodies and

8  rights of way.)  Revenue from the 780,000 acres of land managed by the Department of State

9  Lands is placed in the Common School Fund, which generates tens of millions of dollars

10  annually for Oregon public schools.

11  75.    More than half of Oregon's land area is owned by the federal government.

12  BLM manages over fifteen million acres in Oregon.  The U.S. Forest Service also manages

13  over fifteen million acres (across eleven national forests).  Oregon has eighteen national

14  wildlife refuges and Crater Lake National Park.  Oregon has three primary and three auxiliary

15  interstate highways.  Many Oregon resources, such as the Common School Trust Lands and

16  navigable waters, are ecologically connected to federal lands.  Oregon's fish and wildlife

17  resources also rely on federal lands and waters.

18  76.    Oregon state agencies, including the Department of Fish and Wildlife, the

19  Department of Transportation, the Department of State Lands, and the Oregon Department of

20  Parks and Recreation, regularly engage in the federal NEPA process as cooperating and

21  commenting agencies or as agencies with special expertise highlighting potential impacts to the

22  state's natural resources and public health.

23  77.    Plaintiff STATE OF RHODE ISLAND is a sovereign entity and brings this

24  action to protect its sovereign and proprietary rights.  The Attorney General is the chief legal

25  advisor to the State of Rhode Island, and his powers and duties include acting in federal court

26

on matters of public concern.  This challenge is brought pursuant to the Attorney General's

statutory and common law authority to bring suit and obtain relief on behalf of Rhode Island.

78.     Rhode Island has a sovereign and propriety interest in protecting its state

resources through careful environmental review at both the state and federal level.  Rhode

Island has a statutory responsibility to conserve, enhance, and properly utilize the state's

natural resources.  R.I. Gen. Laws § 10-20-1; *see also* R.I. Const. art. I, § 17.  Although Rhode

Island is the smallest state in land size, forests cover fifty-nine percent of its land area, with a

total of 393,000 acres.  It also has thousands of miles of freshwater streams, rivers, and lakes.

Rhode Island lists over twenty-five species as endangered species and expends significant

resources to protect and recover these species, some of which are not federally protected.

Rhode Island's natural resources generate millions of dollars in annual financial benefits to

state public schools, institutions, and municipal services.  They also generate millions of

dollars' worth of ecosystem services to surrounding communities by filtering drinking water,

purifying air, and providing space for recreation.  Rhode Island's natural areas generate

commercial and recreational opportunities that put hundreds of millions of dollars into the

Rhode Island economy annually.

79.     Rhode Island has over 400 miles of coastline and thousands of acres of federal

lands across three National Park Service affiliated sites, five national wildlife refuges,

numerous national monuments and historic sites, and numerous Department of Defense

locations, including Naval Station Newport and the Quonest Point Air National Guard Station.

Many of these federal lands abut Rhode Island's state-owned lands.  Rhode Island is also home

to two interstate highways and one international airport.  Federal agencies, including the U.S.

Navy and the Coast Guard, also routinely engage in activities in Rhode Island's coastal waters.

Major Federal actions concerning these lands, waters, projects, highways, airports, and other

federal facilities are subject to NEPA.

80.     Rhode Island state agencies, including the Department of Environmental

Management and the Coastal Resources Management Council (CRMC), the Department of

Transportation, and the Department of Health regularly engage in the federal NEPA process as

cooperating and commenting agencies or as agencies with special expertise highlighting

potential impacts to the state's natural resources and public health.  For example, CRMC and

the federal Bureau of Offshore Energy Management jointly worked on the NEPA process to

design the installation of a new offshore wind energy project, where rigorous environmental

review and meaningful public engagement led to a selected alternative that worked for state

and federal agencies, local governments, tribes, and the public, including the commercial

fishing industry.  Federal agency activities and actions requiring federal permits that affect

Rhode Island's coastal zone, water quality, wildlife, and cultural resources are subject to

NEPA and are also reviewed by state agencies for consistency and compliance with Rhode

Island's laws and programs.  In some situations, NEPA is the sole means for state agencies to

advocate for protection of Rhode Island's resources, including protection of state listed species

and other species of concern and their habitat, and to identify unintended consequences of a

proposed action.

81.     Plaintiff STATE OF VERMONT is a sovereign state in the United States of

America.  The State of Vermont brings this action through Attorney General Thomas J.

Donovan, Jr.  The Attorney General is authorized to represent the state in civil suits involving

the state's interests, when, in his judgment, the interests of the state so require.  3 V.S.A. Ch. 7.

82.     Vermont brings this action to protect its sovereign and proprietary interests,

including its interests in natural resources and infrastructure.  The state has ownership,

jurisdiction, and control of all wildlife of the state as trustee for the state's citizens.  10 V.S.A.

§ 4081(a)(1).  The state is also trustee for navigable waters, lakes, ponds, and groundwater

located within the state.  *Id.* §§ 1390(5), 1421; 29 V.S.A. § 401.  Vermont owns, manages and

maintains numerous state forests, parks, and wildlife management areas; buildings and other

infrastructure, including dams, roads, bridges, airports; and railroad, public transportation, bicycle, and pedestrian facilities.  Significant state-owned infrastructure is located in river valleys and is susceptible to damage or destruction by flooding caused by severe rainstorms, the severity and frequency of which is being exacerbated by climate change.

83.     The federal government owns nearly half a million acres of land in Vermont, comprising about eight percent of the state's total land area.  These lands include approximately 400,000 acres within the Green Mountain National Forest.  Located within a day's drive of seventy million people, the national forest is important to Vermont's economy, drawing three to four million visitors to Vermont each year for outdoor recreation, and provides habitat for rare and unique plants, fish, and birds.  Federally owned and managed lands in Vermont also include the Marsh Billings National Historic Park, the Silvia O. Conte National Fish and Wildlife Refuge, the Missiquoi National Wildlife Refuge, and approximately 150 miles of the Appalachian Trail.  Vermont is also home to National Guard installations, including the Vermont Air National Guard Base in South Burlington, at which F-35 fighter jets are based.  Low-income residents of surrounding communities are disproportionately impacted by high noise levels from F-35 training runs.  Two major interstate highways and numerous federal aid highways pass through Vermont.  The federal government also issues permits and provides grants and loans for various activities within the state, including Federal Emergency Management Administration disaster assistance grants for rehabilitation and improvement of state infrastructure.  Federal actions concerning these and other federal lands, facilities and programs are subject to NEPA.

84.     Vermont state agencies, including the Vermont Agency of Transportation and Vermont Agency of Natural Resources, regularly participate in federal NEPA proceedings to protect the State's interests.

85.     Plaintiff STATE OF WISCONSIN is a sovereign state of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the

chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests. *See* Wis. Stat. § 165.25(1m). The Attorney General's powers and duties include appearing for and representing the state, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." *Id.* § 165.25(1m).

86.     The State of Wisconsin has a sovereign interest in its natural resources and in ensuring the protection and conservation of those resources. The State of Wisconsin holds legal title to and is the custodian of all wild animals within Wisconsin and regulates them for conservation and use and enjoyment by the public. *Id.* § 29.011. The State of Wisconsin holds title to the navigable waters of the state in trust for the public and has a duty to protect and preserve those waters for the public for fishing, hunting, recreation, and enjoyment of scenic beauty. Wis. Const. art. IX, § 1; *Wis.'s Envtl. Decade, Inc. v. Dep't of Nat. Res.*, 85 Wis. 2d 518, 526 (1978). The State of Wisconsin has a sovereign interest in protecting its state resources through careful environmental review at both the state and federal level.

87.     Wisconsin is home to the Chequamegon-Nicolet National Forest, the Apostle Islands National Lakeshore, the Ice Age National Scenic Trail, the North Country National Scenic Trail, the Saint Croix National Scenic Riverway, nine federal wildlife refuges and wetland management districts, several Department of Defense facilities including Fort McCoy, five primary interstate highways and additional auxiliary federal highways, and several international airports. Major Federal actions concerning these lands, waters, projects, highways, airports, and other federal facilities are subject to NEPA.

88.     Wisconsin state agencies, including the Wisconsin Department of Natural Resources (WDNR), regularly engage in federal NEPA processes to protect the state's interest in public health, environmental quality, and state natural resources. These agencies have participated in the NEPA process as commenting and cooperating agencies. For example, the WDNR recently provided comments on an environmental assessment prepared by the U.S.

Army Corps of Engineers on the placement of dredged material in the upper Mississippi River and on an environmental impact statement prepared by the U.S. Airforce on the addition of F-35 fighter jets at the 115th Fighter Wing National Guard base in Madison, Wisconsin.  The WDNR is also serving as a cooperating agency for an environmental assessment with the National Park Service for a new segment of the Ice Age National Scenic Trail and for an environmental impact statement on a proposed bridge corridor over the Fox River in Brown County, Wisconsin.

89.     Plaintiff COMMONWEALTH OF MASSACHUSETTS brings this action by and through Attorney General Maura Healey, the chief legal officer of the Commonwealth, on behalf of the Commonwealth and its residents.  The Commonwealth has both sovereign and proprietary interests in the conservation and protection of its natural resources and the environment through comprehensive environmental review at both the state and federal level. *See* Mass. Const. Amend. art. 97; Mass. Gen. Laws, ch. 12, §§ 3, 11D.

90.     Federal agencies regularly undertake major actions subject to NEPA throughout Massachusetts, including operating federal land and facilities and permitting, licensing, and funding projects that affect the Commonwealth's natural resources.  Massachusetts is home to fifteen national parks, five national heritage areas, four wild and scenic rivers, and three national trails managed by the National Park Service and other federal agencies, including the Cape Cod National Seashore, which spans nearly forty miles of coastal land along the eastern shore of Cape Cod.  Six Department of Defense military bases, five interstate highways, eight auxiliary interstate highways, two nuclear legacy management sites, one international airport, approximately 1,000 miles of interstate transmission pipelines, and one international liquid natural gas terminal are located in Massachusetts.  At least twenty-five federally listed endangered or threatened species protected by the U.S. Fish and Wildlife Service or National Marine Fisheries Service are known to occur in Massachusetts.  Numerous federal agencies operate, license, or permit activities in Massachusetts waterways and off Massachusetts's more

1   than 1,500 miles of coastline, impacting Massachusetts fisheries, other valuable resources, and

2   maritime uses, which are critical to the health and economic vitality of the Commonwealth.

3        91.     Massachusetts agencies, including the Massachusetts Executive Office of

4   Energy and Environmental Affairs and its Department of Environmental Protection, Office of

5   Coastal Zone Management, and Division of Fisheries and Wildlife, as well as the

6   Massachusetts Department of Transportation and the Massachusetts Port Authority, engage in

7   the federal NEPA process as coordinating, cooperating, and commenting agencies with

8   specialized expertise to protect the state's interest in public health, environmental quality, and

9   state natural resources.  For example, following extensive community involvement and

10  collaboration between multiple state and federal agencies and the two impacted towns during

11  coordinated review under NEPA and the Massachusetts Environmental Policy Act (MEPA),

12  Mass. Gen. Laws, ch. 30, §§ 61–62I, the National Park Service adopted an alternative plan for

13  the Herring River Restoration on Cape Cod that will restore at least 346 acres of tidal marsh,

14  protect fish species harmed by existing impeded and degraded river conditions, and improve

15  fishing and shellfishing yields, among other significant benefits to the community and the

16  environment.  The pending coordinated NEPA and MEPA process for the I-90 Allston

17  highway project also has helped to convene a wide range of state and federal agencies and

18  stakeholder groups to explore and assess alternatives that minimize impacts to important

19  natural resources in and along the Charles River.

20       92.     Massachusetts state agencies also review federal agency actions subject to

21  NEPA, including permits, that affect Massachusetts's natural resources for consistency and

22  compliance with Massachusetts laws and policies.  *See*, *e.g.*, 301 Mass. Code Regs. § 20.04

23  (procedures for consistency determinations under Federal Coastal Zone Management Act,

24  16 U.S.C. § 1456).

25       93.     Plaintiff COMMONWEALTH OF PENNSYLVANIA brings this action by and

26  through Attorney General Josh Shapiro.  The Attorney General is the chief law officer of the

Commonwealth of Pennsylvania and has authority to represent the Commonwealth and all Commonwealth agencies in any civil action brought by the Commonwealth. Pa. Const. art. IV, § 4; *Cmwlth. Attorneys Act,* 71 P.S. § 732-204(c). The Commonwealth brings this action on its own behalf.

94.     This action is brought pursuant to the Commonwealth's sovereign interests and its trustee obligations to protect Pennsylvania's public natural resources from degradation. The Commonwealth of Pennsylvania has a sovereign interest in its public natural resources, which are the common property of all the people, including generations yet to come. Pa. Const. art. I, § 27. The Pennsylvania Constitution protects every Pennsylvanian's "right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment." *Id.*, § 27. The Commonwealth, as trustee, must conserve and maintain public natural resources for the benefit of all the people. *Robinson Twp. v. Pennsylvania*, 83 A.3d 901, 955–956 (Pa. 2013).

95.     Pennsylvania's public natural resources include 83,184 miles of streams and rivers in the Ohio, Genesee, Potomac, Susquehanna, Lake Erie and Delaware River watersheds, more than 4,000 lakes, reservoirs and ponds, 120 miles of coastal waters in the Lake Erie and Delaware Estuary coastal zones and abundant groundwater resources. Pennsylvania's state forest system comprises 2.2 million acres of forestland in forty-eight of Pennsylvania's sixty-seven counties. Federal actions and activities that propose impacts to the Commonwealth's public natural resources are subject to NEPA. Commonwealth agencies review these actions to ensure the Commonwealth's public natural resources are protected.

96.     Pennsylvania agencies, including without limit the Department of Environmental Protection, the Department of Conservation and Natural Resources, and the Department of Transportation, engage in the federal NEPA process. Pennsylvania is home to large-scale pipeline projects subject to NEPA. Commonwealth agencies closely review and comment on these NEPA analyses and utilize these analyses to support state decision making.

Also, Pennsylvania is home to several federal military installations, including those located at the Harrisburg International Airport, the U.S. Army War College and Carlisle Barracks Army Base, New Cumberland Army Depot, Letterkenny Army Depot, the Mechanicsburg Naval Depot, and the Willow Grove Naval Air Station Joint Reserve Base.  Commonwealth agencies review the actions at these facilities to ensure the Commonwealth's public natural resources are protected.

97.     Plaintiff TERRITORY OF GUAM brings this action by and through Attorney General Leevin Taitano Camacho.  The Attorney General is the chief legal officer of the Government of Guam.  48 U.S.C. § 1421g(d)(1).  This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring an action on behalf of Guam. 5 GCA § 30103.

98.     Guam has a sovereign interest in its natural resources, which run two hundred nautical miles seaward from its low-water line.  Guam is the sovereign and proprietary owner of all surface water and ground water within its territory, which it holds in trust for the people of Guam, 12 GCA § 14505, and has a statutory responsibility to conserve, enhance, and properly utilize its natural resources.  5 GCA § 63502.

99.     The United States Department of Defense has over fifty military installations in Guam and controls over twenty-five percent of the island.  Federal agencies, including the United States Army, Air Force, Navy, Marine Corps, and the Coast Guard, routinely engage in military exercises in Guam.  These exercises, along with other major Federal actions concerning Guam's land, water, and air, are subject to NEPA.

100.    Over the last decade, there have been several federal actions proposed primarily by the Department of Defense in the Marianas, which have had significant environmental impacts on Guam, including the destruction of hundreds of acres of limestone forest that serve as a habitat for numerous endangered species and the planned construction and operation of a live-fire training range complex over Guam's aquifer.  These projects include the Guam and

CNMI Military Relocation Environmental Impact Statement and Supplemental EIS, the Marianas Islands Range Complex EIS, the Mariana Islands Training and Testing EIS, and the Divert Activities and Exercises EIS.  Guam agencies, including the Guam Bureau of Statistics and Plans, Guam Environmental Protection Agency, Guam Waterworks Authority, Guam Department of Agriculture and Guam Department of Public Health and Social Services have and continue to engage in the federal NEPA process to protect Guam's interest in public health, environmental quality, and natural resources.

101.    Plaintiff DISTRICT OF COLUMBIA (the District) is a municipal corporation and is the local government for the territory constituting the permanent seat of government of the United States.  The District is represented by and through its chief legal officer the Attorney General for the District of Columbia.  The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest.  D.C. Code § 1-301.81(a)(1).

102.    As the seat of the nation's capital, the District is uniquely impacted by environmental review on federal actions and projects.  The federal government owns one-third of the land in the District, eighty-five percent of the District's shoreline, and owns the riverbed of the District's two major rivers, the Potomac and Anacostia.  Almost ninety percent of the city's parkland—more than 6,900 acres including Rock Creek Park, the National Mall, Anacostia Park and the Fort Circle Parks—is part of the National Park System.  With the federal government owning or managing federal offices, land, and water resources in the District of Columbia, federal government decisions relating to the environmental impact of projects related to these buildings, land, and resources substantially impacts the District's environment and the public health of its residents.

103.    Under the District's Environmental Policy Act and its implementing regulations, District agencies evaluate environmental impacts through review and analysis of environmental impact screening forms.  This review determines whether the District is to

perform an environmental impact statement because a major action is likely to have substantial negative impact on the environment, if implemented.  However, this analysis is not required when an environmental analysis has been performed in accordance with NEPA.  Thus, when a federal agency does not perform an environmental review under NEPA, the District will perform the analysis to ensure that negative environmental and public health impacts are mitigated.

104.    Plaintiff HARRIS COUNTY, TEXAS is a local subdivision of the State of Texas.  Harris County brings this action to protect its citizens and governmental and proprietary interests, which include parks and greenway spaces.  Harris County is represented by the Harris County Attorney, an elected official and chief legal officer for Harris County.  Harris County is the third largest county in the United States, home to more than four million residents spread over 1,777 square miles, and is the energy capital of the world.

105.    Harris County is often impacted by federal actions subject to NEPA review and has submitted comments and participated in the NEPA process on a range of matters including the Keystone XL Pipeline and the Texas Coastal Study.

106.    Plaintiff CITY OF NEW YORK, a municipal subdivision of the State of New York, brings this action on its own behalf to protect its governmental and proprietary interests, which include more than 30,000 acres of parks and beaches, 2.6 million trees, 520 linear miles of waterfront property, and the nation's largest unfiltered water supply system with a watershed of over one million acres, which provides more than one billion gallons of drinking water daily from nineteen reservoirs to more than nine million residents of the City and State of New York.

107.    Federally funded or permitted actions that affect New York City's environment are subject to the federal NEPA environmental review process.  New York City agencies and authorities regularly rely on NEPA analyses to support local decision making.  In particular, pursuant to the New York State Environmental Quality Review Act (SEQRA) and New York

City Environmental Quality Review (CEQR) regulations, city agencies may rely on a federal EIS if it is sufficient for the City agency to make its findings under SEQRA/CEQR.  Similarly, a federal Environmental Assessment/Finding of No Significant Impact may serve as the basis for a city agency to issue a negative declaration under SEQRA/CEQR.  In addition, the New York City Department of Housing Preservation and New York City Mayor's Office of Management and Budget have assumed NEPA responsibilities from the U.S. Department of Housing and Urban Development (HUD) when utilizing HUD's housing grant programs and managing allocations of HUD's Community Development Block Grant Disaster Recovery and National Disaster Resilience programs, and are thus responsible for complying with HUD's NEPA regulations that will be revised under the Final Rule.

**B.    Defendants**

108.    Defendant CEQ is an agency of the federal government created by NEPA.  CEQ is responsible for guiding NEPA's implementation and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

109.    Defendant Mary B. Neumayr is the Chairman of CEQ and is sued in her official capacity.  Ms. Neumayr is the official responsible for implementing and fulfilling CEQ's duties, including promulgating the Final Rule, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

**V.    STATUTORY AND REGULATORY BACKGROUND**

**A.    Administrative Procedure Act**

110.    The APA, 5 U.S.C. §§ 551–559, governs the procedural requirements for federal agency decision making, including the agency rulemaking process.  Under the APA, a "reviewing court shall … hold unlawful and set aside" federal agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* § 706(2).  An agency action is

arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*).  An agency does not have authority to adopt a regulation that is "plainly contrary to the statute." *United States v. Morton,* 467 U.S. 822, 833 (1984); *see also* 5 U.S.C. § 706(2)(C).

111.     "Agencies are free to change their existing policies," but they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005)); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) ("when an agency rescinds a prior policy its reasoned analysis must consider the 'alterative[s]' that are within the ambit of the existing [policy]") (citations omitted).  An agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy," "or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

112.     Prior to promulgating a rule, agencies must engage in a public notice-and-comment process.  5 U.S.C. §§ 551(5), 553.  Agencies must afford public notice of specific regulatory changes and their reasoned basis to provide the public an opportunity for meaningful comment, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977), including the "technical studies and data that [the agency] has employed in reaching the decision[] to propose particular rules." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076

(9th Cir. 2006).  The agency must consider and respond to all significant comments it receives. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

**B.      National Environmental Policy Act**

113.     NEPA is often referred to as the "Magna Carta" of U.S. environmental law. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193 (D.C. Cir. 1991).

114.     Congress developed NEPA at a time of heightened awareness and growing concern about the environment, amid a series of high-profile environmental crises in the late 1960s.  The national perspective was shifting from "preoccupation with the extraction of natural resources to the more compelling problems of deterioration in natural systems of air, land, and water."  S. Comm. on Interior & Insular Affairs and H.R. Comm. on Science and Astronautics, 90th Congress, *Congressional White Paper on a National Policy for the Environment*, at 1 (Oct. 1968).

115.     Congress recognized that "[o]ur national resources—our air, water, and land—are not unlimited," and as a country, "[w]e no longer have the margins for error that we once enjoyed." S. Rep. No. 91-296, at 5 (1969).  A comprehensive national environmental policy would disrupt the current practice of establishing policy "by default and inaction" where "[e]nvironmental problems are only dealt with when they reach crisis proportions.  Public desires and aspirations are seldom consulted.  Important decisions concerning the use and the shape of [humans'] future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."  *Id.*

116.     NEPA thus declares an overarching national policy to "use all practicable means and measures … to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic and other requirements of present and future generations of Americans."  42 U.S.C. § 4331(a).

117. Cooperation with states and local governments and other concerned public and private organizations is an essential component of this policy. *Id.* §§ 4331(a), 4332(G).

118. NEPA further emphasizes that in carrying out these policies, the federal government has a continuing responsibility "to use all practicable means … to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may," among other things "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." *Id.* § 4331(b).

119. To ensure that these policies are "integrated into the very process of agency decision making," NEPA outlines "action-forcing" procedures, *Andrus*, 442 U.S. at 349–50, that require federal agencies "to the fullest extent possible," to prepare a detailed environmental review or EIS for legislation or other "major Federal actions significantly affecting the quality of the human environment." *Id.* §§ 4332, 4332(2)(C).

120. An EIS must evaluate, among other things, all of the environmental impacts of the proposed federal action, any adverse and unavoidable environmental effects, alternatives to the proposed action, the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitment of resources involved in the proposed action. *Id.* § 4332(2)(C).

121. For proposed actions involving unresolved conflicts about alternative uses of available resources, NEPA further directs that federal agencies should "study, develop, and describe appropriate alternatives" to the proposed action. *Id.* § 4332(E).

122. NEPA also requires federal agencies to work in concert with states, local governments, institutions, organizations, and individuals by making available "advice and

information useful in restoring, maintaining, and enhancing the quality of the environment."
42 U.S.C. § 4332(G).

123.    In short, NEPA directs federal agencies to make well-informed and transparent decisions based on a thorough review of environmental and public health impacts and meaningful input from states, local governments, and the public.

124.    In NEPA, Congress also created CEQ and directed it to appraise federal programs and activities in light of NEPA's overarching policies:  "to be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment." *Id.* § 4342.  CEQ has the statutory duty to take actions consistent with NEPA's policies of environmental protection and informed decision making.

125.    Many State Plaintiffs have adopted their own state environmental policy acts modeled on NEPA.  These include the California Environmental Quality Act, Cal. Pub. Res. Code § 21000–21189.57, Washington's State Environmental Policy Act, Wash. Rev. Code. ch. 43.21C, New York's State Environmental Quality Review Act, N.Y. Envtl. Conserv. L. art. 8; 6 N.Y. Comp. Codes R. & Regs. Part 617; the Massachusetts Environmental Policy Act, Mass. Gen. Laws, ch. 30, §§ 61-62I; and the District of Columbia's Environmental Policy Act, D.C. Code § 8-109.01–109.12, and 20 D.C. Mun. Regs. § 7200–7299.  These state statutes (or little NEPAs) require detailed environmental review for certain state agency and local government actions.  Where an action subject to state environmental review also requires NEPA review, state and local agencies can often comply with little NEPAs by adopting or incorporating by reference certain environmental documents prepared under NEPA, but only if those NEPA documents meet state statutory requirements. *See, e.g.*, 6 N.Y. Comp. Codes R. & Regs. § 617.15; Mass. Gen. Laws, ch. 30, § 62G.

126.    CEQ and several states worked together to harmonize the environmental review processes under NEPA and little NEPAs through state-specific memoranda. *See, e.g.*, CEQ,

*States and Local Jurisdictions with NEPA-Like Environmental Planning Requirements*, https://ceq.doe.gov/laws-regulations/states.html.  This collaboration has long allowed state, local, and federal agencies to share documents, reduce paperwork, and efficiently allocate limited time and resources.  States rely on this collaboration and the effectiveness of federal NEPA documents under the 1978 regulations to allocate state resources and determine staffing needs.

**C.    CEQ's 1978 NEPA Regulations**

127.    In 1977, President Carter issued Executive Order 11,991 directing CEQ to issue regulations to guide federal agency implementation of NEPA.  *Relating to Protection and Enhancement of Environmental Quality*, Exec. Order No. 11,991, 42 Fed. Reg. 26,967 (May 24, 1977) (amending in part Executive Order No. 11,514).

128.    Before proposing the implementing regulations, CEQ conducted extensive outreach, soliciting "the views of almost 12,000 private organizations, individuals, state and local agencies, and Federal agencies," held public hearings, and considered studies of the environmental impact statement process.  NEPA—Regulations, Implementation of Procedural Provisions, 43 Fed. Reg. 55,978, 55,980 (Nov. 29, 1978).

129.    CEQ also prepared an environmental assessment (EA) of its proposed implementing regulations, in compliance with NEPA.  Proposed Implementation of Procedural Provisions, 43 Fed. Reg. 25230, 25232 (May 31, 1978).

130.    In 1978, CEQ finalized a comprehensive set of regulations implementing the "action-forcing" elements of NEPA "to tell federal agencies what they must do to comply with the procedures and achieve the goals of" the statute.  40 C.F.R. § 1500.1(a) (1978).

131.    The 1978 regulations emphasize NEPA's role as "our basic national charter for protection of the environment" and explained that "[t]he NEPA process is intended to help public officials make decisions that are based on understanding of environmental

1    consequences, and take actions that protect, restore, and enhance the environment." *Id.*

2    § 1500.1(c) (1978).

3        132.    The 1978 regulations also emphasize transparency in government decision

4    making by ensuring agencies provide information to the public before "decisions are made and

5    before actions are taken." *Id.* § 1500.1(b) (1978).

6        133.    The 1978 regulations direct agencies to "[e]ncourage and facilitate public

7    involvement in decisions which affect the quality of the human environment," *id.* § 1500.2(d)

8    (1978), allowing states, private organizations, and individuals to inform and influence agency

9    decision making by commenting on proposed agency actions, *id*. § 1503.1(a)(4) (1978).

10       134.    Until the promulgation of the Final Rule, CEQ's 1978 regulations remained

11   largely unchanged with the exception of two minor amendments.  First, in 1986, CEQ removed

12   a requirement that agencies analyze the extent of environmental impacts in a hypothetical

13   "worst case scenario."  NEPA Regulations, Incomplete or Unavailable Information, 51 Fed.

14   Reg. 15,618 (May 27, 1986) (amending 40 C.F.R. § 1502.22).  CEQ prepared an EA for its

15   substantive change to the regulations in 1986 and concluded that the amendment would not

16   have a significant environmental impact.  *Id.* at 15,619.  Then in 2005, CEQ made a minor

17   amendment to the EIS filing requirements.  Other Requirements of NEPA, 70 Fed. Reg. 41,148

18   (July 18, 2005).

19       135.    CEQ has issued numerous guidance documents on NEPA and its 1978

20   regulations on which states and other stakeholders have relied.  *See e.g.*, *Final Guidance for*

21   *Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the*

22   *Effects of Climate Change in National Environmental Policy Act Reviews*, 81 Fed. Reg. 51,866

23   (Aug. 5, 2016), *withdrawn* 82 Fed. Reg. at 16,576 (Apr. 5, 2017); *Memorandum for Heads of*

24   *Federal Departments and Agencies: Establishing, Applying, and Revising Categorical*

25   *Exclusions under the National Environmental Policy Act* (Nov. 23, 2010); *A Citizen's Guide to*

26

1     the *NEPA: Having Your Voice Heard* (Dec. 2007); *Forty Most Asked Questions Concerning*

2     *CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (Mar. 23, 1982).

3         136.    Additionally, CEQ's Environmental Justice Guidance provides useful direction

4     for agency consideration of environmental justice impacts during the NEPA review process.

5     CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act*

6     (Dec. 10, 1997).  The Environmental Protection Agency (EPA) defines environmental justice

7     as "the fair treatment and meaningful involvement of all people regardless of race, color,

8     national origin, or income with respect to the development, implementation, and enforcement

9     of environmental laws, regulations, and policies."  EPA, Environmental Justice:

10    https://www.epa.gov/environmentaljustice.  CEQ's guidance builds on Executive Order

11    12,898, which directs federal agencies to identify and address the disproportionately high and

12    adverse human health or environmental effects of their actions on minority and low-income

13    populations, to the greatest extent practicable and permitted by law.  Exec. Order No. 12,898,

14    59 Fed. Reg. 7,629 (1994) (as amended).

15         137.    The Presidential Memorandum issued with Executive Order 12,898 further

16    directs federal agencies to analyze under NEPA "the environmental effects, including human

17    health, economic and social effects, of Federal actions, including effects on minority

18    communities and low income communities" and to provide opportunities for community input

19    in the NEPA process, including through "identifying potential effects and mitigation measures

20    in consultation with affected communities …."  White House, *Memorandum for the Heads of*

21    *All Departments and Agencies: Executive Order on Federal Action to Address Environmental*

22    *Justice in Minority Populations and Low-Income Populations* (Feb. 11, 1994).

23         138.    CEQ's Environmental Justice Guidance explains that agencies should consider

24    environmental justice impacts as part of their obligation to consider "both impacts on the

25    natural or physical environment and related social, cultural, and economic impacts."  CEQ,

26    *Environmental Justice*, at 8 (citing 40 C.F.R. § 1508.14).  Agencies should consider these

impacts while analyzing the affected area, considering cumulative effects, and developing public participation strategies. *Id*. at 8–9. CEQ further explained that identification of disproportionately high and adverse human health or environmental effects on low-income, minority, or Tribal populations "should heighten agency attention to alternatives …, mitigation strategies, monitoring needs, and preferences expressed by the affected community." *Id*. at 10.

139.  CEQ has also issued a number of studies documenting NEPA's effectiveness. *See, e.g.*, CEQ, *National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years* (Jan. 1997); NEPA Task Force, *Modernizing NEPA Implementation* (Sept. 2003); CEQ, *Examples of Benefits from the NEPA Process for ARRA Funded Activities* (May 2011). For example, in its NEPA Effectiveness Study, a twenty-five year review of NEPA's implementation, CEQ emphasized that "NEPA is a success—it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute." CEQ, *National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years*, at iii (Jan. 1997).

140.  The courts, including the Ninth Circuit, have developed a robust body of case law applying and interpreting NEPA and CEQ's 1978 regulations, providing direction to agencies on how to comply with both CEQ's regulations and the statute. *See, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351–52 (1989); *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004).

141.  NEPA, the 1978 regulations, and CEQ's subsequent guidance have promoted more environmentally protective and transparent agency decisions, while not imposing overly burdensome requirements. In 2014, the Government Accountability Office concluded that the NEPA process "ultimately saves time and reduces overall project costs by identifying and avoiding problems that may occur in later stages of project development." U.S. Gov't Account. Office, *National Environmental Policy Act: Little Information Exists on NEPA*

*Analyses*, 17 (Apr. 2014).  Similarly, U.S. Forest Service officials have observed that "NEPA leads to better decisions."  *Id.*

**D.     The Proposed Rule**

142.    Despite the documented success of the 1978 regulations and reliance by states and the public on NEPA's procedures to protect the environment and public health, CEQ released an Advance Notice of Proposed Rulemaking on June 20, 2018, announcing CEQ's plan to overhaul the 1978 regulations and including a vague list of topics that the rulemaking might address.  Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 83 Fed. Reg. 28,591 (June 20, 2018) (Advance Notice). CEQ issued this proposal in response to President Trump's Executive Order 13,807, which called for revisions to the NEPA regulations, purportedly to expedite infrastructure projects and boost the economy.  Establishing Discipline and Accountability in the Environmental Review and Permitting Process, Exec. Order 13,807, 82 Fed. Reg. 40,463 (Aug. 15, 2017).

143.    CEQ allowed only sixty days for public comment on the Advance Notice.  Most State Plaintiffs submitted comments stating that CEQ had not demonstrated a need for substantial revisions and opposing any revisions that would threaten NEPA's fundamental values of environmental protection and informed decision making.

144.    On January 10, 2020, CEQ released its proposal to significantly revise the 1978 regulations.  85 Fed. Reg. 1,684 (Jan. 10, 2020).

145.    The Proposed Rule included numerous revisions to the 1978 regulations that undermine NEPA's environmental and informed decision making purposes.  For example, the Proposed Rule included regulatory changes to remove numerous agency actions from NEPA's reach, narrow the scope of environmental reviews that do occur, limit public participation, and restrict judicial review for those harmed by agency failure to comply with NEPA.

146.    After publication of the Proposed Rule, CEQ again provided just sixty days for the public to review, analyze, and submit comments on this far-reaching overhaul of its

longstanding regulations, and hosted only two public hearings on the Proposed Rule. Numerous commenters, including representatives from several State Plaintiffs, were not able to reserve a spot to speak at the hearings due to a limited number of speaking slots. Although CEQ received requests from State Plaintiffs, members of Congress, and others for more time to comment and for additional public hearings on the complex and wide-ranging Proposed Rule, CEQ closed the comment period without providing additional hearings or extending the comment period.

147.     Despite this short timeframe, interested parties submitted over 1.1 million comments, the vast majority of which strongly opposed CEQ's Proposed Rule. Most State Plaintiffs submitted detailed comments stating that CEQ's Proposed Rule was unlawful, unreasonable, and unjustified and should be withdrawn. In addition to these comments, many State Plaintiff elected officials and agencies submitted comments expressing concern about CEQ's proposed changes and urging CEQ to withdraw the Proposed Rule. *See, e.g.*, Letter from Washington State Governor Jay Inslee to Mary Neumayr, re Proposed Rule (Mar. 10, 2020) (enclosing comments from seven state agencies and offices opposing the Proposed Rule); Letter from California Governor Gavin Newsom to Edward A. Boling, re Proposed Rule (Mar. 10, 2020).

**E.     The Final Rule**

148.     Just four months after the close of the comment period, President Trump announced the release of the Final Rule on July 15, 2020. The Final Rule was published in the Federal Register the following day. The Final Rule largely adopts the Proposed Rule's unlawful, unjustified, and sweeping revisions to the 1978 Regulations.

149.     CEQ claimed that the Final Rule "advance[s] the original goals of the CEQ regulations to reduce paperwork and delays and promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA," Final Rule, 85 Fed. Reg. at

43,306.  But the Final Rule will do just the opposite—leading to increased confusion and litigation and decisions inconsistent with NEPA's text and purpose.

150.    The Final Rule makes substantial and unsupported revisions to the 1978 regulations, ignores reliance interests on those longstanding regulations, lacks a rational justification, and undermines NEPA's goals of environmental protection, public participation, and informed decision making.  Among other things, the Final Rule arbitrarily and unlawfully:

a.    Deletes language from the 1978 regulations directing federal agencies to comply with "the letter and spirit" of NEPA's "action-forcing" provisions, *compare* 40 C.F.R. § 1500.1(a) (1978), *with* Final Rule, 85 Fed. Reg. at 43,358 (to be codified at § 1500.1(a));

b.    Deletes language from the 1978 regulations stating that NEPA "is our basic national charter for protection of the environment" and that "[t]he NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment," *compare* 40 C.F.R. § 1500.1(a), (c) (1978), *with* Final Rule, 85 Fed. Reg. at 43,357–58 (to be codified at § 1500.1);

c.    Deletes language from the 1978 regulations that federal agencies should "to the fullest extent possible … [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment" and "[u]se all practicable means … to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their action upon the quality of the human environment," *compare* 40 C.F.R. § 1500.2 (1978), *with* Final Rule, 85 Fed. Reg. at 43,317, 43,358 (removing and reserving § 1500.2);

d.    Prohibits federal agencies from adopting NEPA regulations that are more stringent than CEQ's Final Rule, 85 Fed. Reg. at 43,373 (to be codified at § 1507.3(a), (b));

e.      Preemptively concludes that all categorical exclusions (*i.e.*, actions that federal agencies have determined will not have a significant environmental impact), effective by September 14, 2020, comply with the Final Rule, *id.* at 43,373 (to be codified at § 1507.3(a));

f.      Establishes six "NEPA Thresholds" that will allow federal agencies to avoid any environmental review of certain proposed actions, *id.* at 43,359 (to be codified at § 1501.1);

g.      Separates the definition of "major Federal action" from an action's significance and narrows the definition to exclude an agency's failure to act as well as actions that are not "subject to" an undefined amount of "Federal control and responsibility" and actions that are extraterritorial, non-discretionary, have minimal federal funding or minimal federal involvement, or receive certain federal loans, *id.* at 43,375 (to be codified at § 1508.1(q));

h.      Allows federal agencies to rely on unspecified procedures and documentation prepared under other statutory or Executive Order requirements to avoid conducting environmental review, *id.* at 43,359, 43,372–73 (to be codified at 40 C.F.R. §§ 1501.1, 1506.9, 1507.3);

i.      Authorizes federal agencies to determine that other statutes or directives conflict with NEPA and thus excuse agencies from NEPA review, *id.* at 43,359, 43,373, 43,374 (to be codified at §§ 1501.1(a)(2), (a)(3), 1507.3(d)(2));

j.      Revises the analysis of an agency action's "significance," to (i) diminish the scope of actions that will require more detailed environmental review, (ii) remove a prohibition on improperly segmenting a project to avoid analyzing its collective significant impacts, and (iii) eliminate review of important concerns like an action's public health impacts, cumulative effects, effects on threatened and endangered species and their habitat, and proximity to historic or cultural resources, park lands, farmlands, wetlands, wild and scenic

1   rivers, or ecologically critical areas, 85 Fed. Reg. at 43,360 (to be codified at 40 C.F.R.

2   § 1501.3(b));

3          k.      Expands the use of categorical exclusions by adopting a new vague

4   definition that removes consideration of cumulative impacts and allows for use of categorical

5   exclusions in situations with extraordinary circumstances (*i.e.*, circumstances in which a

6   normally excluded action may have a significant effect and would formerly have required

7   preparation of an EA or EIS), *id.* at 43,360 (to be codified at § 1501.4);

8          l.      Allows certain actions to proceed during NEPA review, potentially

9   limiting the range of alternatives that could be considered during environmental review despite

10  NEPA's direction that environmental review occur before agencies take action, *id.* at 43,370

11  (to be codified at § 1506.1);

12         m.      Limits the number of alternatives to the proposed action analyzed in an

13  EA or EIS and the depth of that analysis by, among other things, removing the requirement that

14  agencies "[r]igorously explore and objectively evaluate" all reasonable alternatives to the

15  proposed action, eliminating consideration of alternatives outside the jurisdiction of the lead

16  agency, and removing the requirement that agencies "[d]evote substantial treatment to each

17  alternative," *id.* at 43,365 (to be codified at § 1502.14);

18         n.      Narrows the scope of effects agencies are required to evaluate, imposes

19  strict causation requirements for determining which environmental effects should be

20  considered, and directs agencies not to consider cumulative and indirect effects, all of which

21  will limit review of environmental justice and climate change impacts, among others, *id.* at

22  43,360, 43,365–66, 43,375 (to be codified at §§ 1501.3(b), 1502.15, 1508.1(g), (m));

23         o.      Reduces agencies' obligations to obtain additional information about

24  environmental impacts when such information is not immediately available and further allows

25  agencies to refuse to consider certain scientific evidence if the agency determines it is not a

26  "reliable data source," *id.* at 43,366–67 (to be codified at §§ 1502.21, 1502.23);

1           p.       Allows project proponents with potential conflicts of interest to prepare

2 the EIS as long as conflicts are disclosed to the federal agency (but not the public), 85 Fed.

3 Reg. at 43,371 (to be codified at § 1506.5(b)(4));

4           q.       Imposes unreasonable and unworkable time and page limits for EAs and

5 EISs, *id*. at 43,360, 43,362–64 (to be codified at §§ 1501.5(f), 1501.10(b), 1502.7);

6           r.       Limits public participation in the NEPA process by striking key

7 provisions emphasizing the importance of public participation and eliminating the requirement

8 that a draft EIS circulated for public comment satisfy NEPA's standards to the fullest extent

9 possible, *id.* at 43,364–65 (to be codified at § 1502.9);

10           s.       Places an undue burden on the public to analyze environmental issues

11 and to meet a vague standard of specificity and detail and imposes burdensome exhaustion

12 requirements on commenters, *id*. at, 43,358, 43,367–68 (to be codified at §§ 1500.3(b)(3),

13 1503.3);

14           t.       Reduces agencies' obligation to consider and respond to public

15 comments, *id*. at 43,366, 43,368–69 (to be codified at §§ 1502.17, 1505.2(b), 1503.4);

16           u.       Permits agencies to claim a presumption that they have adequately

17 considered all public comments on an EIS, *id*. at 43,369 (to be codified at § 1505.2(b)); and

18           v.       Seeks to limit judicial review of agency NEPA compliance by

19 attempting to restrict remedies parties injured by deficient NEPA review can secure through

20 litigation and promoting unlawful bond requirements, 85 Fed. Reg. at 43,358 (to be codified at

21 § 1500.3(c), (d)).

22       151.    NEPA Review.   CEQ did not conduct any environmental review before issuing

23 the Proposed Rule or Final Rule.   Instead, CEQ asserted without adequate explanation that a

24 NEPA review was not required because the regulations are procedural and "apply generally to

25 Federal actions affecting the environment."   *Id.* at 43,353–54.   CEQ then claimed that even if it

26 were to conduct an EA, it likely would result in a Finding of No Significant Impact, citing its

cursory analysis of environmental impacts in the Final Rule's Regulatory Impact Analysis (RIA). *Id*. But the RIA analysis of environmental impacts, which consists of only two pages and a short appendix, does not meet requirements for an EA or an EIS and summarily concludes that the Final Rule will have no adverse environmental impacts. RIA at 10–11; App'x. A. The RIA does not analyze alternative actions, and it ignores environmental impacts of the Final Rule, including climate change and environmental justice impacts. Moreover, despite relying on the RIA to justify its conclusions of NEPA compliance in the Final Rule, CEQ did not make the RIA available for public review and comment.

152.   Environmental Justice. CEQ also did not adequately review environmental justice impacts from the Final Rule as required by Executive Order 12,898. Instead, in the Final Rule, CEQ concluded without rational explanation or support, and again relying on the inadequate RIA, that the Final Rule will "not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations." Final Rule, 85 Fed. Reg. at 43,356–57.

153.   The Final Rule will become effective on September 14, 2020. *Id*. at 43,372 (to be codified at § 1506.13). At that time, CEQ's existing guidance documents that are inconsistent with the regulatory changes will effectively be withdrawn. *Id*. at 43,371 (to be codified at § 1506.7).

154.   Federal agencies may apply the Final Rule to ongoing activities and environmental documents begun before the effective date. *Id*. at 43,372-73 (to be codified at § 1506.13). As a result, federal agencies may apply the revised regulations to NEPA reviews currently in progress, including reviews impacting State Plaintiffs.

155.   Federal agencies are also required to amend their NEPA regulations to conform to the Final Rule. *Id*. at 43,373 (to be codified at § 1507.3(b)).

156.   The Final Rule is unlawful and violates NEPA and the APA, because: (i) the Final Rule is contrary to NEPA's text and purpose; (ii) CEQ failed to provide a rational

explanation for the Final Rule's numerous changes in policy and interpretation; (iii) CEQ exceeded its statutory authority with certain revisions in the Final Rule; (iv) CEQ violated notice-and-comment requirements; and (v) CEQ failed to analyze the Final Rule's significant environmental impacts or consider reasonable alternatives to the Final Rule, as required by NEPA.  For these reasons, the Final Rule is arbitrary, capricious, and contrary to law, was promulgated in excess of statutory authority and without observance of procedure required by law, and should be vacated.

## VI.   THE FINAL RULE WILL HARM STATE PLAINTIFFS

157.   State Plaintiffs' unique, concrete, and particularized interests will be harmed by CEQ's Final Rule, which undermines and weakens key NEPA requirements.  A judgment vacating the Final Rule and reinstating the 1978 regulations and associated guidance would redress these harms.

158.   As the Supreme Court has recognized, State Plaintiffs are entitled to "special solicitude" in seeking to remedy environmental harms.  *Massachusetts v. EPA,* 549 U.S. 497 519–22 (2007).  State Plaintiffs have a concrete proprietary and sovereign interest in preventing harm to their natural resources, including their state-owned and state-regulated water, air, coastlines, public lands, and wildlife, as a result of fewer and less robust federal environmental reviews and diminished public participation.

159.   Many federal actions, including those actions subject to NEPA, impact state-owned and/or state-regulated resources.  Federal agencies routinely conduct major Federal actions within and near our states and territories, including those related to federal land management, infrastructure projects, energy projects, water management, national defense and military training, and interstate transportation projects.  Federal lands can encompass large-scale and important ecosystems that help to support biodiversity.  Among other things, the Final Rule will increase the number of federal actions that avoid environmental review and diminish the scope of NEPA reviews that do occur.  These changes will limit opportunities

through the NEPA process to develop alternatives or other solutions that avoid or mitigate adverse impacts to state and territorial natural resources (including water, air, coastlines, public lands, and wildlife) and public health.  As a result, the Final Rule will cause unmitigated adverse impacts to public health and to state and territorial natural resources (including water, air, coastlines, public lands, and wildlife).

160.    In particular, federal agencies will no longer properly analyze and mitigate climate change risk and impacts under the Final Rule.  Climate change impacts have already harmed and are continuing to harm state and territorial sovereign lands and coastal areas, state and territorial natural resources, state and territorial infrastructure, and the health and safety of state and territorial residents resulting in economic losses for State Plaintiffs.  State Plaintiffs are already committing significant resources to reduce their own greenhouse gas (GHG) emissions and investing in infrastructure to protect communities and state resources from the impacts of climate change.  The Final Rule, however, reduces the number of federal actions that will be subject to NEPA review.  For those projects that do require NEPA review, the Final Rule eliminates consideration of cumulative impacts, including a project's reasonably foreseeable upstream and downstream GHG emissions and the impact of those emissions on climate change.  Both of these changes will reduce federal agency understanding of an action's potential harms.  Without such information, federal agencies will not engage in efforts to avoid or mitigate harms from GHG emissions and associated climate change, which will exacerbate climate change impacts in our states and territories, diminish our states' understanding of the actions contributing to those impacts, and cause states and territories economic harm.

161.    Eliminating consideration of climate impacts will also place an increased burden on efforts by State Plaintiffs to study and abate harms from climate change.  For example, the Final Rule's elimination of climate change considerations will make it more challenging for New York to assess GHGs from projects subject to NEPA review where those GHGs are generated outside New York but are associated with electricity generation or fossil

fuel transportation in New York.  Under New York's Climate Leadership and Community Protection Act, Chapter 106 of the Laws of 2019 (Climate Act), which requires significant statewide emission reductions by set dates, such out-of-state emissions contribute to statewide GHG emissions.  N.Y. Envtl. Conserv. L. § 75-0107(1).  New York thus may need to implement additional and potentially costly regulatory, policy, or other actions to ensure the achievement of the requirements of the Climate Act.  By decreasing the quality of analysis and potential mitigation for GHG emissions from projects with impacts on Massachusetts residents, the Final Rule may impose similar challenges and burdens on Massachusetts' ability to assess and meet the GHG emission-reduction mandates of the Massachusetts Global Warming Solutions Act.  *See* Mass. Gen. Laws. ch. 21N, §§ 1–11.

162.    The Final Rule's instruction that federal agencies should not consider impacts that are "remote in time" and "geographically remote" may result in inadequate analysis of and, consequently, potential damage to the State Plaintiffs' fish and wildlife.  For example, the operation of federal dams has a major impact on several of Oregon's iconic salmon populations.  Salmon travel hundreds of miles.  If impacts "geographically remote" or "remote in time" are ignored, NEPA analysis of federal hydrosystem actions could disregard mortality that results from juvenile salmon encountering powerhouses during their outmigration through the hydrosystem, but that does not manifest until after the salmon enter the ocean.

163.    By decreasing opportunities for public comment and participation, the Final Rule also limits State Plaintiffs' ability to influence federal projects affecting their natural resources and residents.  Through NEPA, state and territorial agencies regularly engage with federal agencies and permit applicants to identify potential adverse impacts to their state and territorial resources and propose alternatives or mitigation measures to avoid those harms.  For example, the Washington Department of Fish and Wildlife recently commented on the draft EA for a proposed expansion of a ski area on federal lands within the state to highlight impacts to state lands and wildlife and suggest the most effective mitigation of these impacts.

1    Washington state agencies also recently submitted comments on the Draft Supplemental EIS

2    for the Navy's proposed Northwest Training and Testing activities, which threatens harmful

3    impacts to critically endangered Southern Resident Killer Whales, a species that Washington

4    has dedicated significant resources to protect.  Under the Final Rule, these opportunities to

5    comment on and help shape federal actions will be diminished in some situations and lost in

6    others.  Where actions proceed with diminished public process under the Final Rule, states will

7    lose the opportunity to comment on or, if necessary, challenge the actions before harms occur.

8           164.    Fewer and less robust environmental reviews and diminished opportunities for

9    public participation will also increase the burden on State Plaintiffs to respond to public health

10   disparities flowing from uninformed federal decisions that adversely impact vulnerable

11   communities.  For example, the Final Rule excludes consideration of cumulative impacts to

12   communities that face a historic and disproportionate pattern of exposure to environmental

13   hazards and are more likely to suffer future health disparities due to the elimination of

14   cumulative impact review from the NEPA process.  These communities also are more likely to

15   experience severe impacts of climate change, including flooding, extreme weather events such

16   as extreme heat, and degraded air and water quality.  Increased public health and community

17   harms from weakened NEPA reviews will require greater expenditures of state and territorial

18   funds to remedy increased public health disparities flowing from uninformed federal agency

19   action.

20          165.    These harms will also impair ongoing efforts by State Plaintiffs to reduce public

21   health disparities, which State Plaintiffs already devote significant resources to address.  For

22   example, the New York State Department of Environmental Conservation's Office of

23   Environmental Justice directs resources to disproportionately impacted communities and

24   enhances public participation through grant opportunities, enforcement of environmental laws

25   and programs, and consultation with local industries.  California's Community Air Protection

26   Program (CAPP) helps to reduce exposure in communities most impacted by air pollution.

CAPP works with communities throughout California to measure and reduce adverse health impacts from air pollution, including through targeted incentive funding to deploy cleaner technologies in communities experiencing localized air pollution.  In Washington, the Department of Health and a statewide Environmental Justice Task Force are working to reduce health disparities.  The Final Rule hinders these state efforts by adopting changes that allow agencies to avoid thorough consideration of impacts on public health and environmental justice.

166.    State Plaintiffs have also relied on the 1978 regulations to review proposed agency NEPA rules and to determine their potential impact on state and territorial natural resources.  For example, the Washington Department of Fish and Wildlife (WDFW) relied on the requirement in the 1978 regulations that projects with extraordinary circumstances will not be subject to a categorical exclusion in assessing potential wildlife impacts from the Forest Service's proposed categorical exclusions.  *See* Letter from WDFW Director Kelly Susewind to Amy Baker, U.S. Forest Service on proposed categorical exclusions, USFS-HQ-2019-12195 (Aug. 6, 2019).  The Final Rule, however, authorizes federal agencies to apply a categorical exclusion even where extraordinary circumstances exist, diminishing the protections to state natural resources on which WDFW relied.  Similarly, the Final Rule requires federal agencies to amend their NEPA regulations to meet the lowered environmental review standards of the Final Rule, which will increase the risk of adverse impacts to state and territorial natural resources.

167.    Additionally, State Plaintiffs have institutional and proprietary interests in federal agency compliance with NEPA's text and goals of environmental protection, public participation, and informed decision making.  Fewer and weaker federal environmental reviews mean that state agencies in Washington, California, New York, and Massachusetts will no longer be able to adopt or incorporate most federal NEPA documents into their own state NEPA review processes because the NEPA documents will no longer satisfy state law,

1  including, for example, requirements that state review include climate impacts and greenhouse

2  gas emissions.  *See, e.g.*, Wash. Rev. Code ch. 43.21; Cal. Pub. Res. Code § 21083.5; 6 N.Y.

3  Comp. Codes R. & Regs. § 617.15; Mass. Gen. Laws, ch. 30, §§ 61, 62G.  Similarly, state

4  agencies in California will no longer be able to prepare joint documents to satisfy both NEPA

5  and state's little NEPA law.  Cal. Code Regs., tit. 14, § 1517.  Similar problems may arise even

6  in states that do not have little NEPAs.  In Oregon, for example, the State Energy Facility

7  Siting Council may need to develop separate environmental reviews to meet the requirements

8  of Oregon statutory law before approving energy facilities, rather than rely on federal NEPA

9  documentation according to the Council's longstanding practice.  As a result, State Plaintiff

10  agencies will need to expend financial and administrative resources to conduct environmental

11  analyses that would not have been necessary under the 1978 regulations.

12       168.    Robust NEPA review is critical for State Plaintiffs that lack environmental

13  review processes or where state environmental review statutes may not apply.  In these

14  situations, state agencies will be unable to fill significant gaps in analysis through their own

15  state environmental review and will thus need to rely on the federal NEPA process to

16  understand a project's anticipated environmental impacts.  Where the federal environmental

17  review is insufficient, as it will be under the Final Rule, states and territories will lack valuable

18  information to determine how federal projects will impact state and territorial natural

19  resources.  Moreover, while State Plaintiffs can act to protect natural resources within their

20  borders, they cannot control decisions about those resources made by non-plaintiff states.

21  Thus, despite the State Plaintiffs' efforts, State Plaintiffs may not be able wholly to fill the

22  regulatory gaps created by the Final Rule because other non-plaintiff states may not adequately

23  protect water, air, and wildlife that cross state boundaries.

24       169.    Federal agencies will also be required to amend their NEPA regulations to

25  conform to the Final Rule.  85 Fed. Reg. at 43,373 (to be codified at § 1507.3(b)).  These

26  regulatory changes will further burden State Plaintiff agencies that frequently participate in the

NEPA process and will place a particular burden on State Plaintiff agencies, like Caltrans, that have been delegated NEPA authority.

170.     State Plaintiffs also suffered procedural harm from CEQ's failure to comply with the procedural requirements of the APA and NEPA in promulgating the Final Rule. CEQ's failure to promulgate a rationally supported and lawful rule and failure to prepare an EA or EIS for the Final Rule harms State Plaintiffs' procedural interests in participating in a lawful rulemaking and environmental review process that adequately considers and mitigates environmental impacts on the State Plaintiffs' residents and natural resources.

171.     State Plaintiffs have thus suffered concrete injury caused by CEQ's promulgation of the Final Rule.  A court judgment vacating the entire Final Rule and reinstating the 1978 regulations and associated guidance will redress the harms to State Plaintiffs by requiring that federal agencies continue to review actions under the prior regulations and guidance, consistent with NEPA.  Therefore, State Plaintiffs have standing to bring this action.

## FIRST CAUSE OF ACTION
**Violation of the APA and NEPA by Adopting Regulations Contrary to NEPA**
**5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq*.**

172.     State Plaintiffs incorporate all preceding paragraphs by reference.

173.     The APA provides that this Court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).  An agency does not have authority to adopt a regulation that is "plainly contrary to the statute."  *Morton*, 467 U.S. at 834; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703 (1995).

174.     The Final Rule is "not in accordance with law" because it conflicts with NEPA's text, structure, and purpose and exceeds the scope of CEQ's jurisdiction, authority, and discretion under NEPA.

1    175.    The Final Rule violates NEPA and the APA by adopting provisions that, both

2    individually and collectively, conflict with NEPA's overriding purposes of environmental

3    protection, public participation, and informed decision making and the statute's mandate that

4    agencies apply NEPA "to the fullest extent possible."  5 U.S.C. § 706(2)(A); 42 U.S.C.

5    §§ 4331, 4332.  The Final Rule is unlawful because, among other things, it:

6        a.    Restricts the number of projects subject to detailed environmental

7    review, including, among others things, through (i) a new "NEPA thresholds" provision that

8    establishes six broad and ill-defined circumstances in which NEPA does not apply, Final Rule,

9    85 Fed. Reg. at 43,359 (to be codified at § 1501.1); (ii) a narrow definition of "major Federal

10   action" that is inconsistent with NEPA's plain language, *id*. at 43,375 (to be codified at

11   § 1508.1(q)); and (iii) a revised analysis for determining what actions are likely to have

12   "significant effects" and thus require an EIS, *id.* at 43,360 (to be codified at § 1501.3).  These

13   provisions are directly contrary to NEPA's text and purpose and its mandate that agencies

14   apply the statute "to the fullest extent possible."  *See* 42 U.S.C. §§ 4331, 4332.

15       b.    Limits the scope of environmental effects agencies must consider when

16   conducting NEPA review.  For example, the Final Rule allows agencies to avoid considering

17   cumulative and indirect impacts, as well as impacts that are "remote in time" or

18   "geographically remote."  Final Rule, 85 Fed. Reg. at 43,375 (to be codified at § 1508.1(g));

19   *see also id*. at 43,360 (to be codified at § 1501.3(b)(1)) (limiting the "affected area" in the

20   significance analysis to "national, regional, or local").  Congress however, plainly intended

21   NEPA to address such impacts.  NEPA directs agencies to consider "any adverse

22   environmental effects which cannot be avoided should the proposal be implemented,"

23   42 U.S.C. 4332(C)(ii), and "the relationship between local short-term uses of man's

24   environment and the maintenance and enhancement of long-term productivity," *id.*

25   § 4332(2)(C)(iv).  NEPA further directs agencies to "recognize the worldwide and long-range

26   character of environmental problems," rather than examine the impacts of each federal

1    proposal in a silo, *id.* § 4332(2)(F).  Indeed, the Senate Committee Report on NEPA stated that

2    the statute was necessary because "[i]mportant decisions concerning the use and the shape of

3    man's future environment continue to be made in small but steady increments which

4    perpetuate rather than avoid the recognized mistakes of previous decades."  S. Rep. No. 91-

5    296, at 5.  Avoiding this death by a thousand cuts demands that federal agencies carefully

6    consider the cumulative environmental impacts of their actions with other related and unrelated

7    actions—not, as the Final Rule would have it, ignore those impacts entirely.

8                    c.    Limits the number of alternatives to the proposed action analyzed in an

9    EA or EIS and the depth of that analysis by, among other things, removing the requirement that

10   agencies "[r]igorously explore and objectively evaluate" all reasonable alternatives to the

11   proposed action, eliminating consideration of alternatives outside the jurisdiction of the lead

12   agency, and removing the requirement that agencies "[d]evote substantial treatment to each

13   alternative.  Final Rule, 85 Fed. Reg. at 43,365 (to be codified at § 1502.14).  The Final Rule

14   also unlawfully allows certain actions to proceed during NEPA review, constraining available

15   alternatives.  *Id*. at 43,370 (to be codified at § 1506.1).  Contrary to these provisions, NEPA's

16   plain language requires "to the fullest extent possible" consideration of "alternatives to the

17   proposed action" and limits action on proposals until after that comprehensive environmental

18   review occurs.  42 U.S.C. § 4332, 4332(2)(C)(iii); *Robertson*, 490 U.S. at 349 ("Simply by

19   focusing the agency's attention on the environmental consequences of a proposed project,

20   NEPA ensures that important effects will not be overlooked or underestimated only to be

21   discovered after resources have been committed or the die otherwise cast.").

22                   d.    Diminishes agencies' obligation to obtain or develop information

23   regarding environmental impacts when such information is not already available.  The 1978

24   regulations required agencies to obtain such information when the cost of obtaining it was "not

25   exorbitant."  40 C.F.R. § 1502.22(a) (1978).  The Final Rule lowers the bar and permits

26   agencies to forgo additional investigation when the cost would be merely "unreasonable."

Final Rule, 85 Fed. Reg. at 43,366 (to be codified at 40 C.F.R. § 1502.21(b)).  This vague and lax standard is inconsistent with NEPA's statutory mandate that agencies consider all the environmental impacts of their actions, not just those that are readily apparent.  *See* 42 U.S.C. § 4332(2)(C)(ii) (agencies must disclose "*any* adverse environmental effects which cannot be avoided should the proposal be implemented" (emphasis added)).

        e.      Undermines the ability of State Plaintiffs and the public to comment on federal proposals, in direct conflict with NEPA's informed decision making mandate and direction that federal agencies work "in cooperation with State and local governments, and other concerned public and private organizations." *Id.* § 4331(a); *see also id.* § 4332(2)(C) (directing that "the comments and views of the appropriate Federal, State, and local agencies … shall accompany the [agency] proposal through the existing agency review processes" and shall be made available to the public), *id.* § 4332(2)(G) ("make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment").  The Final Rule allows federal agencies to claim a "presumption" that they have considered public comments (including comments by states and their agencies) by making a certification in the record of decision approving a proposed action.  85 Fed. Reg. 43,369 (to be codified at 40 C.F.R. § 1505.2(b)).  This unjustified presumption invites federal agencies to overlook state and public input on federal proposals.  Indeed, the Final Rule adds a provision stating that agencies "are not required to respond to each comment." *Id.* at 43,368 (to be codified at 40 C.F.R. § 1503.4(a)(5)).  Together, these changes, which excuse federal agencies from providing meaningful response to comments submitted by State Plaintiffs, local governments, and the public, unlawfully render NEPA's mandated public participation process an empty paperwork exercise.

176.     For these reasons, the Final Rule is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA and the APA.  5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq*.  The Final Rule should therefore be held unlawful and set aside.

### SECOND CAUSE OF ACTION
### Violation of the APA for Arbitrary and Capricious Rulemaking
### 5 U.S.C. § 706(2)

177.     State Plaintiffs incorporate all preceding paragraphs by reference.

178.     The APA provides that this Court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

179.     Pursuant to the APA, in promulgating a regulation an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43.

180.     When the regulation represents a change in policy or interpretation, the agency must provide a rational explanation for that change.  *Fox Television, Inc.*, 556 U.S. at 515.  The agency must demonstrate that the new rule "is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id*.

181.     Moreover, in changing policy agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Dep't of Homeland Sec.*, 140 S. Ct. at 1915 (citations omitted).

182.     In promulgating the Final Rule, CEQ failed, both for the entire rule and for its individual changes, to provide the reasoned analysis required by the APA.  Specifically, CEQ failed to provide a rational explanation for its changes to its longstanding NEPA interpretations

and policies, relied on factors Congress did not intend for CEQ to consider, offered

explanations that run counter to the evidence before the agency, ignored substantial reliance

interests (including reliance by State Plaintiffs on NEPA's procedures to help protect state and

territorial natural resources and public health) in the 1978 regulations and associated guidance,

and entirely overlooked important issues.

183.    CEQ provided no reasoned analysis to demonstrate that the revisions in the

Final Rule, both individually and collectively, will achieve its purported objectives to reduce

paperwork and delays while "at the same time to produce better decisions [that] further the

national policy to protect and enhance the quality of the human environment."  Final Rule,

85 Fed. Reg. at 43,313; *see also id.* at 43,307.

184.    In particular, CEQ failed to demonstrate how the Final Rule will further

NEPA's policies of producing better decisions and furthering protection and enhancement of

the human environment when the Final Rule adopts provisions that conflict with NEPA's text,

purpose, legislative history, and CEQ's longstanding prior interpretations; that will produce

fewer and less robust environmental reviews and restrict public participation; and that will

limit judicial review.

185.    CEQ further failed to demonstrate how its revisions will reduce delay or add

clarity when CEQ's Final Rule injected new, undefined, and poorly explained language and

requirements into the NEPA process and swept away decades of agency regulations, guidance,

and case law that formerly provided extensive direction for federal agencies implementing

NEPA.  If anything, the Final Rule will lead to more delay, confusion, and litigation over the

correct interpretation and application of the Final Rule.

186.    CEQ also failed to meaningfully examine evidence, including studies developed

by CEQ itself, demonstrating successful implementation of NEPA under the 1978 regulations

and indicating that delay in project implementation is often caused by factors other than CEQ's

implementing regulations. *See, e.g.*, U.S. Gov't Account. Office, *National Environmental Policy Act: Little Information Exists on NEPA Analyses*, 16 (Apr. 2014).

187.    CEQ also failed to rationally consider environmental justice impacts from the Final Rule or provide factual support for its conclusion that the Final Rule will "not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations." Final Rule, 85 Fed. Reg. at 43,356–57. CEQ does not justify its departure from its longstanding policy that environmental justice impacts should be thoroughly analyzed through the NEPA process.

188.    CEQ also failed to consider important aspects of the Final Rule by, among other things, ignoring evidence of NEPA's successful implementation and sweeping away concerns about environmental justice impacts, natural resource impacts (including climate change impacts), and burdens imposed on State Plaintiffs resulting from the Final Rule.

189.    For these reasons, the Final Rule is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of the APA. 5 U.S.C. § 706(2). The Final Rule should therefore be held unlawful and set aside.

### THIRD CAUSE OF ACTION
**Violation of the APA for Promulgating Regulations in Excess of Statutory Authority**
**5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.***

190.    State Plaintiffs incorporate all preceding paragraphs by reference.

191.    The APA provides that this Court shall "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

192.    Several of the Final Rule's provisions, individually and collectively, exceed CEQ's "statutory jurisdiction [and] authority." *Id.* § 706(2)(C).

193.    These unlawful revisions include:

a.      Carving out new exceptions to NEPA's requirements.  As discussed above, the Final Rule would greatly expand the circumstances in which agencies can avoid complying with NEPA.  CEQ has no authority to excuse agencies from complying with NEPA's environmental review mandate.

b.      Redefining "major Federal action" to exclude an agency's failure to act, *compare* 40 C.F.R. § 1508.18 ("[a]ctions include the circumstance where the responsible agency officials fail to act and that failure to act is reviewable by courts or administrative tribunals"), *with* Final Rule, 85 Fed. Reg. at 43,375 (to be codified at § 1508.1(q) (removing failure to act language from the definition of "major Federal action")), effectively rewriting the definition of a reviewable agency action under the APA, 5 U.S.C. § 551(13).  CEQ has no authority to limit the application of the APA.

c.      Placing a limit on the remedies available in a NEPA lawsuit, stating that "[h]arm from the failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements," suggesting that courts should decline to invalidate agency action where agencies commit "minor, non-substantive errors that have no effect on agency decision making," and stating that the Final Rule "create[s] no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm."  Final Rule, 85 Fed. Reg. at 43,358 (to be codified at § 1500.3(d)).  CEQ has no authority, statutory or otherwise, to instruct courts on the remedies they can order.  *See City of Los Angeles v. Barr*, 941 F.3d 931, 938 (9th Cir. 2019) ("An agency literally has no power to act ... unless and until Congress confers power upon it.").

194.     For these reasons, the Final Rule is arbitrary, capricious, not in accordance with law and in excess of CEQ's statutory authority.  5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.* The Final Rule should therefore be held unlawful and set aside.

1
2

### FOURTH CAUSE OF ACTION
### Violation of the APA's Notice-and-Comment Requirements
### 5 U.S.C. § 706(2)

3       195.    State Plaintiffs incorporate all preceding paragraphs by reference.

4       196.    The APA provides that this Court shall "hold unlawful and set aside" agency

5   action that is "without observance of procedure required by law."  5 U.S.C. § 706(2).

6       197.    Prior to promulgating, amending, or repealing a rule, agencies must engage in a

7   public notice-and-comment process.  *Id.* §§ 551(5), 553.  To satisfy the requirements of APA

8   section 553(b), agencies must afford public notice of specific regulatory changes and their

9   reasoned basis to provide the public an opportunity for meaningful comment.  *Home Box*

10  *Office v. FCC*, 567 F.2d at 35–36.  To allow for meaningful public comment, an agency must

11  "make available" during the public comment period "technical studies and data that it has

12  employed in reaching the decision[] to propose particular rules."  *Kern Cty. Farm Bureau*, 450

13  F.3d at 1076.  The public may then submit comments on the proposed rule.  5 U.S.C. § 553(c).

14      198.    "An agency must consider and respond to significant comments received during

15  the period for public comment."  *Perez*, 575 U.S. at 96.  "These procedures are 'designed to

16  assure due deliberation' of agency regulations and 'foster the fairness and deliberation that

17  should underlie a pronouncement of such force.'"  *E. Bay Sanctuary Covenant v. Trump*, 932

18  F.3d 742, 775 (9th Cir. 2018) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230

19  (2001)).  "In considering and responding to comments, 'the agency must examine the relevant

20  data and articulate a satisfactory explanation for its action including a "rational connection

21  between the facts found and the choice made."'"  *Altera Corp. & Subsidiaries v. Comm'r of*

22  *Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43),

23  *cert. denied sub nom. Altera Corp. & Subsidiaries v. CIR*, No. 19-1009, 2020 WL 3405861

24  (U.S. June 22, 2020).

25
26

1    199.   CEQ failed to provide a meaningful opportunity to comment on data or

2    technical studies that it employed in reaching conclusions in the Final Rule.  *Kern Cty. Farm*

3    *Bureau*, 450 F.3d at 1076.

4    200.   In the Final Rule, CEQ relied repeatedly on its RIA to support its revised

5    regulations and to dismiss harms to the environment, public health, and vulnerable

6    communities, including to dismiss its obligation under NEPA to prepare an EA or EIS and its

7    obligation under Executive Order 12,898 to assess environmental justice impacts.  *See, e.g.*,

8    Final Rule, 85 Fed. Reg. at 43,352, 43,354, 43,356.  CEQ thus relied on the RIA in reaching its

9    decisions in the Final Rule.

10    201.   CEQ did not provide an opportunity for the public to comment on the RIA prior

11    to promulgating the Final Rule.

12    202.   CEQ also failed to respond adequately to comments on the Proposed Rule.  For

13    example, State Plaintiffs and others submitted significant comments on the Advance Notice

14    and the Proposed Rule explaining that:

15       a.   CEQ has not presented sufficient evidence to demonstrate a need for the

16    Proposed Rule, particularly given that studies, including studies developed by CEQ itself, and

17    State Plaintiffs' own experience with NEPA demonstrate that NEPA leads to better decisions,

18    that external factors contribute to delay in environmental reviews, and that existing tools could

19    remedy CEQ's concerns about delay;

20       b.   CEQ's Proposed Rule, if finalized, would increase confusion,

21    uncertainty, and litigation, causing the very delay CEQ claimed that it sought to avoid in

22    promulgating the Final Rule;

23       c.   CEQ's Proposed Rule, if finalized, would adversely impact the unique

24    interests of states, territories, and local governments including by harming state resources,

25    limiting state access to information, disrupting coordination with federal agencies,

26

1   undermining state reliance on the 1978 regulations and associated guidance, and burdening

2   states with increased environmental review;

3           d.      CEQ's Proposed Rule, if finalized, would eliminate consideration of

4   climate change impacts, contributing to adverse impacts to natural resources and public health

5   in our states, territories, and communities; and

6           e.      CEQ's Proposed Rule, if finalized, would adversely impact vulnerable

7   communities by limiting NEPA's application and scope, including by excluding certain federal

8   actions from environmental review, eliminating consideration of cumulative impacts, and

9   limiting opportunities for public comment.

10      203.    CEQ failed to provide a rational response to these significant comments.  To the

11  extent CEQ addressed these issues, it provided only cursory responses that did not "examine

12  the relevant data and articulate a satisfactory explanation for its action."  *Altera Corp. &*

13  *Subsidiaries*, 926 F.3d at 1080.

14      204.    Because CEQ failed to provide an opportunity to comment on the RIA and CEQ

15  failed to rationally respond to significant comments, the Final Rule is arbitrary, capricious, an

16  abuse of discretion, and promulgated "without observance of procedure required by law."

17  5 U.S.C. § 706(2).  The Final Rule should therefore be held unlawful and set aside.

18                          **FIFTH CAUSE OF ACTION**
19  **Violation of NEPA and the APA for Failure to Prepare an EA or EIS on the Final Rule**
    **42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706(2)**

20      205.    State Plaintiffs incorporate all preceding paragraphs by reference.

21      206.    NEPA requires federal agencies to take a "hard look" at the environmental

22  consequences of a proposal before acting on it.  *See* 42 U.S.C. § 4332.  That is, a federal

23  agency must prepare an EIS for all "major Federal actions significantly affecting the quality of

24  the human environment."  *Id.* § 4332(2)(C); 40 C.F.R. § 1502.3 (1978).

25

26

207.    An EIS must discuss, among other things: the environmental impact of the proposed federal action, any adverse and unavoidable environmental effects, any alternatives to the proposed action, and any irreversible and irretrievable commitment of resources involved in the proposed action.  42 U.S.C. § 4332(2)(C).

208.    CEQ is a federal agency subject to NEPA.

209.    CEQ's 1978 regulations apply to CEQ's promulgation of the Final Rule.  Final Rule, 85 Fed. Reg. 43,354 (stating that if CEQ were to prepare an EIS on the Final Rule, the 1978 regulations would apply).

210.    Under CEQ's 1978 regulations, a "major Federal action" included "new or revised agency rules [and] regulations," like the Final Rule.  40 C.F.R. § 1508.18(a) (1978).

211.    CEQ's 1978 regulations specify that in an EIS, agencies must rigorously explore and objectively evaluate all reasonable alternatives, including the alternative of taking no action, and must discuss the reasons for eliminating any alternatives rejected from detailed study.  *Id.* § 1502.14.

212.    The 1978 regulations also require agencies to analyze both the direct impacts that an action will have on the environment, as well as the action's "reasonably foreseeable" indirect and cumulative impacts.  Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.8(b) (1978).  Cumulative impacts are those impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  *Id.* § 1508.7 (1978).

213.    CEQ's analysis of alternatives and impacts should consider, among other things, the disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations.  42 U.S.C. § 4332(2)(C); Exec. Order No. 12,898, 59 Fed. Reg. 7629 (1994) (as amended); CEQ, Environmental Justice (1997).

214.     As a preliminary step, an agency may first prepare an EA to determine whether the effects of an action may be significant.  40 C.F.R. §§ 1501.4(b), 1508.9 (1978).  If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are not significant.  *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001) (internal citations omitted); *see also Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

215.     An EIS must always be prepared if "substantial questions are raised as to whether a project … *may* cause significant degradation of some human environmental factor." *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)).

216.     CEQ's promulgation of the Final Rule is a "major Federal action" that significantly affects the environment.  The Final Rule severely limits federal agencies' obligation to review environmental impacts under NEPA both by excluding federal actions from environmental review and by limiting the scope of environmental reviews that do occur. These changes will cause federal agencies to overlook—and thus fail to address, avoid, or mitigate—their actions' impacts, including significant impacts to State Plaintiffs' natural resources, climate change, public health, and environmental justice.  Projects with significant unstudied and undisclosed impacts will move forward with no or insufficient environmental review in violation of NEPA.  Moreover, excusing agencies from considering cumulative impacts will result in agencies taking actions without fully understanding the impacts of those actions on climate change, overburdened and underserved communities, water and air quality, and sensitive, threatened, and endangered wildlife.

217.     Under NEPA, CEQ was required to address the Final Rule's significant environmental impacts and consider reasonable alternatives to the Final Rule in an EIS or, at a minimum, an EA.  42 U.S.C. § 4332(2)(C).  CEQ did neither.

1  218.    CEQ provided no legally sufficient justification—let alone a "convincing

2  statement of reasons"—for failing to comply with NEPA in promulgating the Final Rule.

3  *Babbitt*, 241 F.3d at 730; *see also Sierra Club v. Bosworth,* 510 F.3d. 1016 (9th Cir. 2007).

4  219.    CEQ's failure to take a "hard look" at the environmental impacts of the Final

5  Rule prior to its promulgation was arbitrary and capricious, an abuse of discretion, and

6  contrary to the procedural requirements of NEPA and the APA.  5 U.S.C. § 706(2); 42 U.S.C.

7  § 4332(2)(C).  The Final Rule should therefore be held unlawful and set aside.

8  **PRAYER FOR RELIEF**

9  WHEREFORE, State Plaintiffs respectfully request that this Court:

10  1.    Declare that CEQ violated NEPA and the APA by promulgating a Final Rule

11  that is contrary to NEPA's language and purpose and exceeds CEQ's statutory authority;

12  2.    Declare that CEQ violated the APA by promulgating a Final Rule that is

13  arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and fails

14  to follow the procedures required by law;

15  3.    Declare that CEQ violated NEPA and the APA by promulgating a Final Rule

16  without preparing an EA or an EIS evaluating the Final Rule's environmental and public health

17  impacts;

18  4.    Vacate the entire Final Rule so that the 1978 regulations as amended and

19  associated guidance are immediately reinstated;

20  5.    Enjoin CEQ from implementing, enforcing, or relying upon the Final Rule;

21  6.    Award State Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

22  7.    Award such other relief as the Court deems just and proper.

23

24

25

26

1    DATED this 28th day of August, 2020.

2

3    XAVIER BECERRA                          ROBERT W. FERGUSON
     Attorney General of California          Attorney General of Washington

4
     /s/ Joshua R. Purtle                    /s/ Aurora Janke
5    SARAH E. MORRISON, SBN 143459           AURORA JANKE*
     Supervising Deputy Attorney General     ELIZABETH HARRIS*
6    JAMIE B. JEFFERSON, SBN 197142          Assistant Attorneys General
     JOSHUA R. PURTLE, SBN 298215            Washington Attorney General's Office
7    JULIA K. FORGIE, SBN 304701             Environmental Protection Division
     Deputy Attorneys General                800 5th Ave Ste. 2000 TB-14
8    1515 Clay Street, 20th Floor            Seattle, Washington 98104-3188
     P.O. Box 70550                          (206) 233-3391
9    Oakland, CA 94612-0550                  Aurora.Janke@atg.wa.gov
     (510) 879-1002                          Elizabeth.Harris@atg.wa.gov
10   Jamie.Jefferson@doj.ca.gov
     Joshua.Purtle@doj.ca.gov                Attorneys for Plaintiff State of Washington
11

12   Attorneys for Plaintiff State of California

13

14

15   PHILIP J. WEISER                        WILLIAM TONG
     Attorney General of Colorado            Attorney General of Connecticut
16
     /s/ Scott Steinbrecher                  /s/ Robert Snook
17   SCOTT STEINBRECHER*                     ROBERT SNOOK*
     Assistant Deputy Attorney General       Assistant Attorney General
18   Ralph C. Carr Colorado Judicial Center  Attorney General's Office
     1300 Broadway, Seventh Floor            165 Capitol Avenue
19   Denver, Colorado 80203                  Hartford, Connecticut, 06106
     (720) 508-6287                          (860) 808-5250
20                                           Robert.Snook@ct.gov
21
     Attorneys for Plaintiff State Colorado
22                                           Attorneys for Plaintiff State of Connecticut

23

24

25

26

KATHERINE S. DYKES
Commissioner Connecticut Department
of Energy and Environmental Protection

*/s/ Kirsten S. P. Rigney*
KIRSTEN S. P. RIGNEY*
Director, Legal Office
Department of Energy and
Environmental Protection
10 Franklin Square
New Britain, CT 06051
(860) 827-2984

*/s/ Robert Snook*
ROBERT SNOOK*
Assistant Attorney General
10 Franklin Square
New Britain, CT 06051
(860) 827-2620
Robert.Snook@ct.gov

*Attorneys for Plaintiff Connecticut
Department of Energy and
Environmental Protection*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Kayli H. Spialter*
KAYLI H. SPIALTER*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 577-8508
kayli.spialter@delaware.gov

*Attorneys for Plaintiff State of Delaware*

<table>
<tr><td>1</td><td colspan="2">

KWAME RAOUL
Attorney General of Illinois

</td></tr>
</table>

KWAME RAOUL
Attorney General of Illinois

*/s/ Jason E. James*
JASON E. JAMES*
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental
Enforcement/Asbestos Litigation
Division
Office of the Attorney General
Environmental Bureau
69 West Washington St., 18th Floor
Chicago, IL 60602
(312) 814-0660
jjames@atg.state.il.us

*Attorneys for Plaintiff State of Illinois*

AARON FREY
Maine Attorney General

*/s/ Jillian R. O'Brien*
JILLIAN R. O'BRIEN, SBN 251311
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
jill.obrien@maine.gov
(207) 626-8582

*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland

*/s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN*
Special Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

FOR THE PEOPLE OF THE STATE OF
MICHIGAN

DANA NESSEL
Attorney General of Michigan

*/s/ Elizabeth Morrisseau*
ELIZABETH MORRISSEAU*
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

KEITH ELLISON
Attorney General of Minnesota

*/s/ Peter N. Surdo*
PETER N. SURDO*
Special Assistant Attorney General
445 Minnesota Street Suite 900
Saint Paul, MN 55101
(651) 757-1061

*Attorneys for Plaintiff State*
*of Minnesota*

GURBIR S. GREWAL
Attorney General of New Jersey

*/s/ Lisa Morelli*
LISA MORELLI*
Deputy Attorney General
Environmental Permitting and
Counseling
R.J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ 08625
(609) 376-2804

*Attorneys for Plaintiff State of New*
*Jersey*

AARON D. FORD
Attorney General of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

HECTOR BALDERAS
Attorney General of New Mexico

*/s/ William Grantham*
WILLIAM GRANTHAM*
Assistant Attorney General
201 Third Street NW, Suite 300
Albuquerque, New Mexico 87102
(505) 717-3520
wgrantham@nmag.gov

*Attorneys for the State of New Mexico*

LETITIA JAMES
Attorney General of New York

*/s/ Claiborne E. Walthall*
CLAIBORNE E. WALTHALL*
Assistant Attorney General
New York State Office of
the Attorney General
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov

*Attorneys for Plaintiff State of New York and New York State Department of Environmental Conservation*

ELLEN ROSENBLUM
Attorney General of Oregon

*/s/ Paul Garrahan*
PAUL GARRAHAN*
Attorney-in-Charge
STEVE NOVICK*
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

*Attorneys for Plaintiff State of Oregon*

JOSHUA H. STEIN
Attorney General of North Carolina

DANIEL S. HIRSCHMAN*
Senior Deputy Attorney General

*/s/ Asher P. Spiller*
ASHER P. SPILLER*
Assistant Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
aspiller@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Gregory S. Schultz*
GREGORY S. SCHULTZ*
Special Assistant Attorney General
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
gschultz@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

*/s/ Nicholas F. Persampieri*
NICHOLAS F. PERSAMPIERI*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
nick.persampieri@vermont.gov

*Attorneys for Plaintiff State of Vermont*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Emily M. Ertel*
EMILY M. ERTEL*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0432
ertelem@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*

MAURA HEALEY
Attorney General of Massachusetts

*/s/ Turner Smith*
TURNER SMITH*
MATTHEW IRELAND*
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov
Matthew.Ireland@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

JOSH SHAPIRO
Attorney General of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General

*/s/ Ann R. Johnston*
ANN R. JOHNSTON*
Senior Deputy Attorney General
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
(717) 705-6938

*Attorneys for Plaintiff Commonwealth of Pennsylvania*

1 LEEVIN TAITANO CAMACHO   KARL A. RACINE
2 Attorney General of Guam     Attorney General for the District of Columbia

3 */s/ Joseph A. Perez*       KATHLEEN KONOPKA
 JOSEPH A. PEREZ*       Deputy Attorney General
4 Assistant Attorney General     Public Advocacy Division
 Consumer Protection Division
5 590 South Marine Corps Drive,   */s/ Alacoque Hinga Nevitt*
 Suite 901, ITC Building      ALACOQUE HINGA NEVITT, SBN 268768
6 Tamuning, Guam 96913 ▪ USA   WESLEY ROSENFELD*
7 Telephone: (671) 475-3324    Assistant Attorneys General
 Facsimile: (671) 472-2493     District of Columbia Office of the Attorney
8 jperez@oagguam.org       General
                 400 6th Street, NW
9 *Attorneys for Plaintiff Territory*  Washington, D.C. 20001
 *of Guam*          (202) 717-1368
10              alacoque.nevitt@dc.gov

11              *Attorneys for Plaintiff District of Columbia*
12

13 VINCE RYAN        JAMES E. JOHNSON
14 Harris County Attorney     Corporation Counsel of the
              City of New York
15 */s/ Sarah Jane Utley*
 SARAH JANE UTLEY*     */s/ Nathan Taylor*
16 Managing Attorney       NATHAN TAYLOR*
 Environmental Practice Group   New York City Law Department
17 Harris County Attorney's Office   100 Church Street, Rm 6-144
18 1019 Congress, 15th Floor    New York, NY  10007
 Houston, Texas 77057      (646) 940-0736 (m)
19 (713) 274-5124        (212) 356-2315
 Sarah.Utley@cao.hctx.net    NTaylor@law.nyc.gov
20

21 *Attorneys for Plaintiff Harris County,* *Attorneys for Plaintiff City of New York*
 *Texas*
22

23 *Application for admission pro hac vice forthcoming

24

25

26