JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL E. SALAMANCA
Deputy Assistant Attorney General
BARCLAY T. SAMFORD (NM State Bar No. 12323)
Senior Attorney, Natural Resources Section
U.S. Department of Justice
Environment and Natural Resources Division
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel.: (303) 844-1475
Fax: (303) 844-1350
E-mail: clay.samford@usdoj.gov
ALLEN M. BRABENDER (MN State Bar No. 0324012)
Attorney, Appellate Section
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7415
Washington, DC 20044
Tel.: (202) 514-5316
Fax: (202) 353-1873
E-mail: allen.brabender@usdoj.gov

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No. 3:20-cv-06057-RS |
| Plaintiffs, | **DEFENDANTS' MOTION TO DISMISS** |
| v. | Judge: Hon. Richard Seeborg |
| COUNCIL ON ENVIRONMENTAL QUALITY, and MARY NEUMAYR, in her official capacity as Chair of the council on Environmental Quality, | Hearing Noticed: February 25, 2020 at 1:30pm |
| Defendants. | |

# TABLE OF CONTENTS

NOTICE OF MOTION TO DISMISS AND MOTION ................................................................. 1

MEMORANDUM AND POINTS OF AUTHORITIES ............................................................ 1

BACKGROUND ............................................................................................................... 3

    I.     The National Environmental Policy Act. ......................................................... 3

    II.    CEQ: The 1970s Guidelines and Regulations. ............................................... 3

    III.   NEPA Practice Outgrows the 1978 Regulations. ............................................ 4

    IV.   Modernizing the NEPA Regulations. ............................................................. 8

    V.    The Current Lawsuit. .................................................................................... 9

STANDARD OF REVIEW ............................................................................................... 10

ARGUMENT ................................................................................................................... 10

    I.     In the Absence of a Live Dispute Over the Application of the Regulations to a Particular Project or Decision, the States' Challenge Is Not Ripe. ................... 10

         A.    A Regulation Is Ordinarily Subject to APA Review Only As Part of a Challenge to a Particular Application of the Regulation. ...................... 11

         B.    No Special Circumstances Justify Direct Review of the 2020 Rule. ........ 14

         C.    The Hardship to the Parties Favors Deferring Judicial Review Until the 2020 Rule Is Applied to Concrete Decisions. .................................... 16

    II.    In the Absence of a Live Dispute Over the Concrete, Site-Specific Application of the 2020 Rule, the States Lack Standing. ..................................... 18

         A.    *Summers* Forecloses the States' Lawsuit. .................................................. 19

         B.    The States Fail to Allege Specific Facts of Imminent, Concrete Injury and Instead Rely on Speculation About Possible Future Injuries to Their Interests in the Environment. .......................................... 22

             1.    The States' Speculative Fears that Federal Agencies Will Fail to Properly Analyze the Impacts of Their Future Actions Do Not Confer Standing. ...................................................... 23

             2.    The States' Predictions of Informational Losses Are Not Justiciable Under Article III Because They Are Speculative

and Because NEPA Provides No Right to Specific
Information. ................................................................. 24

3.    The States' Speculative Fears that Federal Agencies Will
Fail to Properly Analyze Alternatives to Their Future
Actions Do Not Confer Standing. .................................... 26

4.    The Future Possibility that Some Unknown Federal Agency
Might Invoke a Categorical Exclusion in Extraordinary
Circumstances Is Not Justiciable in the Context of This
Facial Challenge to the 2020 Rule. ................................. 26

5.    The States' Speculation About Possible Effects on Their
Abilities to Participate in Future NEPA or APA Processes Is
Not justiciable. .............................................................. 27

6.    Mere Deprivation of a Procedural Right Without
Particularized, Concrete Harm Is Not Justiciable Under
Article III. ..................................................................... 28

CONCLUSION .................................................................................... 31

Defs.' Mot. to Dismiss
*California v. CEQ*, No. 3:20-cv-06057-RS

ii

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Abbott Labs. v. Gardner,*
4
   387 U.S. 136 (1967) ................................................................ 11, 12, 14, 15, 16

5

*Allen v. Wright,*
6
   468 U.S. 737 (1984) ................................................................................ 19, 21

7

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531 (1987) ........................................................................................ 15
8

*Andrus v. Sierra Club,*
9
   442 U.S. 347 (1979) .......................................................................................... 4

10

*Ashley Creek Phosphate Co. v. Norton,*
   420 F.3d 934 (9th Cir. 2005) ......................................................................... 29
11

*Ass'n of Am. Med. Colls. v. United States,*
12
   217 F.3d 770 (9th Cir. 2000) ......................................................................... 17

13

*Bova v. City of Medford,*
   564 F.3d 1093 (9th Cir. 2009) ....................................................................... 23
14

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.,*
15
   123 F.3d 1142 (9th Cir. 1997) ......................................................................... 6

16

*City of Dallas v. Hall,*
   562 F.3d 712 (5th Cir. 2009) ........................................................................... 7
17

*Clapper v. Amnesty Int'l. USA,*
18
   568 U.S. 398 (2013) .................................................... 10, 19, 20, 28, 31

19

*Cottonwood Env't Law Center v. U.S. Forest Service,*
   789 F.3d 1075 (9th Cir. 2015) ....................................................................... 13
20

*Cronin v. U.S. Dep't of Agric.,*
21
   919 F.2d 439 (7th Cir. 1990) ........................................................................... 7

22

*Ctr. for Biological Diversity v. Kempthorne,*
   588 F.3d 701 (9th Cir. 2009) ......................................................................... 21
23

*Dep't of Transp. v. Pub. Citizen,*
24
   541 U.S. 752 (2004) .................................................................... 3, 14, 24, 26

25

*Dreher v. Experian Info. Sols., Inc.,*
   856 F.3d 337 (4th Cir. 2017) ................................................................... 25, 30
26

*Fed. Election Comm'n v. Akins,*
27
   524 U.S. 11 (1998) ......................................................................................... 25

28

*Fla. Audubon Soc'y v. Bentsen,*
   94 F.3d 658 (D.C. Cir. 1996) ........................................................................ 30

Defs.' Mot. to Dismiss
*California v. CEQ,* No. 3:20-cv-06057-RS

iii

*Forsham v. Harris*,
  445 U.S. 169 (1980)...................................................................................... 25

*Found. on Econ. Trends v. Lyng*,
  943 F.2d 79 (D.C. Cir. 1991)............................................................. 25, 26, 30

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006)......................................................................... 14

*Gardner v. U.S. Bureau of Land Mgmt.*,
  638 F.3d 1217 (9th Cir. 2011)....................................................................... 21

*Habeas Corpus Resource Center v. U.S. Dep't of Justice*,
  816 F.3d 1241 (9th Cir. 2016)........................................................... 13, 16, 19

*Habeas Corpus Resource Center v. U.S. Department of Justice*,
  816 F.3d 1241 (9th Cir. 2016)....................................................................... 13

*In re Endangered Species Act Section 4 Deadline Litig.-MDL No. 2165*,
  704 F.3d 972 (D.C. Cir. 2013)................................................................ 29, 30

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)................................................... 19, 21, 22, 29, 31

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)........................................................................... 2, 11, 14

*Mayo v. Reynolds*,
  875 F.3d 11 (D.C. Cir. 2017)......................................................................... 14

*Metro. Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983)....................................................................................... 24

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007).............................................................................. 29, 30

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
  538 U.S. 803 (2003).............................................................. 12, 18, 28

*Navajo Nation v. Dep't of Interior*,
  876 F.3d 1144 (9th Cir. 2017)....................................................................... 29

*Nevada v. Burford*,
  918 F.2d 854 (9th Cir. 1990) ....................................................................... 18

*New River Valley Greens v. U.S. Dep't of Transp.*,
  No. 97-1978, 1998 WL 633959 (4th Cir. Sept. 10, 1998) ............................ 7

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)......................................................................................... 21

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998)................................................... 1, 12, 13, 14, 16

*Principal Life Ins. Co. v. Robinson,*
    394 F.3d 665 (9th Cir. 2005) ........................................................................... 11

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.,*
    415 F.3d 1078 (9th Cir. 2005) ................................................................... 10, 25

*Reno v. Catholic Social Services, Inc.,*
    509 U.S. 43 (1993) ............................................................................. 11, 12, 15

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ................................................................................. 3, 4, 14

*Sabine River Auth. v. U.S. Dep't of Interior,*
    951 F.2d 669 (5th Cir. 1992) .............................................................................. 7

*Safer Chems., Healthy Fams. v. EPA,*
    943 F.3d 397 (9th Cir. 2019) ........................................................................... 18

*San Luis & Delta-Mendota Water Auth. v. Salazar,*
    638 F.3d 1163 (9th Cir. 2011) ................................................................... 11, 16

*Schlesinger v. Reservists Comm. to Stop the War,*
    418 U.S. 208 (1974) ................................................................................... 20, 28

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ..................................................................... 19, 25, 29

*St. Clair v. City of Chico,*
    880 F.2d 199 (9th Cir. 1989) ........................................................................... 10

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ........................................................................... 19, 20, 29

*Tex. Energy Rsrv. Corp. v. Dep't of Energy,*
    710 F.2d 814 (Temp. Emer. Ct. App. 1983) ...................................................... 11

*Texas v. United States,*
    523 U.S. 296 (1998) ................................................................................... 17, 28

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ......................................................................... 17

*Toilet Goods Ass'n v. Gardner,*
    387 U.S. 158 (1967) ......................................................................................... 15

*Utah Int'l Inc. v. Andrus,*
    488 F. Supp. 962 (D. Utah 1979) ....................................................................... 7

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ......................................................................................... 10

*W. Watersheds Project v. Kraayenbrink,*
    632 F.3d 472 (9th Cir. 2011) ........................................................................... 21

*Wash. Toxics Coal. v. Env't Prot. Agency*,
    413 F.3d 1024 (9th Cir. 2005) ................................................................. 11

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................................ 15

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ............................................................. 19, 21, 31

*Wilderness Society, Inc. v. Rey*,
    622 F.3d 1251 (9th Cir. 2010) ............................................. 22, 25, 29, 30

**Statutes**

16 U.S.C. § 1540(g)(1) ........................................................................... 11

42 U.S.C. § 4332(2)(B) ............................................................................. 3

42 U.S.C. § 4332(2)(C) ........................................................................ 3, 25

42 U.S.C. § 4332(2)(C) ............................................................................. 3

42 U.S.C. § 4332(2)(I) .............................................................................. 3

42 U.S.C. § 4342 ...................................................................................... 3

42 U.S.C. § 4344 ...................................................................................... 3

42 U.S.C. § 7607(b)(1) ........................................................................... 14

5 U.S.C. § 704 ........................................................................................ 15

**Regulations**

23 C.F.R. Pt. 771 (2019) ........................................................................... 4

33 C.F.R. Pt. 230 (2019) ........................................................................... 4

36 C.F.R. § 51.3 (2002) ........................................................................... 12

36 C.F.R. Pt. 220 (2019) ........................................................................... 4

40 C.F.R § 1501.4(b) (2019) .................................................................... 27

40 C.F.R. § 1500.3 (2003) ......................................................................... 3

40 C.F.R. § 1501.1(b) (2020) .................................................................... 2

40 C.F.R. § 1501.5(e) (2020) ................................................................... 27

40 C.F.R. § 1502.10 (2020) ....................................................................... 3

40 C.F.R. § 1502.14(e) (2020) ................................................................. 26

40 C.F.R. § 1502.7 (2019) ......................................................................... 5

40 C.F.R. § 1507.3 (2019) .................................................................... 4, 16

40 C.F.R. §§ 1500-1599 (2019) ............................................................... 4

43 Fed. Reg. 55,978 (Nov. 29, 1978) ................................................. 3, 4, 8

44 Fed. Reg. 873 (Jan. 3, 1979) ............................................................. 4

46 Fed. Reg. 18,026 (Mar. 23, 1981) ...................................................... 6

83 Fed. Reg. 28,591 (June 20, 2018) ...................................................... 8

85 Fed. Reg. 1,684 (Jan. 10, 2020) ......................................................... 8

85 Fed. Reg. 43,304 (July 16, 2020) ............................ 1, 2, 4, 5, 6, 8, 9, 14, 16, 17, 23, 24, 26, 27

**Other Authorities**

Council on Environmental Quality, Environmental Impact Statement Timelines (2010-2018)
(June 12, 2020) ............................................................................. 5, 6

Council on Environmental Quality, Length of Environmental Impact Statements (2013-2018)
(June 12, 2020) ................................................................................ 5

James E. Salzman and Barton H. Thompson, Jr., ENVIRONMENTAL LAW AND POLICY 340 (5th ed.
2019) ............................................................................................... 5

Philip K. Howard, COMMON GOOD, TWO YEARS, NOT TEN: REDESIGNING INFRASTRUCTURE
APPROVALS (Sept. 2015 ..................................................................... 6

S. Rep. No. 91-296 (1969) ................................................................... 25

Update to the Regulations Implementing the Procedural Provisions of the National
Environmental Policy Act, Final Rule Response to Comments, RIN 0331-AA03, Council on
Environmental Quality (June 30, 2020) ................................................ 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION TO DISMISS AND MOTION

Please take notice that on Thursday, February 25, 2020 at 1:30pm this motion will be heard before the Honorable Judge Seeborg.  Defendants Council on Environmental Quality (CEQ), et al. move to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(1).  As set forth in the following memorandum, the case should be dismissed because Plaintiffs' claims are not ripe and Plaintiffs do not have standing.

## MEMORANDUM OF POINTS AND AUTHORITIES

A group of state and local governments (the States) ask this Court to conduct a broad, facial review of CEQ's updated regulations governing implementation of the National Environmental Policy Act (NEPA) (2020 Rule). 85 Fed. Reg. 43,304 (July 16, 2020).  There is no jurisdiction to do so.  The 2020 Rule applies to *internal* federal agency processes, not to the public.  Any purported harm to the States allegedly caused by the 2020 Rule can only occur after the Rule has been applied to a particularized action and results in a final agency decision.  Only then might a particular provision of the 2020 Rule be challenged "at a time when harm is more imminent and more certain."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998).  No such application of the Rule is before the Court.  Plaintiffs' premature facial review is barred by the doctrines of ripeness and standing.

This year, CEQ rightly updated its NEPA regulations—something it has been trying (without success) to get right for decades.  NEPA is a procedural statute.  Congress intended it to ensure that federal agencies consider environmental effects before committing to major federal actions.  But over time, the process NEPA created became mired in an accretion of guidance documents, inconsistent agency interpretations, conflicting case law, and litigation.  NEPA implementation and related litigation can be lengthy.  It can significantly delay major infrastructure and other projects that this country urgently needs. 85 Fed. Reg. at 43,305.  CEQ found that NEPA reviews for Federal Highway Administration projects, on average, take more than seven years to proceed from a notice of intent to preparation of an environmental impact statement (EIS) to issuance of a record of decision.  *Id*.  This is a dramatic departure from CEQ's prediction in 1981 that federal agencies would be able to complete most EISs—the most

Defs.' Mot. to Dismiss
*California v. CEQ*, No. 3:20-cv-06057-RS

1

1   intensive review of a project's environmental impacts under NEPA—in twelve months or less.

2   *Id.*

3          In July 2020, CEQ took action.  CEQ issued its first comprehensive revision of the NEPA

4   implementing regulations in over forty years.  85 Fed. Reg. at 43,304.  The result of a deliberate

5   and thorough two-year rulemaking proceeding under the Administrative Procedure Act (APA),

6   the 2020 Rule clarifies and streamlines the NEPA process.  It reduces paperwork and delay, and

7   promotes better decisions.  The 2020 Rule regulates federal agencies by establishing the

8   procedures that those agencies follow as they revise their own agency-specific NEPA

9   procedures, and as they propose and analyze future agency actions.  *See, e.g.*, 40 C.F.R. §

10   1501.1(b) (2020) (providing that agencies may determine whether actions or decisions are

11   "major Federal actions" through promulgation of agency-specific NEPA procedures, or on an

12   individual basis as appropriate).

13          The States' Amended Complaint challenges no concrete application of the 2020 Rule that

14   causes them actual harm.  Yet, the States mount a facial challenge to the Rule.  They bring

15   claims under the APA and Endangered Species Act (ESA).  But the 2020 Rule can cause no

16   actual harm to the States unless and until it is actually applied to a specific proposed action and

17   results in a final agency decision.  Thus, the States' demand for direct facial review runs afoul of

18   fundamental precepts of judicial review under Article III of the United States Constitution and

19   the APA.  When proceeding by the general review provisions of the APA or even the ESA's

20   citizen suit provision—rather than by statute-specific judicial review provisions that "permit

21   broad regulations to serve as the 'agency action,' and thus to be the object of judicial review

22   directly"—a plaintiff must "direct its attack against some particular 'agency action' that 'causes

23   it harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (*NWF*).  If the 2020 Rule is

24   ever applied to a specific proposed action and results in a decision that actually causes harm to

25   the States, they can challenge that decision and the 2020 Rule provisions that the decision may

26   rely upon.  But in its current posture, the States' case must be dismissed for lack of jurisdiction.

27

28

**BACKGROUND**

## I.     The National Environmental Policy Act.

Enacted in 1969 and signed into law in 1970, NEPA is considered the first major environmental law in the United States.  Unlike many other statutes, NEPA does not mandate particular results or substantive standards.  It requires federal agencies to go through an analytical process before taking major action significantly affecting the environment.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  The core element of that process is the requirement to prepare a "detailed statement," which under CEQ regulations has come to be known as an "environmental impact statement," or EIS, "on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS generally describes, among other items, the purpose and need for the proposed action, the alternatives to the action, the affected environment, and the environmental consequences of alternatives.  *See id.*; 40 C.F.R. § 1502.10 (2020).[1]

## II.     CEQ: The 1970s Guidelines and Regulations.

NEPA also established CEQ—an agency within the Executive Office of the President— "with authority to issue regulations interpreting" the statute.  CEQ "has promulgated regulations to guide federal agencies in determining what actions are subject to [its] statutory requirement."  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 40 C.F.R. § 1500.3 (2003)); see also 42 U.S.C. §§ 4332(2)(B),  (C),  (I), 4342, 4344.  At first, CEQ issued only "guidelines" to federal agencies on how to comply with NEPA.  43 Fed. Reg. 55,978, 55,978 (Nov. 29, 1978).  But while CEQ considered the guidelines to be binding on federal agencies, "some agencies viewed them as advisory only."  *Id.*  The courts also differed over the weight that should be accorded the guidelines in evaluating agency compliance with NEPA.  *Id.*  The result was inconsistent agency practices and judicial interpretations of the law, impeding federal

---

[1] Defendants use the year "2020" to designate CEQ's new regulations, effective September 14, 2020, and the year "2019" to designate its old regulations.

1    agency coordination and public participation and causing unnecessary paperwork, delay, and

2    duplication of agency efforts.  *Id.*

3           In part to cut through that tangle, CEQ issued regulations implementing NEPA in 1978.

4    The stated goal was "[t]o reduce paperwork, to reduce delays, and at the same time to produce

5    better decisions [that] further the national policy to protect and enhance the quality of the human

6    environment."  *Id.*; *see also* 44 Fed. Reg. 873 (Jan. 3, 1979) (technical corrections); 40 C.F.R. §§

7    1500-1599 (2019) (CEQ regulations).[2]  In the years since the promulgation of the 1978

8    regulations, the Supreme Court has held that CEQ's interpretation of NEPA in its regulations

9    must be given "substantial deference."  *Robertson*, 490 U.S. at 355 (citing *Andrus v. Sierra Club*,

10   442 U.S. 347, 358 (1979)).

11   **III.    NEPA Practice Outgrows the 1978 Regulations.**

12          Since 1978, the implementation of NEPA has become increasingly complicated.  Due in

13   large part to the complexity of the regulations,[3] conflicting judicial decisions have continued to

14   hamper agencies as they try to comply with the statute.  *See* 85 Fed. Reg. at 43,310.  "A

---

16   [2] In addition, the 1978 regulations directed federal agencies to adopt their own implementing
17   procedures, as necessary, in consultation with CEQ.  *See* 40 C.F.R. § 1507.3 (2019).  Over
     eighty-five federal agencies and their subunits have developed such procedures.  *See, e.g.*, 23
18   C.F.R. Pt. 771 (2019) (Federal Railroad Administration/Federal Highway Administration/Federal
     Transit Administration); 33 C.F.R. Pt. 230 (2019) (U.S. Army Corps of Engineers—Civil
19   Works); 36 C.F.R. Pt. 220 (2019) (U.S. Forest Service).

20   [3] The complexity of the regulations has given rise to CEQ's issuance of more than
21   thirty guidance documents to assist federal agencies in understanding and complying with
     NEPA.  *See* 85 Fed. Reg. at 43,308-09 (describing CEQ's guidance documents and reports).  In
22   their own implementing procedures, many federal agencies have included additional processes
     and practices to improve their own implementation of NEPA.  Presidents also have issued
23   directives, and Congress has enacted legislation to reduce delays and expedite the
24   implementation of NEPA and the CEQ regulations, including for transportation, water, and other
     types of infrastructure projects.  *See id.* at 43,310-12.  Despite these efforts, the NEPA process
25   continues to slow or prevent the development of important infrastructure and other projects that
26   require federal permits or approvals, as well as rulemakings and other proposed actions.  The
     past four decades' worth of CEQ guidance, agency practices, more recent presidential directives
27   and statutory developments, and the body of case law related to NEPA implementation had not
     previously been harmonized or codified in CEQ's regulations.  The 2020 Rule fixes that
28   interlocking set of problems, decades in the making.

---

1    challenge for agencies is that courts have interpreted key terms and requirements differently,

2    adding to the complexity of environmental reviews." *Id.* The complexity of the regulations and

3    diversity of judicial interpretations has led NEPA to become the single most litigated

4    environmental statute in the United States. *See* James E. Salzman and Barton H. Thompson, Jr.,

5    ENVIRONMENTAL LAW AND POLICY 340 (5th ed. 2019) ("Perhaps surprisingly, there have been

6    thousands of NEPA suits. It might seem strange that NEPA's seemingly innocuous requirement

7    of preparing an EIS has led to more lawsuits than any other environmental statute.").

8         Agencies have responded to the litigation risk "by generating voluminous studies

9    analyzing impacts and alternatives well beyond the point where useful information is being

10   produced and utilized by decision makers." 85 Fed. Reg. at 43,305. The public is not served by

11   a plethora of EISs and other NEPA documentation so extensive that finding particular points of

12   environmental concern becomes a search for the proverbial needle in the haystack. In its most

13   recent review, CEQ found that final EISs averaged 661 pages in length. *See* Council on

14   Environmental Quality, Length of Environmental Impact Statements (2013-2018) at 1 (June 12,

15   2020) (CEQ Length of EISs Report), *available at* https://ceq.doe.gov/nepa-practice/eis-

16   length.html (last visited Dec. 1, 2020). One quarter were 748 pages or longer. *Id.* This page

17   count does not include appendices, which can span thousands of additional pages. Thus, the

18   average modern EIS is more than four times as long as the already thorough, 150-page level of

19   analysis contemplated by the 1978 regulations. *See* 40 C.F.R. § 1502.7 (2019) (the text of an

20   EIS "shall normally be less than 150 pages").

21        With the length of documents dramatically increasing, so too are the delays brought about

22   by the NEPA process. *See* 85 Fed. Reg. at 43,305 ("the NEPA process has become increasingly

23   complicated and can involve excessive paperwork and lengthy delays"). As noted above, CEQ

24   has found that NEPA reviews for Federal Highway Administration projects, on average, take

25   more than *seven years* to proceed from a notice of intent to preparation of an EIS to issuance of a

26   record of decision. *See* Council on Environmental Quality, Environmental Impact Statement

27   Timelines (2010-2018) at 10 (June 12, 2020) ("2020 Timelines Report"), *available at*

28   https://ceq.doe.gov/nepa-practice/eis-timelines.html (last visited Dec. 1, 2020). This is a

dramatic departure from CEQ's prediction in 1981 that federal agencies would be able to complete most EISs in twelve months or less.  *See* 46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981) (Question 35).  In its most recent review, CEQ found that, across the federal government, the average time for completion of an EIS and issuance of a decision was 4.5 years.  2020 Timelines Report at 1.  CEQ determined that one quarter of EISs took less than 2.2 years, and one quarter of the EISs took *more than 6 years*.  *Id.*  And these timelines do not include further delays associated with litigation.  Note as well that in the infrastructure context, even projects that Congress has fully funded have trouble moving forward.  *See* Philip K. Howard, COMMON GOOD, TWO YEARS, NOT TEN: REDESIGNING INFRASTRUCTURE APPROVALS, at 3 (Sept. 2015), *available at* https://www.commongood.org/wp-content/uploads/2017/07/2YearsNot10Years.pdf (last visited Dec. 1, 2020) ("Funding is obviously critical for new infrastructure, but it's not sufficient.  Even fully-funded projects have trouble moving forward.");[4] *see also, e.g.*, *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1176 (9th Cir. 1997) (Trott, J., concurring in part and dissenting in part) ("too much of anything can be trouble, and one can only wonder if this case and the tortured history of this traffic amelioration proposal suggest that too much process now renders any controversial project too difficult and costly to accomplish, regardless of its merit").

Although other factors may contribute to project delays, the frequency and consistency of multi-year review processes for EISs leaves no doubt that NEPA implementation and related litigation is a significant factor.  These delays impact the many projects and activities that are subject to NEPA each year, "slow[ing] or prevent[ing] the development of important infrastructure and other projects that require Federal permits or approvals, as well as rulemakings and other proposed actions."  *See* 85 Fed. Reg. at 43,305.  As courts have recognized, a determination that the preparation of an EIS is necessary "has been the kiss of death to many a federal project"—but not because of the project's environmental impacts or lack of need—

---

[4] Philip K. Howard was an advisor to Vice President Gore's Reinventing Government Initiative, writing the introduction to his book on streamlining government.  *See* Vice President Al Gore, COMMON SENSE GOVERNMENT: WORKS BETTER AND COSTS LESS (1995).

1    simply because EISs have become "very costly and time-consuming to prepare."  *City of Dallas*

2    *v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009) (quoting *Sabine River Auth. v. U.S. Dep't of Interior*,

3    951 F.2d 669, 677 (5th Cir. 1992) (citing *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 443 (7th

4    Cir. 1990))); *see also New River Valley Greens v. U.S. Dep't of Transp.*, No. 97-1978, 1998 WL

5    633959, at *2 (4th Cir. Sept. 10, 1998) (*per curiam*) (drolly explaining that NEPA "creates a

6    somewhat cumbersome procedure"); *Utah Int'l Inc. v. Andrus*, 488 F. Supp. 962, 973 (D. Utah

7    1979) ("[T]he enactment of NEPA in 1969 has materially aided the transformation of federal

8    coal leasing into a complicated and cumbersome process.  Substantial delays pending preparation

9    of [EISs] and the implementation of new regulations appear to be inherent in such a labyrinthine

10   process.").

11          In our modern globalized economy, a project delayed by "analysis paralysis" can often

12   turn into a project that evaporates.  Capital flows elsewhere to a place where a return on

13   investment can be achieved sooner and with more certainty.  This phenomenon harms our

14   country's ability to build modern, resilient infrastructure.  *See* Update to the Regulations

15   Implementing the Procedural Provisions of the National Environmental Policy Act, Final Rule

16   Response to Comments, RIN 0331-AA03, Council on Environmental Quality (June 30, 2020)

17   (RTC) ("Commenters have noted that the development of infrastructure depends on the existence

18   of predictable and reasonably expeditious schedules for review.").[5]  Additionally, one of the

19   paradoxes of NEPA is that over time the process has discouraged updating of crumbling

20   infrastructure.  In other words, slowing down infrastructure development can and does have the

21   counterproductive effect of worsening the environment by perpetuating older infrastructure and

22   technologies.  *See* RTC at 2 (noting that a timely NEPA process "that is focused on significant

23   environmental impacts will benefit not only our economy but also our environment, resulting in

24   less congested roadways, sustainable infrastructure, and large-scale habitat restoration").

25

26

27

28   [5] https://ceq.doe.gov/docs/laws-regulations/ceq-final-rule-response-to-comments-2020-06-30.pdf
     (last visited Dec. 1, 2020).

## IV.    Modernizing the NEPA Regulations.

Following so many decades of NEPA practice, implementation, and litigation, CEQ took its first steps towards enhancing the efficiency of the process through rulemaking in June 2018. CEQ issued an advance notice of proposed rulemaking (ANPRM), requesting comment on potential updates and clarifications to the CEQ regulations.  83 Fed. Reg. 28,591 (June 20, 2018). Issuing an ANPRM—an optional APA process—demonstrates CEQ's commitment to soliciting new ideas as it considered potential revisions to its NEPA regulations.  Using information gathered from comments on the ANPRM, on January 10, 2020 CEQ published a notice of proposed rulemaking proposing to update its regulations for implementing the procedural provisions of NEPA.  85 Fed. Reg. 1,684 (Jan. 10, 2020).  CEQ received approximately 1,145,571 comments on the proposed rule.  85 Fed. Reg. at 43,306.

On July 16, 2020, CEQ published its final rule modernizing and clarifying its regulations to facilitate more efficient, effective, and timely NEPA reviews by federal agencies.  The final rule "simplif[ied] regulatory requirements, codif[ied] certain guidance and case law relevant to these regulations, revis[ed] the regulations to reflect current technologies and agency practices, eliminat[ed] obsolete provisions, and improv[ed] the format and readability of the regulations." *Id.*  The revisions finalized in the rule advance the original objective of the 1978 regulations: "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment."  *Id.* at 43,313 (quoting 43 Fed. Reg. at 55,978).

CEQ made various revisions in the 2020 Rule "to align the regulations with the text of the NEPA statute, including revisions to reflect the procedural nature of the statute."  *Id.*  CEQ also revised the regulations to ensure that NEPA documents are as concise as possible and "serve their purpose of informing decision makers regarding significant potential environmental effects of proposed major Federal actions and the public of the environmental issues in the pending decision-making process."  *Id.*  CEQ made changes "to ensure that the regulations reflect changes in technology, increase public participation in the process, and facilitate the use of existing studies, analyses, and environmental documents prepared by States, Tribes, and local

1   governments." *Id.*  In sum, in the 2020 Rule CEQ sought to provide greater clarity for federal

2   agencies, States, Tribes, localities, and the public, and to advance the original goals of the CEQ

3   regulations to reduce paperwork and delays and promote better decisions consistent with

4   NEPA's policy objectives.

5           The 2020 Rule took effect on September 14, 2020.  *See* 40 C.F.R. § 1506.13 (2020).

6   Federal agencies throughout the Executive Branch are now beginning to implement the updated

7   CEQ regulations, including by proposing updates to agency NEPA procedures for public review

8   and comment.  40 C.F.R. § 1507.3 (2020) (providing that agencies are to revise their NEPA

9   procedures in consultation with CEQ); 40 C.F.R. § 1501.1(b) (providing that agencies may

10   determine whether actions or decisions are "major Federal actions" on a case-by-case basis or

11   through the promulgation of agency-specific NEPA procedures, as appropriate); *see also*, *e.g.*,

12   Procedures for Considering Environmental Impacts, 85 Fed. Reg. 74640 (Nov. 23, 2020) (issued

13   for public comment by the Office of the Secretary, Department of Transportation).

14   **V.**     **The Current Lawsuit.**

15           On August 28, 2020, the States filed a Complaint bringing a direct, facial challenge to the

16   2020 Rule, Compl., ECF No. 1, which they amended on November 23, 2020 to add a claim

17   under the ESA, Am. Compl., ECF No. 75.  The Amended Complaint alleges that the 2020 Rule

18   violates NEPA, the ESA, and the APA in various ways.  *Id.* ¶¶ 204-62.  The Amended

19   Complaint makes various allegations that the 2020 Rule *could* cause *other* federal agencies to

20   apply the 2020 Rule to *future* NEPA reviews in some way that *could* harm the States' sovereign

21   and propriety interests.  *Id.* ¶¶ 186-203.  The Amended Complaint also alleges that CEQ failed to

22   consult under the ESA with the relevant wildlife agencies over the effects of the 2020 Rule on

23   threatened and endangered species.  *Id.* ¶¶ 252-62.  But the Amended Complaint does not tie its

24   allegations of legal violations or harm to any concrete, real-world application of the 2020 Rule in

25   final agency action.  Notwithstanding that fatal omission, the Amended Complaint asks the Court

26   to vacate and set aside the final rule and reinstate the 1978 regulations.  *Id.* at 84, Prayer for

27   Relief ¶ 5.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STANDARD OF REVIEW**

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges subject matter jurisdiction.  Plaintiffs bear the burden of establishing subject matter jurisdiction.  *See St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).  If the material jurisdictional facts are not in dispute, and the moving party is entitled to judgment as a matter of law, the Court should grant the Rule 12(b)(1) motion to dismiss.  *Id.*

**ARGUMENT**

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  Effectuated by a cluster of overlapping doctrines—including standing and ripeness—the case-or-controversy requirement serves both to maintain the separation of powers and to ensure that legal issues "will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *see also Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 408-09 (2013).

Here, well-established Article III principles, as applied generally, as applied in the context of APA review, and as articulated in a plethora of Supreme Court cases—demonstrate that the States' broad, facial challenge to the 2020 Rule is not justiciable because it is not ripe and because the States lack standing.  As will be further explained below, there is no jurisdiction for judicial review unless the States challenge particular provisions of the 2020 Rule in the context of specific application in final agency action causing them actual, concrete "real world" harm.

**I.**     **In the Absence of a Live Dispute Over the Application of the Regulations to a Particular Project or Decision, the States' Challenge Is Not Ripe.**

Because "NEPA provides no private right of action," the States' challenge to CEQ's NEPA compliance in promulgating 2020 Rule is brought under the APA.  *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1102 (9th Cir. 2005).  To determine whether administrative action is ripe for judicial review under the APA

and ESA, courts evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967);[6] *see also Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 670 (9th Cir. 2005).

### A.   A Regulation Is Ordinarily Subject to APA Review Only As Part of a Challenge to a Particular Application of the Regulation.

Where—as here—the challenged agency action is a regulation, courts presume the challenge is not ripe. As the Supreme Court explained in *NWF*,

> Absent [a pre-enforcement review] provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

497 U.S. at 891. The only exceptions to this presumption against pre-application review of regulations are where there is a special review statute permitting the regulation "to be the object of judicial review directly" or where the regulation is a substantive rule requiring the plaintiff to immediately adjust its primary conduct under threat of serious penalties. *Id.*

Subsequent decisions of the Supreme Court are to the same effect. In *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993), the Court applied *NWF* in rejecting, as unripe, a challenge to regulations issued by the Immigration and Naturalization Service. Those regulations would be applied in individual agency adjudications to determine whether an alien was eligible for legalization, a particular form of immigration relief. The Court explained that

---

[6] The ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1), authorizes a private right of action for the States' newly-added claim seeking to compel CEQ to consult with the appropriate federal wildlife services under Section 7 of the ESA (Am. Compl. ¶¶ 19, 252-62). *See Wash. Toxics Coal. v. Env't Prot. Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005). But this Court has held that the *Abbott Labs* ripeness analysis, discussed herein, also applies to pre-enforcement review claims brought under the ESA's citizen suit provision. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011); *see also Tex. Energy Rsrv. Corp. v. Dep't of Energy*, 710 F.2d 814, 817-18 (Temp. Emer. Ct. App. 1983). The States' ESA claim therefore is not ripe for the same reasons as their NEPA and APA claims.

1    newly promulgated regulations may be ripe for judicial review outside the context of any

2    particular affirmative application by the agency *only* if the regulations "present[] plaintiffs with

3    the immediate dilemma to choose between complying with newly imposed, disadvantageous

4    restrictions and risking serious penalties for violation." *Id.* at 57 (citing, *inter alia*, *Abbott Labs.*,

5    387 U.S. at 152-53).  The Court cited *NWF* for the proposition that, if such a dilemma is absent,

6    "a controversy concerning a regulation is not ordinarily ripe for review under the [APA] until the

7    regulation has been applied to the claimant's situation by some concrete action."  *Reno*, 509 U.S.

8    at 58.  Noting that the regulations at issue in *Reno* "impose[d] no penalties for violating any

9    newly imposed restriction," the Court held that the plaintiffs' challenge would not be ripe until

10   they had taken the steps necessary to cause the regulations to be applied to their own applications

11   for legalization.  *Id.* at 58-59.

12           Similarly, in *National Park Hospitality Ass'n v. Department of the Interior*, 538 U.S. 803

13   (2003), the Court considered a facial challenge to a National Park Service regulation.  That

14   regulation provided that its concession contracts "are not contracts within the meaning of" the

15   Contract Disputes Act.  *Id.* at 806 (quoting 36 C.F.R. § 51.3 (2002)).  The Court concluded that

16   the case was not ripe.  Applying the two-part *Abbott Labs* test, the Court found that there would

17   be no undue hardship from withholding review.  The rule did not command anyone to do or

18   refrain from doing anything, did not affect the concessioner plaintiffs' primary conduct, and did

19   not impose serious penalties for violations.  *Id.* at 809-10.  In addition, the Court held that the

20   case was not fit for review, even though the question presented was purely legal and the rule

21   constituted "final agency action."  The Court concluded that "further factual development would

22   significantly advance our ability to deal with the legal issues presented."  *Id.* at 812 (citation and

23   internal quotation marks omitted).  Accordingly, the Court held that "judicial resolution of the

24   question presented here should await a concrete dispute about a particular concession contract."

25   *Id.*

26           Likewise, in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998), the Court held that

27   a facial challenge to a forest plan for a particular National Forest was not ripe for judicial review.

28

*Id.* at 732-37.[7]  The Court noted that the plan alone caused no hardship to the plaintiff—it "does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut." *Id.* at 733.  Rather, as here, plaintiff "will have ample opportunity later to bring its legal challenge" to the plan in the context of a specific logging project "at a time when harm is more imminent and more certain." *Id.* at 734.  And in *Habeas Corpus Resource Center v. U.S. Department of Justice*, 816 F.3d 1241 (9th Cir. 2016), the Ninth Circuit similarly held that a facial challenge to the Department of Justice's final regulations for fast-tracking certain habeas corpus petitions was not ripe for review.  816 F.3d at 1252-54.  There, as here, the final regulations did not immediately affect the plaintiffs' primary conduct. *Id.* at 1252.  Rather, the Court classified the regulations' impact as *indirect*, because there (as here) the regulations would only impact plaintiffs to the extent they are applied in *future* final agency actions. *Id.*  The Court held that the facial challenge was not ripe because, "in the absence of a concrete application of the Final Regulations, the challenges to the substance of the Final Regulations represent 'abstract disagreements over administrative policies' that the ripeness doctrine seeks to avoid." *Id.* at

---

[7] Dictum from *Ohio Forestry* states that "*a person with standing who is injured by a failure to comply with the NEPA procedure* may complain of that failure at the time the failure takes place, for the claim can never get riper." 523 U.S. at 737 (emphasis added).  Thus, to pursue claims that CEQ committed procedural errors, the States must demonstrate standing (which, as addressed below, they cannot).  Moreover, the Court's dictum should not be taken to mean that every claim raising a procedural error is ripe for judicial review as soon as it occurs.  Although many procedural claims are ripe as soon as the alleged violations occur—if, for example, the associated agency action *directly* authorized particular trees to be cut, a specific highway to be built, or any other specific activity that would have direct on-the-ground consequences.  Thus, for a person with standing, a regulation would be subject to immediate challenge for failure to comply with a procedure if it directly authorized actions with real on-the-ground consequences.  The Ninth Circuit in *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075 (9th Cir. 2015), viewed the standards and guidelines for preserving lynx habitat at issue in that case as having such consequences because they were being actively applied in site-specific projects that already had been authorized and in fact many were actually underway. 789 F.3d at 1084.  But this is not such a case.  Unlike in *Cottonwood*, where the court viewed the plaintiffs' allegations as tying their "injury to imminent harm in specific forests and project areas," *id.* at 1081, no such imminent harm is alleged here.

1  1254 (quoting *Ohio Forestry*, 523 U.S. at 736 (quoting *Abbott Labs*., 387 U.S. at 148)); *see also*

2  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18-21 (D.C. Cir. 2006).

3  **B.      No Special Circumstances Justify Direct Review of the 2020 Rule.**

4  Under the first prong of the *Abbott Labs* test—as applied by the Supreme Court in

5  *NWF*—a challenge to a regulation is presumed not to be fit for review until the regulation has

6  been applied in a manner that harms a plaintiff.  497 U.S. at 891.  The only exceptions to this

7  presumption are where there is a special review statute permitting the regulation "to be the object

8  of review directly" or where the regulation is a "substantive rule" requiring a plaintiff to

9  immediately adjust its primary conduct under threat of serious penalties.  *Id.*  Neither of those

10  special circumstances is present here.

11  First, neither the APA nor NEPA nor the ESA contains any specialized review procedure

12  that would allow for a direct challenge to CEQ regulations.[8]  *Mayo v. Reynolds*, 875 F.3d 11, 19

13  (D.C. Cir. 2017); *see supra* n.6.  Second, the 2020 Rule is a procedural rule guiding actions of

14  other agencies—it is not a substantive rule regulating the conduct of, or posing an immediate

15  threat to, the States.  *See* 85 Fed. Reg. at 43,358 (The regulations "provide direction to Federal

16  agencies to determine what actions are subject to NEPA's procedural requirements and the level

17  of NEPA review where applicable."); *Pub. Citizen*, 541 U.S. at 756-57 ("NEPA imposes only

18  procedural requirements on federal agencies with a particular focus on requiring agencies to

19  undertake analyses of the environmental impact of their proposals and actions." (citing

20  *Robertson*, 490 U.S. at 349-50)).  As a rule outlining the procedures agencies will follow as they

21  conduct environmental analysis of future decisions, the 2020 Rule does not threaten the States

22

23

24  _____

25  [8] This is in contrast, for example, to the Clean Air Act, which expressly allows direct review of
certain Environmental Protection Agency regulations in the D.C. Circuit within sixty days of

26  publication, because Congress saw a need to confirm rapidly, and on a national basis, the validity
of a new set of clean air regulations through the process of judicial review.  42 U.S.C. §

27  7607(b)(1).  As to NEPA or the ESA, Congress did not opt to create such a carefully calibrated
judicial review provision explicitly authorizing an exception to the ordinary rule that facial

28  challenges to regulations are not ripe.

1    with the prospect of penalties of any kind, let alone the serious penalties needed to overcome the

2    presumption against direct facial review.

3           Two mutually reinforcing sets of controlling principles support the fitness for review

4    framework described above.  First, the declaratory and injunctive remedies that the States seek

5    under the APA and ESA are equitable in nature.  As the Supreme Court explained in *Abbott*

6    *Labs*, such remedies are discretionary, and "courts traditionally have been reluctant to apply

7    them to administrative determinations unless they arise in the context of a controversy 'ripe' for

8    judicial resolution."  387 U.S. at 148; *see also Reno*, 509 U.S. at 57; *Amoco Prod. Co. v. Vill. of*

9    *Gambell*, 480 U.S. 531, 542-43 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13

10   (1982).  Absent a statute directing that particular categories of regulations are subject to direct

11   pre-enforcement review, the ripeness principles discussed above define the manner in which, and

12   extent to which, a reviewing court's equitable discretion should be exercised.

13          Second, the APA does not authorize direct and immediate judicial review of every

14   agency action—only of "[a]gency action made reviewable by statute and final agency action for

15   which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Because NEPA itself does

16   not confer a private right of action, NEPA claims must proceed under the APA, but may proceed

17   in this manner only if "there is no other adequate remedy in a court."  Where a particular mode

18   of review carries with it the prospect of serious penalties for an unsuccessful challenge—such as

19   in a defense against an enforcement suit—that mode of review ordinarily would not be

20   "adequate" within the meaning of the APA.  But where, as here, judicial review can be deferred

21   until a concrete application of a rule and where no potential challenger is forced into the

22   Hobson's Choice-style dilemma described in *Abbott Labs*, immediate pre-enforcement review of

23   agency regulations is unavailable under the APA.  In these circumstances, judicial review of the

24   agency's application of the rule in a site-specific decision is a fully adequate remedy for any

25   legal defect in the regulation. *See Reno*, 509 U.S. at 60-61; *Toilet Goods Ass'n v. Gardner*, 387

26   U.S. 158, 165 (1967) (where non-compliance with an agency regulation would result in only a

27   minor sanction, which could then be challenged in court, "[s]uch review will provide an adequate

28   forum for testing the regulation in a concrete situation").  The same is true for the ESA claim.

1    *See San Luis & Delta-Mendota Water Auth.*, 638 F.3d at 1173 (*Abbott Labs* ripeness analysis

2    also applies to pre-enforcement review claims brought under the ESA's citizen suit provision).

### C.    The Hardship to the Parties Favors Deferring Judicial Review Until the 2020 Rule Is Applied to Concrete Decisions.

5         In addition to the fitness of an issue for judicial review, courts must consider the relative

6    "hardship to the parties of withholding court consideration."  *Abbott Labs.*, 387 U.S. at 149; *see*

7    *also Ohio Forestry*, 523 U.S. at 733.  This factor also weighs in favor of concluding that the

8    States' facial challenge to the 2020 Rule is not ripe.  *See Habeas Corpus Res. Ctr.*, 816 F.3d at

9    1253-54 (holding that a challenge seeking pre-enforcement review of a regulation was not ripe

10   because it would hinder agency efforts to refine its policies).

11        As noted above, the States face absolutely no hardship from waiting to pursue their

12   claims through a challenge to a specific application of the 2020 Rule.  The 2020 Rule itself does

13   not govern primary conduct and thus has no impact on the States—it does not "command anyone

14   to do anything or to refrain from doing anything"; "grant, withhold, or modify any formal legal

15   license, power, or authority"; "subject anyone to any civil or criminal liability"; or create "legal

16   rights or obligations." *Ohio Forestry*, 523 U.S. at 733. The 2020 Rule will only impact the States

17   if and when it is applied in the context of a future site-specific action that affects their interests.

18   While it might be "easier, and certainly cheaper, to mount one legal challenge against the [Rule]

19   now, than to pursue many challenges to each site-specific [] decision to which the Rule might

20   eventually lead . . . [t]he case-by-case approach is the traditional, and remains the normal, mode

21   of operation of the courts."  *Id.* at 735 (internal quotation marks, ellipses and citations omitted).

22        In contrast, immediate facial review would hinder agency efforts to refine their policies.

23   Before the 2020 Rule can result in final agency action that harms the States, CEQ and federal

24   agencies must begin implementing the procedural rule.  The 2020 Rule did not even become

25   effective until September 14, 2020.  Moreover, federal agencies, in consultation with CEQ, are

26   developing and then will propose for public comment agency-specific NEPA procedures in

27   response to the 2020 Rule.  *See* 85 Fed. Reg. at 43,373-74 (40 C.F.R. § 1507.3 (2020)).  In

28   addition to conforming revisions, the 2020 Rule instructs agencies to develop and include in their

1    implementing procedures processes unique to each agency, as necessary.  The 2020 Rule directs

2    agencies to develop "agency NEPA procedures to improve agency efficiency and ensure that

3    agencies make decisions in accordance with the Act's procedural requirements."  *See* 85 Fed.

4    Reg. at 43,373.

5         Under these circumstances, allowing a facial challenge to the 2020 Rule to proceed at this

6    point would "hinder agency efforts to refine [their] policies."  *Ohio Forestry*, 523 U.S. at 735.

7    The 2020 Rule requires federal agencies to rethink and then revise their own NEPA procedures

8    in light of the 2020 Rule and their existing statutory authorities.  Many of these changes will be

9    developed as part of public processes under the requirements of the 2020 Rule.  85 Fed. Reg. at

10   43,373 ("Agencies shall provide an opportunity for public review and review by the Council for

11   conformity with the Act and the regulations in this subchapter before adopting their final

12   procedures.").  Critically, "[t]o prevail in such a facial challenge," Plaintiffs "must establish that

13   no set of circumstances exists under which the [regulation] would be valid."  *Reno v. Flores*, 507

14   U.S. 292, 301 (1993) (citation omitted).  It is entirely speculative for the States to make such

15   claims now.

16        In the absence of a site-specific application, the States' challenge to the 2020 Rule is both

17   unmanageable and relies on speculation about future applications.  *See Thomas v. Anchorage*

18   *Equal Rights Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (rejecting claim based on chain of

19   uncertain future events as unripe).  Moreover, to the extent they might be harmed by some

20   concrete application of the procedures contained in the 2020 Rule, the States would suffer no

21   hardship from waiting to bring their challenge until it materializes and solidifies.  At this time,

22   the States cannot allege a cognizable injury in fact.  But they are free to seek judicial review of

23   the relevant agency action if their now-speculative alleged harms ever become concrete and

24   particularized.  "A claim is not ripe for adjudication if it rests upon contingent future events that

25   may not occur as anticipated, or indeed may not occur at all."  *Ass'n of Am. Med. Colls. v. United*

26   *States*, 217 F.3d 770, 782 (9th Cir. 2000) (quoting *Texas v. United States*, 523 U.S. 296, 300

27   (1998)).  Allowing for judicial review in this case—before the States have identified a specific

28   proposed action that has resulted in a decision causing them harm—would interfere in numerous

agencies' environmental review processes and embroil this Court in an abstract challenge to a government-wide program that does not raise any special circumstances justifying direct review.

At this point, no one can say with any certainty if the first concrete application of the new NEPA regulations resulting in final agency action that can be challenged will arise in a General Services Administration building project for a new federal courthouse, a Department of Transportation case about a new off-ramp from a highway, a Federal Energy Regulatory Commission regulation involving wholesale energy markets, a Federal Communications Commission order concerning 5G networks, a Bureau of Land Management easement for an electric transmission line for a wind or solar farm, or a new Department of Housing and Urban Development fair housing initiative—or any one of hundreds of other federal agency contexts and permutations of new rules, new adjudications, or new orders that hybridize rulemaking and adjudication procedures.  And when application of a promulgated rule presents such a black box, facial challenges to the overarching promulgated rule are not ripe. Uncertainty simply is not enough.  See *Nat'l Park Hosp. Ass'n*, 538 U.S. at 811 (mere uncertainty as to the validity of a legal rule is insufficient hardship for purposes of the ripeness analysis); *see also Safer Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 415 (9th Cir. 2019).

In sum, a suit challenging the 2020 Rule in the context of some forthcoming, site-specific action subject to NEPA and the ESA would provide a fully "adequate remedy" under the APA and the ESA for any legal defect in the 2020 Rule.  The States' lawsuit does not identify such a site-specific action, and thus it must be dismissed because it is not ripe.

## II.    In the Absence of a Live Dispute Over the Concrete, Site-Specific Application of the 2020 Rule, the States Lack Standing.

For similar reasons, the States lack Article III standing.  While the States allege that they are entitled to "special solicitude" when establishing standing, Am. Compl. ¶ 187, a suit brought by states can be dismissed for lack standing just like that of any other litigant.  *See Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990) (noting that "a state has a 'quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general,'" but holding that a state does not have standing to assert that interest in an action against the United

States (citations omitted)).  To establish Article III standing, the States must allege facts showing (1) that they have suffered an injury in fact, (2) that is fairly traceable to the defendant's conduct, and (3) that it is likely, and not merely speculative, that the injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  "[S]tanding is to be determined as of the commencement of suit."  *Id.* at 570 n.5.  "Where, as here, a case is at the pleading stage, the plaintiff must clearly … allege facts demonstrating each element."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation and internal quotation marks omitted).  A straightforward application of the Supreme Court's decision in *Summers v. Earth Island Institute* demonstrates that the States lack standing to bring a facial challenge to the 2020 Rule.

### A.     *Summers* **Forecloses the States' Lawsuit.**

Like respondents in *Summers*, the States challenge a rule that "neither require[s] nor forbid[s] any action" on their part.  *See Habeas Corpus Res. Ctr.*, 816 F.3d at 1252 (explaining that regulations governing future agency decisionmaking do not regulate citizens' "primary conduct").  They are therefore not the object of the 2020 Rule.  "[W]hen the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish."  *Defs. of Wildlife*, 504 U.S at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).  Thus, the States face a high bar to establish their Article III standing here—one they cannot surmount with their speculative allegations of possible future harms disconnected to any challenge to a concrete application of the 2020 Rule.

The States "can demonstrate standing only if application of the [2020 Rule] by the Government will affect" them in a way that threatens to impose an "'injury in fact' that is concrete and particularized."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009).  That threat of "'concrete' injury must be '*de facto*'; that is, it must actually exist."  *Spokeo, Inc.*, 136 S. Ct. at 1548.  It also "must be actual and imminent, not conjectural or hypothetical."  *Summers*, 555 U.S. at 493; *see also Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  To meet the imminence requirement, a "threatened injury must be *certainly impending*"; "[a]llegations of *possible* future injury are not sufficient."  *Clapper*, 568 U.S. at 409-10 (citation omitted).  Merely increasing the risk of some speculative future harm is not enough.  *Id.*  Combined, these

1   requirements ensure that the alleged injury is not too speculative for Article III purposes, *id.* at

2   409, and "that 'there is a real need to exercise the power of judicial review in order to protect the

3   interests of the complaining party.'" *Summers*, 555 U.S. at 493 (quoting *Schlesinger v.*

4   *Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974)).

5          In *Summers*, the Supreme Court applied these deep-rooted standing principles to a suit

6   brought by environmental organizations to prevent the Forest Service from enforcing regulations

7   that exempted certain smaller projects from the notice, comment, and appeal process used by the

8   Forest Service for more significant projects. 555 U.S. at 490-91. The organizations challenged

9   both the procedural regulations themselves and a particular application of the regulations to the

10  Burnt Ridge Project. *Id.* at 491. By the time the case came to the Supreme Court, the parties had

11  settled their dispute concerning the Burnt Ridge Project, leaving only the plaintiffs' challenge to

12  the regulations in the abstract. *Id.* at 491-92, 494. The Supreme Court held that the

13  organizations did not have standing to challenge the regulations after the settlement because

14  plaintiffs failed to demonstrate that the government had applied the regulations to any other

15  particular project that would imminently harm one of their members. *Id.* at 492-96. According

16  to the Supreme Court, there is

17          no precedent for the proposition that when a plaintiff has sued to challenge the
18          lawfulness of certain action or threatened action but has settled that suit, he retains
            standing to challenge the basis for that action (here, the regulation in the abstract),
19          apart from any concrete application that threatens imminent harm to his interests.

20  *Id.* at 494. "Such a holding," the Supreme Court continued, "would fly in the face of Article III's

21  injury-in-fact requirement." *Id.*

22          Just as in *Summers*, the States' challenge presents precisely the sort of review—

23  untethered to a concrete factual context—that flies in the face of Article III. The States assert

24  fears and concerns that the 2020 Rule will result in future agency actions premised on less robust

25  impacts or alternatives analyses, predictions of diminished access to information and public

26  participation, and projected resource expenditures. Am. Compl. ¶¶ 186-203. But none of these

27  hypothetical future actions have been developed under the 2020 Rule. And the States offer only

28  speculation about how, when, and where the 2020 Rule will be applied. These speculative

1    claims are followed by further conjecture about how the 2020 Rule as applied to possible future

2    actions would result in injury.  But it is not sufficient to recite that they are harmed because the

3    2020 regulations *could* allegedly cause *other* federal agencies to apply the 2020 Rule to *future*

4    NEPA reviews in an attenuated chain of events that *could* lead to environmental harm, a loss of

5    information, or resource expenditures.  The causal chain is too tenuous.  Even before *Summers*,

6    it was well established that "[a]llegations of possible future injury do not satisfy the requirements

7    of Art[icle] III."  *Whitmore*, 495 U.S. at 158.

8           As the Supreme Court recognized in *Summers*, typically only concrete applications of

9    regulations in the context of ground-disturbing actions have the potential to cause injuries in fact

10    to a litigant's interests.  That does not mean that one must wait for the ground-disturbing action

11    to begin before bringing suit, but it does mean that, until a specific final agency action *authorizes*

12    that action to occur, the risk of harm to the plaintiff remains too distant and too speculative for

13    Article III.  Thus, challenging a concrete application of a regulation is necessary to the Article III

14    analysis.[9]  In fact, even before *Summers*, the Supreme Court recognized that programmatic

15    challenges disconnected from challenges to specific applications of the program (such as through

16    a project approval) were "rarely if ever appropriate for federal-court adjudication."  *Defs. of*

17    *Wildlife*, 504 U.S. at 568 (quoting *Allen*, 468 U.S. at 759-60); *see also Norton v. S. Utah*

18    *Wilderness All.*, 542 U.S. 55, 67 (2004) ("The prospect of pervasive oversight by federal courts

19    over the manner and pace of agency compliance with such congressional directives is not

20    contemplated by the APA."); *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1221 (9th

21    Cir. 2011) (same).

22

---

23    [9] Sometimes regulations on their face apply directly to a challenging entity or are self-

24    effectuating in a manner that directly causes imminent, concrete harm.  *See, e.g.*, *W. Watersheds*

       *Project v. Kraayenbrink*, 632 F.3d 472, 481, 483 (9th Cir. 2011) (regulations ceding ownership

25    rights and court finding injury in fact where it prevented the litigant from "obtaining title and

       ownership" (citation omitted)); *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 708

26    (9th Cir. 2009) (finding standing when regulations authorizing incidental take "threaten

27    imminent, concrete harm to [plaintiffs'] interests by destroying polar bears and walrus in the

       Beaufort Sea").  But the 2020 Rule is not such an animal.

28

The Ninth Circuit again confirmed these principles in *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010), holding that "[t]he lack of any linkage between the project and the claimed injury undermines the effort to establish standing." *Id.* at 1257; *see also id.* at 1260 ("A concrete and particular project must be connected to the procedural loss."). There, as here, the court was reviewing a facial challenge to federal regulations that provided certain procedures governing agency decisionmaking (*i.e.*, as here, regulations on regulations). *Id.* at 1253-54. Before the district court in *Rey*, the plaintiffs claimed that the deprivation of the procedure itself (*in vacuo*) was sufficient to confer Article III standing, but they changed direction on appeal after *Summers*, contending instead that their Article III injuries stemmed from a concrete application of the challenged regulations in an action known as the Ash Creek Project. *Id.* at 1256-57. But the Ninth Circuit rejected this basis for standing because the Ash Creek Project was not even in existence when the complaint was filed. *Id.* at 1257; *see also Defs. of Wildlife*, 504 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of suit.").

Here too, the States challenged the 2020 Rule on August 28, 2020, *before* it even went into effect on September 14, 2020. And their Amended Complaint adds an ESA claim, but does nothing to fix this fatal problem. They necessarily therefore cannot be challenging any concrete and particular project applying the 2020 Rule, as required by *Summers* and *Rey*. And at this point one can only speculate when and if such a concrete and particular project will be approved, whether it will actually injure the States' interests, and whether those injuries are caused by the 2020 Rule or by some other factor. The States therefore lack Article III standing.

**B.      The States Fail to Allege Specific Facts of Imminent, Concrete Injury and Instead Rely on Speculation About Possible Future Injuries to Their Interests in the Environment.**

Because the States fail to challenge a concrete application of the 2020 Rule, their allegations of injury to their purported sovereign and proprietary interests in the physical environment necessarily rest on pure speculation about how federal agencies other than CEQ may apply the 2020 Rule in the future. As noted above, the 2020 Rule did not even become effective until September 14, 2020. Moreover, agency-specific processes are often governed by separate substantive statutes that control agency decisionmaking and not just by the APA alone

1 (the APA provides a default set of procedures that apply if Congress does not provide more

2 specific structure for matters such as the promulgation of regulations, the public commenting

3 processes, and judicial review). How the 2020 Rule will fit into those processes is largely left to

4 agency discretion. Thus, the when, the where, and the how of the 2020 Rule's application to a

5 specific project or decision is within the control of other federal agencies, not CEQ. *See supra*

6 §§ I.B-C.

7        The States' speculation regarding how federal agencies other than CEQ will apply the

8 2020 Rule in a manner that allegedly may harm their sovereign and propriety interests in the

9 environment can be separated into six categories. But each category of alleged harm is

10 insufficient to confer Article III standing because each category is untethered to any concrete

11 application of the 2020 Rule and therefore rests on pure speculation of how federal agencies

12 other than CEQ will apply the 2020 Rule in the context of their own decisionmaking. *See Bova*

13 *v. City of Medford*, 564 F.3d 1093, 1096-97 (9th Cir. 2009) (no standing where alleged injury

14 was contingent upon future events that may not occur).

15        **1.**    **The States' Speculative Fears that Federal Agencies Will Fail**

16                  **to Properly Analyze the Impacts of Their Future Actions Do**
                      **Not Confer Standing.**

17        *First*, the States speculate that under the 2020 Rule various agencies will fail to consider

18 impacts of their proposed projects, including impacts previously categorized as cumulative under

19 the 1978 regulations such as climate change impacts. Am. Compl. ¶¶ 190-92, 194. But the 2020

20 Rule does not preclude consideration of impacts previously categorized as indirect and

21 cumulative, including climate change impacts. *See* 85 Fed. Reg. at 43,331, 43,344 (explaining

22 how climate change impacts are considered under the 2020 Rule). The 2020 Rule rather replaces

23 the concepts of indirect and cumulative impacts with a more straightforward requirement to

24 consider "those effects that are reasonably foreseeable and have a reasonably close causal

25 relationship to the proposed action" consistent with case law, including from the Supreme Court,

26 that bounded all effects analysis. *Id.* Under that standard, these agencies can consider climate

27 change impacts of the kind that the States speculate may not be considered under the new rule.

28

1    At this point, Plaintiffs can do no more than speculate about how the 2020 Rule might produce a

2    different analysis from its predecessor.

3        Importantly, this proximate-cause analysis approach to effects under NEPA was already

4    the approach the Supreme Court had applied in cases such as *Public Citizen*.  *See* 541 U.S. at 767

5    ("NEPA requires 'a reasonably close causal relationship' between the environmental effect and

6    the alleged cause . . . [akin] to the 'familiar doctrine of proximate cause from tort law.'" (quoting

7    *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983))).  Even before

8    the new Rule, NEPA analysis was not limitless and did not require analysis of impacts that were

9    too temporally or geographically remote, and thus not the reasonably foreseeable consequence of

10   the proposed action.  *See* 85 Fed. Reg. at 43,333-34.  Thus, how an impact is categorized is the

11   incorrect question under NEPA.  Instead, the proper question is whether that impact is the

12   reasonably foreseeable result of the proposed action—regardless of whether it would be

13   categorized direct, indirect, or cumulative under the old regulations.  At this time, the States can

14   only speculate that some impact that used to be labeled as indirect or cumulative, such as impacts

15   on climate change, will escape analysis.  And that failure affects their interests in a specific

16   geographic location.  Such speculation deserves no audience in a federal court.

17       **2.     The States' Predictions of Informational Losses Are Not**
         **Justiciable Under Article III Because They Are Speculative**
18       **and Because NEPA Provides No Right to Specific Information.**

19       *Second*, and relatedly, the States allege that the 2020 Rule and its lack of a requirement to

20   consider cumulative impacts will either deprive them of information or require them to spend

21   their own resources to obtain that information.  Am. Compl. ¶¶ 198-99.  But, for the reasons

22   expressed in the previous paragraphs, these alleged informational injuries are pure speculation.

23   These are mere unsubstantiated fears of how other federal agencies will conduct their future

24   environmental reviews under the 2020 Rule.  The States cannot say at this juncture that they will

25   be deprived of any information to which they are legally entitled.  Federal agencies have an

26   incentive to disclose information that states may be seeking to avoid litigation with those states.

27   And if the States are so deprived of information in the future, they can bring an action against the

28   federal agency that deprived them of that information to obtain that information.  At this point,

1   because the States' claim is disconnected from any concrete application of the 2020 Rule, they

2   cannot show any threat of the "'real' harm with an adverse effect" necessary to sustain a claim of

3   informational injury. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017)

4   (quoting *Spokeo, Inc.*, 136 S. Ct. at 1548).

5       Beyond their purely speculative nature, the States' claims of informational injuries also

6   fail because they cannot show that NEPA grants them a right to information. An informational

7   injury constitutes a cognizable injury in fact only where a statute grants citizens a right to

8   information. *See Rey*, 622 F.3d at 1258 (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21

9   (1998)). But NEPA's purpose is to facilitate informed agency and congressional decisionmaking

10  through the preparation of EISs. 42 U.S.C. § 4332(2)(C). Unlike statutes that sustain

11  informational standing, like FOIA, *see Rey*, 622 F.3d at 1258 (collecting cases), nothing in

12  NEPA's text reveals a congressional intent to confer a legally actionable right to information on

13  the public, the violation of which can assist in establishing Article III injury. Again, NEPA

14  affords no private right of action of any kind. *See Ranchers Cattlemen*, 415 F.3d at 1102.

15  Review of NEPA analysis takes place only consistent with the APA's strictures. *Id.*

16      While NEPA requires copies of any EIS prepared and comments received be made

17  available to the public under FOIA, *see* 42 U.S.C. § 4332(2)(C), nothing in NEPA's text or its

18  legislative history reveals a congressional intent to confer a legally actionable right to specific

19  information on the public. *See Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C. Cir.

20  1991); S. Rep. No. 91-296, at 20 (1969) (requiring the creation of EISs so that agencies would

21  develop information "for subsequent reviewers and decisionmakers, both within the executive

22  branch and in the Congress"). The public disclosure of completed EISs through FOIA is merely

23  incidental to NEPA's primary mandate of promoting informed decisionmaking, and is therefore

24  not enough to satisfy the first part of the informational injury test. *See Rey*, 622 F.3d at 1259.

25      Further, FOIA requires an agency to disclose only existing documents, not develop

26  additional information. *See Forsham v. Harris*, 445 U.S. 169, 186 (1980). The States here do

27  not seek disclosure of existing, non-FOIA exempt EISs. Rather, they are asking the Court to

28  conclude that, as a statutory matter, Congress intended NEPA to require agencies to develop and

1   include certain information in EISs, and created in the public a cognizable right to that

2   information.  As the D.C. Circuit explained in *Lyng*, if this kind of claim seeking the production

3   of certain information under NEPA were sufficient to sustain standing, "[i]t would potentially

4   eliminate any standing requirement in NEPA cases" because anyone could always allege a right

5   to more information.  *Lyng*, 943 F.2d at 84-85.  The States' claims of informational injury fail for

6   this reason in addition to the fact they are purely speculative.

7
8   **3.    The States' Speculative Fears that Federal Agencies Will Fail to Properly Analyze Alternatives to Their Future Actions Do Not Confer Standing.**

9   *Third*, the States speculate the various federal agencies might not consider a full range of

10   alternatives to, or mitigation for, their proposed actions.  Am. Compl. ¶¶ 189, 193.  But just as

11   the 1978 regulations had been interpreted, the 2020 Rule requires these agencies to consider a

12   "reasonable range of alternatives," including mitigation alternatives.  85 Fed. Reg. at 43,351,

13   43,365 (40 C.F.R. § 1502.14(e) (2020)).  And, just as the Supreme Court required in *Public*

14   *Citizen*, those challenging agency action have an obligation under the 2020 Rule to alert agencies

15   to particular alternatives or forfeit their challenges to the agencies' alternatives analysis in a

16   subsequent lawsuit.  *See Pub. Citizen*, 541 U.S. at 764-65; 85 Fed. Reg. at 43,317.  So the States

17   can alert agencies to reasonable alternatives and agencies have an incentive to consider such

18   alternatives to avoid litigation.  It is therefore pure conjecture that under the 2020 Rule some

19   federal agency might not in the future properly consider alternatives or mitigation.

20
21   **4.    The Future Possibility that Some Unknown Federal Agency Might Apply a Categorical Exclusion Where Extraordinary Circumstances Are Present Is Not Justiciable in the Context of This Facial Challenge to the 2020 Rule.**
22

23   *Fourth*, the States speculate that they may be harmed by the future application of a

24   categorical exclusion by an agency other than CEQ, even where extraordinary circumstances

25   exist.  Am. Compl. ¶ 197.  But, at this early juncture, the States cannot say when or even if any

26   federal agency will apply a categorical exclusion where such extraordinary circumstances are

27   present, and that such application will cause concrete harm to their interests.  The 2020 Rule only

28   provides that an agency may apply a categorical exclusion to a proposed action, notwithstanding

1   the presence of extraordinary circumstances, where the agency determines there are

2   circumstances that lessen the impacts or other conditions sufficient to avoid significant effects.

3   40 C.F.R. § 1501.4(b)(1) (2020).  At least until some agency proposes to take an action and

4   applies a categorical exclusion after making such a determination, the States are under no threat

5   of imminent, concrete harm.  If any such imminent, concrete harm materializes in the future, the

6   States can bring an action against the final agency action invoking the categorical exclusion,

7   alleging harm due to the implementation of the 2020 Rule.  That is the kind of APA-compliant

8   action Congress has required and that the constitutional justiciability requirements of standing

9   and ripeness demand.

10          **5.      The States' Speculation About Possible Effects on Their
                     Abilities to Participate in Future NEPA or APA Processes Is
11                   Not justiciable.**

12          *Fifth*, the States express concerns about opportunities to participate in the future NEPA

13  and APA processes.  They express concerns, for example, that allegedly decreased opportunities

14  for public comment will diminish their ability to influence decisionmakers.  Am. Compl. ¶ 193.

15  But the 2020 Rule does not decrease opportunities for public comment.  *Compare, e.g.*, 40 C.F.R

16  § 1501.4(b) (2019) (the then-codified version of the 1978 regulations) ("The agency shall

17  involve environmental agencies, applicants, and the public, to the extent practicable, in preparing

18  assessments required by [these regulations]"), *with* 40 C.F.R. § 1501.5(e) (2020) ("Agencies

19  shall involve the public, State, Tribal, and local governments, relevant agencies, and any

20  applicants, to the extent practicable in preparing environmental assessments.").  To the contrary,

21  the 2020 Rule largely reiterates and expands public participation from that in the 1978

22  regulations.  *See* 85 Fed. Reg. at 43,314 (discussing the 2020 Rule provisions that "bring relevant

23  comments, information, and analyses to the agency's attention, as early in the process as

24  possible").

25          As with their other claims of injuries, the States can only speculate how agencies other

26  than CEQ may apply the 2020 Rule in a way that affects their ability to comment and participate

27  in the NEPA process.  And, of course, if these agencies apply the 2020 Rule in a way that

28  reduces the States' abilities to comment in some legally flawed fashion, they can pursue that

1    deprivation in a challenge to that site-specific application.  *See Nat'l Park Hosp. Ass'n*, 538 U.S.

2    at 812 (concluding that facial challenge to regulations "should await a concrete dispute about a

3    particular" application); *Texas*, 523 U.S. at 301 ("The operation of [a challenged] statute is better

4    grasped when viewed in light of a particular application.").

5           Remarkably, the States also complain that they will have *increased* opportunities to

6    influence decisionmakers by participating in the future APA rulemakings or other procedures

7    that federal agencies will need to undergo to implement the 2020 Rule.  Am. Compl. ¶ 201.  Any

8    injuries that the States may suffer from *voluntarily* participating in future APA rulemakings or

9    proceedings are not cognizable under Article III because they are self-inflicted.  *See Clapper*,

10   568 U.S. at 416 (Parties "cannot manufacture standing merely by inflicting harm on themselves

11   based on their fears of hypothetical future harm that is not certainly impending.").  They are also

12   the result of generalized grievances because APA § 553(c) grants all "interested persons" the

13   ability to participate in a rulemaking.  *See Schlesinger*, 418 U.S. at 220 ("[S]tanding to sue may

14   not be predicated upon an interest . . . which is held in common by all members of the public,

15   because of the necessarily abstract nature of the injury all citizens share.").  Moreover, as already

16   explained, these additional rulemakings or proceedings that agencies must undertake to

17   implement the 2020 Rule are one reason why this facial challenge is not justiciable.  The States

18   may be able to persuade another federal agency to adopt a provision that is consistent with the

19   2020 Rule, but eliminates a feared injury.

20          **6.      Mere Deprivation of a Procedural Right Without
                     Particularized, Concrete Harm Is Not Justiciable Under
21                   Article III.**

22          *Sixth*, and finally, the States allege that they have standing to redress the so-called

23   "procedural harm from CEQ's failure to comply with the procedural requirements of the APA,

24   NEPA, and the ESA."  Am. Compl. ¶ 202.  But the deprivation of a procedural right granted by

25   statute (procedural injury) is insufficient to justify Article III standing.  Even under statutes like

26   the APA or NEPA, which give the public a right to participate in the statutory process, some

27   injury in fact distinct from a procedural claim is essential under Article III, because procedural

28   protections exist only to secure substantive interests, and therefore may be invoked only by

1   persons whose interests are being threatened with concrete and particularized harms.[10]  *See*

2   *Summers*, 555 U.S. at 496 ("[A] procedural right without some concrete interest *that is affected*

3   *by the deprivation*—a procedural right *in vacuo*—is insufficient to create Article III standing.")

4   (emphasis added); *Spokeo, Inc.*, 136 S. Ct. at 1549 ("a bare procedural violation, divorced from

5   any concrete harm," cannot satisfy the injury-in-fact requirement).  Thus, "procedural injury,

6   standing on its own, cannot serve as injury-in-fact." *Rey*, 622 F.3d at 1260; *see also Navajo*

7   *Nation v. Dep't of the Interior*, 876 F.3d 1144, 1161 (9th Cir. 2017); *Ashley Creek Phosphate*

8   *Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005).  Under *Summers*, a "concrete and particular

9   *project* must be connected to the procedural loss."  *See Rey*, 622 F.3d at 1260 (emphasis added).

10   Rather than challenging a project that is threatening an imminent, concrete, and

11   particularized injury that the sought-after procedure could potentially redress, the States contend

12   that their injury stems from their interest in having CEQ "promulgate a rationally supported and

13   lawful rule."  Am. Compl. ¶ 202.  But an interest in compliance with the law is the sort of

14   generalized grievance that does not constitute an injury in fact.  *Defs. of Wildlife*, 504 U.S. at

15   573-74 ("We have consistently held that a plaintiff raising only a generally available grievance

16   about government—claiming only harm to his and every citizen's interest in proper application

17

18

_____

19   [10] Alleging a procedural violation only lessens the "redressability and immediacy" requirements
20   of standing such that litigants need not show the outcome of the procedure statutorily granted to
     them necessarily will redress their threatened injuries.  *See Defs. of Wildlife*, 504 U.S. at 572 n.7.
21   The States still must identify an injury in fact that justifies this Court's exercise of Article III
     jurisdiction and establish a causal connection between the injury and the complained of conduct.
22   *See Summers*, 555 U.S. at 497 ("Unlike redressability, however, the requirement of injury in fact
     is a hard floor of Article III jurisdiction that cannot be removed by statute.").  Moreover, unlike
23   the APA or NEPA, Section 7 of the ESA does not confer a personal procedural right on Plaintiffs
     that relaxes the redressability requirement of standing.  *See Nat'l Ass'n of Home Builders v. Defs.*
24   *of Wildlife*, 551 U.S. 644, 660 n.6 (2007) (holding that there is no "independent right to public
     comment with regard to consultations conducted under [ESA] § 7(a)(2)"); *see also In re*
25   *Endangered Species Act Section 4 Deadline Litig.-MDL No. 2165*, 704 F.3d 972, 979 (D.C. Cir.
26   2013) (concluding plaintiff lacked standing in part because it had "failed to identify a violation
     of a procedural right afforded by the ESA that is designed to protect its interests").
27

28

1   of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him

2   than it does the public at large—does not state an Article III case or controversy.").

3        Nor may the States reframe their procedural deprivation "in terms of informational loss."

4   *See Rey*, 622 F.3d at 1260.  If simply not receiving the information that potentially could result

5   from the NEPA process were sufficient to confer standing, then every person alleging a NEPA

6   claim would have standing, which is why courts have rejected informational injury as a basis for

7   standing in procedural rights cases.  *Id.* (declining to apply the theory of informational injury in

8   the context of a procedural rights case); *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658,

9   674 & n.2 (D.C. Cir. 1996) (citing *Lyng*, 943 F.2d at 84).  As the Ninth Circuit held in *Rey*, any

10  attempt by the States to reframe an alleged procedural deprivation "in terms of informational

11  loss" fails because it is untethered to a concrete application of the 2020 Rule.  622 F.3d at 1260;

12  *see also Dreher*, 856 F.3d at 346 ("it would be an end-run around the qualifications for

13  constitutional standing if any nebulous frustration resulting from a statutory violation would

14  suffice as an informational injury").

15       Ultimately, the States' allegation of "procedural" harms under NEPA, the APA, and ESA

16  adds nothing to their purported standing.[11]  It, too, fails because the States cannot show actual

17  and imminent harm caused by the mere unapplied existence of the 2020 Rule.  It makes no

18  difference that the States label their claims as procedural.  Generalized grievances and

19  speculative allegations of possible future harm are not sufficient under Article III to establish

20  standing.  In short, the States lack standing to challenge the 2020 Rule in the absence of a live

21  dispute over a concrete application of those regulations.  *See Rey*, 622 F.3d at 1260 (Under

---

[11] Moreover, unlike the APA, which provides citizens a right to participate in a rulemaking, or
NEPA, which provides citizens the right to participate in the preparation of an EIS, Section 7 of
the ESA does not confer a personal procedural right on Plaintiffs that relaxes the redressability
requirement of standing.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644,
660 n.6 (2007) (holding that there is no "independent right to public comment with regard to
consultations conducted under [ESA] § 7(a)(2)"); *see also In re Endangered Species Act Section
4 Deadline Litig.-MDL No. 2165*, 704 F.3d 972, 979 (D.C. Cir. 2013) (concluding plaintiff
lacked standing in part because it had "failed to identify a violation of a procedural right afforded
by the ESA that is designed to protect its interests").

*Summers*, a "concrete and particular *project* must be connected to the procedural loss") (emphasis added).

***

In sum, the States' fears are premised on speculation about what federal agencies other than CEQ might do or require someday in the future, which plainly does not satisfy the requirements of Article III. *See Whitmore*, 495 U.S. at 158 ("Allegations of possible future injury do not satisfy the requirements of Art. III."). This sort of open-ended conjecture about pending and future agency actions embodies the very "conjectural or hypothetical" injuries that are not "concrete and particularized" and "actual or imminent," and thus do not confer standing. *See Defs. of Wildlife*, 504 U.S. at 560; *Clapper*, 568 U.S. at 410. And even when federal agencies apply the 2020 Rule, the States would still need to show the injury "fairly traceable" to the changes of the 2020 Rule. *See Defs. of Wildlife*, 504 U.S. at 560 ("there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant" (citation and internal quotation marks omitted)).

Because the States fail to allege the kinds of concrete and particularized injuries that may only come from real-world applications of the 2020 Rule, which they do not challenge, they lack Article III standing.

<strong>CONCLUSION</strong>

For the foregoing reasons, the Court should grant the motion to dismiss.

Dated: December 1, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL E. SALAMANCA
Deputy Assistant Attorney General

*/s/ Allen M. Brabender*
ALLEN M. BRABENDER
MN State Bar No. 0324012
Attorney, Appellate Section
U.S. Department of Justice
Environment and Natural Resources Division
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-5316
E-mail: allen.brabender@usdoj.gov

BARCLAY T. SAMFORD
NM State Bar No. 12323
Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1475
E-mail: clay.samford@usdoj.gov

CLARE BORONOW
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1362
clare.boronow@usdoj.gov