XAVIER BECERRA
Attorney General of California
SARAH E. MORRISON, SBN 143459
Supervising Deputy Attorney General
JAMIE B. JEFFERSON, SBN 197142
JOSHUA R. PURTLE, SBN 298215
JULIA K. FORGIE, SBN 304701
LANI M. MAHER, SBN 318637
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Phone: (510) 879-1002
Fax: (510) 622-2270
Jamie.Jefferson@doj.ca.gov
Joshua.Purtle@doj.ca.gov

*Attorneys for Plaintiff State of California*

ROBERT W. FERGUSON
Attorney General of Washington
AURORA JANKE, *Pro Hac Vice*
ELIZABETH HARRIS, *Pro Hac Vice*
Assistant Attorneys General
Counsel for Environmental Protection
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104-3188
Phone: (206) 233-3391
Fax: (206) 464-6451
Aurora.Janke@atg.wa.gov
Elizabeth.Harris@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

*[Additional counsel listed on signature page]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, ET. AL.,<br><br>Plaintiffs,<br><br>v.<br><br>COUNCIL OF ENVIRONMENTAL QUALITY AND MARY B. NEUMAYR**,** in her official capacity as Chairman of the Council on Environmental Quality<br><br>Defendants,<br><br>AMERICAN FARM BUREAU FEDERATION, ET. AL.,<br><br>Defendant-Intervenors. | Case No. 3:20-cv-06057<br><br>**STATE PLAINTIFFS' CONSOLIDATED OPPOSITION TO FEDERAL DEFENDANTS AND DEFENDANT INTERVENORS' MOTIONS TO DISMISS**<br><br>Date:        February 25, 2021<br>Time:        1:30pm<br>Dept.:       Courtroom 3<br>Judge:       Hon. Richard Seeborg |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ISSUE STATEMENT ......................................................................................................... 3

BACKGROUND ................................................................................................................. 3

    I.   The Administrative Procedure Act ............................................................. 3

    II.  The Endangered Species Act ...................................................................... 4

    III. The National Environmental Policy Act .................................................... 4

    IV. CEQ's Previous, Longstanding NEPA Regulations ................................. 8

    V.  CEQ's Final Rule ..................................................................................... 10

STANDARD OF REVIEW ............................................................................................... 12

ARGUMENT ..................................................................................................................... 12

    I.   State Plaintiffs Have Standing to Bring This Action ............................... 12

         A.   The Final Rule Harms State Plaintiffs ........................................ 14

             1.   State Plaintiffs' concrete interests will be harmed by the Final Rule ....... 14

             2.   State Plaintiffs need not wait for specific applications of the Final Rule to challenge its unlawful promulgation ............................................. 18

             3.   CEQ and Intervenors' other arguments against State Plaintiffs' harms lack merit ............................................................. 20

         B.   State Plaintiffs Have Demonstrated Causation and Redressability ................. 24

    II.  State Plaintiffs' Challenge Is Ripe for Review ........................................ 26

         A.   State Plaintiffs Satisfy Constitutional Ripeness ........................... 27

         B.   State Plaintiffs Satisfy Prudential Ripeness .................................. 27

             1.   State Plaintiffs' challenge is fit for judicial review ................................. 28

             2.   Withholding judicial review would impose hardship on State Plaintiffs ............................................. 31

         C.   A Facial Challenge to the Final Rule is Consistent with the APA ................. 33

CONCLUSION ................................................................................................................... 36

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ..................................................................................... 26, 33, 34

*Air All. Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018) ................................................................................ 16

*Alaska Cmty. Action on Toxics v. CEQ*,
   No. 3:0-cv-05199-RS (Dec. 1, 2020) .......................................................................... 3

*Andrus v. Sierra Club*,
   442 U.S. 347 (1979) ....................................................................................................... 5

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
   397 U.S. 150, (1970) ......................................................................................... 3, 34, 35

*Barnes v. Dep't of Transp.*,
   655 F.3d 1124 (9th Cir. 2011) ..................................................................................... 9

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................... 26, 35

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
   524 F.3d 938 (9th Cir. 2008) ...................................................................................... 24

*Bishop Paiute Tribe v. Inyo Cty.*,
   863 F.3d 1144 (9th Cir. 2017) ................................................................................... 27

*California ex rel. Becerra v. Sessions*,
   284 F. Supp. 3d 1015 (N.D. Cal. 2018) ................................................................... 27

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
   575 F.3d 999 (9th Cir. 2009) ...................................................................................... 32

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ...................................................................................... 16

*California v. Bernhardt*,
   460 F. Supp. 3d 875 (N.D. Cal. 2020) ..................................... 2, 3, 12–15, 17, 20

*California v. Bernhardt*,
   No. 4:19-cv-06013-JST (Dec. 6, 2019), ECF No. 46 ............................................... 3

*California v. Ross*,
   362 F. Supp. 3d 727 (N.D. Cal. 2018) ..................................................................... 36

*California v. Trump,*
 963 F.3d 926 (9th Cir. 2020), *cert. granted sub nom. Trump v. Sierra Club,* No. 20-
 138, 2020 WL 6121565 (U.S. Oct. 19, 2020) ........................................................ 13

*Cent. Delta Water Agency v. United States,*
 306 F.3d 938 (9th Cir. 2002) .......................................................................... 15, 18

*Citizens for Better Forestry v. U.S. Dep't of Agric.,*
 341 F.3d 961 (9th Cir. 2003) ....................................................................... 6, 24, 28

*City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.,*
 981 F.3d 742 (9th Cir. 2020) ............................................................................... 3

*City and Cnty. of S.F. v. Whitaker,*
 357 F. Supp. 3d 931 (N.D. Cal. 2018) ................................................................. 25

*Clapper v. Amnesty Intern. USA,*
 568 U.S. 398 (2013) ........................................................................................... 18

*Clark v. City of Seattle,*
 899 F.3d 802 (9th Cir. 2018) ............................................................................... 27

*Cottonwood Env'tl Law Ctr. v. U.S. Forest Serv.,*
 789 F.3d 1075 (9th Cir. 2015) ....................................... 17, 18, 22, 25, 27, 29

*Ctr. for Biological Diversity v. Kempthorne,*
 588 F.3d 701 (9th Cir. 2009) ................................................................. 28, 29, 30, 31

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
 538 F.3d 1172 (9th Cir. 2008) ............................................................................. 23

*Davis v. Federal Election Comm'n,*
 554 U.S. 724 (2008) ........................................................................................... 12

*Dep't of Commerce v. New York,*
 139 S. Ct. 2551 (2019) ........................................................................... 12, 13, 24, 26

*Department of Transportation v. Public Citizen,*
 541 U.S. 752 (2004) ..................................................................................... 22, 23

*Encino Motorcars, LLC v. Navarro,*
 136 S. Ct. 2117 (2016) ...................................................................................... 25

*Energy Future Coal. v. EPA,*
 793 F.3d 141 (D.C. Cir. 2015) ........................................................................ 28, 29

*Env'tl Justice Health All. v. CEQ,* No. 1:20-cv-06143-CM (Nov. 11, 2020) ............................. 3

*Env'tl Prot. Info. Ctr. v. Simpson Timber Co.*,
   255 F.3d 1073 (9th Cir. 2001) ........................................................ 36

*Gompper v. VISX, Inc.*,
   298 F.3d 893 (9th Cir. 2002) .......................................................... 36

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*,
   816 F.3d 1241 (9th Cir. 2016) .............................................. 12, 30, 33

*Idaho Conserv. League v. Mumma*,
   956 F.2d 1508 (9th Cir. 1992) ........................................................ 13

*Ilio'ulaokalani Coal. v. Rumsfeld*,
   464 F.3d 1083 (9th Cir. 2006) ........................................................ 23

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
   402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................ 22

*Iowa Citizens for Cmty. Improvement v. CEQ*, No. 1:20-cv-02715-TJK (Oct. 15, 2020) ......... 3

*Kern v. Bureau of Land Mgmt.*,
   284 F.3d 1062 (9th Cir. 2002) .......................................................... 9

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
   387 F.3d 989 (9th Cir. 2004) ............................................................ 9

*Kootenai Tribe of Idaho v. Veneman*,
   313 F.3d 1094 (9th Cir. 2002) ........................................................ 35

*Lexmark Int'l, Inc. v. Static Control Components*,
   *Inc.*, 572 U.S. 118 (2014) ............................................................. 35

*Lujan v Nat'l Wildlife Federation*,
   497 U.S. 871 (1990) ...................................................................... 29

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .......................................................... 12, 15, 20, 25

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ........................................................ 13, 15, 20, 24

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ...................................................................... 35

*Nat. Res. Def. Council v. Jewell*,
   749 F.3d 776 (9th Cir. 2014) .......................................................... 17

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   440 F.3d 459 (D.C. Cir. 2006) ........................................................ 28

*Nat'l Min. Ass'n v. Fowler*,
  324 F.3d 752 (D.C. Cir. 2003) .................................................................................. 21

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) ..................................................................................... 27, 30

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ........................................................................ 27, 28, 29, 32

*Reno v. Cath. Soc. Servs. Inc.*,
  509 U.S. 43 (1993) ........................................................................................ 30, 34

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ......................................................................................... 5, 9

*Rumsfeld v. Forum for Academic & Inst. Rights, Inc,*.
  547 U.S. 47 (2006) .............................................................................................. 13

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ..................................................................... 12, 22

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
  638 F.3d 1163 (9th Cir. 2011) ............................................................................ 30

*Sierra Club v. Marsh*,
  872 F.2d 497 (1st Cir. 1989) ................................................................................ 6

*Sierra Club v. Marsh*,
  976 F.2d 763 (1st Cir. 1992) .............................................................................. 24

*Sierra Club v. Trump*,
  929 F.3d 670 (9th Cir. 2019) .............................................................................. 35

*Sierra Forest Legacy v. Sherman*,
  646 F.3d. 1161 (9th Cir. 2011) ....................................................... 18, 19, 20, 30

*State of Cal. ex rel. State Water Res. Control Bd. v. FERC*,
  966 F.2d 1541 (9th Cir. 1992) ............................................................................ 29

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009) ..................................................................................... 18, 19

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................................... 13, 18, 27

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) .............................................................................................. 4

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ................................................................... 13, 16, 33

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ....................................................................... 27

*Thomas v. Peterson,*
    753 F.2d 754 (9th Cir. 1985) ......................................................................... 22

*U.S. West Commc'n v. MFS Intelenet, Inc.,*
    193 F.3d 1112 (9th Cir.1999) ........................................................................ 28

*W. Watersheds Project v. Kraayenbrink,*
    632 F.3d 472, (9th Cir. 2011) ................................................... 4, 14, 17, 25, 32

*Washington Toxics Coal. v. U.S. Dep't of Interior,*
    457 F. Supp. 2d 1158 (2006) .......................................................................... 31

*Western Oil & Gas Ass'n v. EPA,*
    633 F.2d 803 (9th Cir. 1980) ......................................................................... 29

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................................ 28, 29

*Wild Virginia v. CEQ,*
    No. 3:20-cv-00045-NKM (Aug. 25, 2020) ......................................................... 3

*Wild Virginia v. CEQ,*
    3:20-cv-00045 (W.D. Va. Sept. 21, 2020) ........................................................ 2

*Wild Virginia. v CEQ,*
    3:20-cv-00045-JPJ-PMS (Sept. 2, 2020) ......................................................... 35

*WildEarth Guardians v. Provencio,*
    923 F.3d 655 (9th Cir. 2019) ......................................................................... 35

*Wilderness Soc. v. U.S. Forest Serv.,*
    630 F.3d 1173 (9th Cir. 2011) ....................................................................... 35

*Wilderness Society v. Rey,*
    622 F.3d 1251 (9th Cir. 2010) ................................................................... 18, 19

*Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold &*
    *Easement in the Cloverly Subterranean, Geological Formation,*
    524 F.3d 1090 (9th Cir. 2008) ....................................................................... 22

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................................... 5

*Wolfe v. Strankman,*
    392 F.3d 358 (9th Cir. 2004) .................................................................... 12, 21

## Statutes

16 U.S.C. § 1536(a)(2) ..................................................................................... 4, 34

16 U.S.C. § 1540(g) .............................................................................................. 34

42 U.S.C. § 4331(a) ................................................................................................ 5

42 U.S.C. § 4332 ......................................................................................... 5, 6, 13

42 U.S.C. § 4332(G) ............................................................................................... 5

42 U.S.C. § 4342 .................................................................................................... 8

5 U.S.C. § 551(13) .................................................................................................. 3

5 U.S.C. § 553(a)(3)(A) ........................................................................................ 30

5 U.S.C. § 702 ................................................................................................... 3, 33

5 U.S.C. § 704 ........................................................................................................ 3

N.Y. Env't. Conserv. Law § 8-0105(3)-(4) ........................................................ 13

Wash. Rev. Code § 43.21C.020(2) ...................................................................... 13

## Other Authorities

43 Fed. Reg. 25,230 (May 31, 1978) ..................................................................... 8

43 Fed. Reg. 55,978 (Nov. 29, 1978) .................................................................... 8

Final Rule, Update to the Regulations Implementing the Procedural Provisions of the
  National Environmental Policy Act
  85 Fed. Reg. 43,304 (July 16, 2020) (codified at 40 C.F.R. pt. 1500) ........... 1, 10, 31, 33, 35

S. Comm. on Interior & Insular Affairs and H.R. Comm. on Science and Astronautics,
  90th Congress,
  *Congressional White Paper on a National Policy for the Environment* (Oct. 1968) .............. 4

S. Rep. No. 91-296 (1969) ................................................................................... 4, 5

## Regulations

40 C.F.R. § 1500.1(a) (1978) ................................................................................. 8

40 C.F.R. § 1500.1(b) (1978) ................................................................................. 9

40 C.F.R. § 1500.1(c) (1978) ................................................................................. 8

40 C.F.R. § 1500.2(d) (1978) ................................................................................. 9

40 C.F.R. § 1502.23 (2020) .................................................................................. 11

40 C.F.R. § 1506.13 (2020) .................................................................................. 26

40 C.F.R. § 1507.3(a) (2020).................................................................... 11, 15, 26

40 C.F.R. § 1507.3(b) (2020)................................................................................ 11

50 C.F.R. § 402.02 ............................................................................................... 34

50 C.F.R. § 402.12(a) ............................................................................................. 4

N.Y. COMP. CODES R. & REGS. tit. 6, § 617.2 (c) ................................................ 13

N.Y. COMP. CODES R. & REGS. tit. 6, § 617.2(b)................................................. 13

WASH. ADMIN. CODE §§ 197-11-704..................................................................... 13

Opposition to Motions to Dismiss
Case No. 3:20-cv-06057 :

**INTRODUCTION**

The National Environmental Policy Act (NEPA) serves as our nation's bedrock law for environmental and public health protection by directing federal agencies to make transparent, well-informed decisions through a process that involves meaningful public participation. NEPA prioritizes careful, informed decision making over rushed and reckless action, enabling agencies to consider and adopt alternatives to a proposed action or incorporate mitigation measures to protect public health, preserve irreplaceable natural resources for current and future generations, and avoid long-term, irreversible, and costly environmental harms.

State Plaintiffs, which include 21 states, the territory of Guam, the District of Columbia, Harris County, Texas, and the City of New York, challenge the Council on Environmental Quality and Chairman Mary B. Neumayr's (collectively, CEQ) promulgation of a Final Rule[1] that undermines fundamental requirements of NEPA and violates procedural requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–706, the Endangered Species Act, (ESA) 16 U.S.C. §§ 1531–44, and NEPA itself, 42 U.S.C. §§ 4321–47. *See generally* First Am. Complaint for Declaratory and Injunctive Relief (Complaint), ECF No. 75. CEQ's promulgation of the Final Rule is fundamentally flawed. The Final Rule conflicts with NEPA and includes provisions that exceed CEQ's authority. In promulgating the Final Rule, CEQ bypassed basic principles of the APA rulemaking process by failing to provide reasoned analysis and support for its regulatory revisions rendering the rulemaking arbitrary and capricious. CEQ also violated the APA by failing to respond adequately to comments, including those submitted by State Plaintiffs. In addition, CEQ failed to adhere to NEPA, itself, by refusing to conduct environmental review on the significant environmental and public health impacts of the Final Rule. Finally, CEQ failed to consult with the appropriate federal agencies regarding the Final Rule's potential impacts on threatened and endangered species in violation of the ESA.

---

[1] Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (Final Rule), 85 Fed. Reg. 43,304 (July 16, 2020) (codified at 40 C.F.R. pt. 1500).

1   State Plaintiffs have standing to bring this challenge and their claims are ripe.  As

2   described in detail below, State Plaintiffs suffer sovereign, proprietary, and procedural harms,

3   including harms to State Plaintiffs' natural resources and increased risk of climate change

4   impacts, from CEQ's unlawful promulgation of the Final Rule that severely restricts the scope

5   and application of NEPA's environmental review provisions.  The Final Rule is in effect and

6   applies to all federal agencies.  The Final Rule will result in fewer and less robust environmental

7   reviews for proposed actions across the country, including in plaintiff States, causing

8   environmental and public health harms, sidelining public participation, aggravating

9   disproportionate impacts to vulnerable communities and communities of color, and reducing

10  access to judicial review of agency actions that violate NEPA.  *See* Compl. ¶¶ 5, 9, 178, 189,

11  193–95.  Because State Plaintiffs suffer an injury-in-fact from CEQ's Final Rule, State Plaintiffs'

12  claims are constitutionally ripe.  State Plaintiffs' claims are also prudentially ripe because they are

13  purely legal claims that will not benefit from further factual development and State Plaintiffs will

14  suffer hardship if this Court declines to review their claims.  For these reasons, the Court should

15  deny CEQ and Intervenors' motions to dismiss and review State Plaintiffs' challenge on the

16  merits.

17      In their motions to dismiss the Complaint, CEQ and Intervenors seek to dismiss State

18  Plaintiffs' legal claims by erroneously arguing that there is a presumption *against* judicial review

19  of the Final Rule and that State Plaintiffs cannot challenge promulgation of the Final Rule unless

20  they challenge a specific application of the Final Rule by a different federal agency.  CEQ and

21  Intervenors' arguments are based on a misreading of the law and a blatant distortion of State

22  Plaintiffs' claims as a challenge to the implementation of the Final Rule rather than a challenge to

23  its unlawful promulgation.  This Court and others have rejected similar arguments.  Order, *Wild*

24  *Virginia v. CEQ*, No. 3:20-cv-00045 (W.D. Va. Sept. 21, 2020), ECF No. 98 (denying motion to

25  dismiss plaintiffs' challenge to the Final Rule at issue in this case based on ripeness and standing

26  arguments); *California v. Bernhardt*, 460 F. Supp. 3d 875, 884 (N.D. Cal. 2020) (denying motion

27

28

1  to dismiss states' challenge to ESA regulations based on standing and ripeness arguments).[2]  This

2  Court, too, should reject CEQ and Intervenors' attempts to shield the Final Rule from judicial

3  review.

**ISSUE STATEMENT**

5  Should the Court deny CEQ and Intervenors' Motions to Dismiss because State Plaintiffs

6  have standing and their claims are ripe?

**BACKGROUND**

8  **I.      The Administrative Procedure Act**

9  The APA contains "generous review provisions" that courts construe to serve a "broadly

10  remedial purpose." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 156

11  (1970)(citation omitted).  Under the APA, "[a] person suffering legal wrong because of agency

12  action, or adversely affected or aggrieved by agency action within the meaning of a relevant

13  statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Agency actions subject to judicial

14  review include those "made reviewable by statute and final agency action for which there is no

15  other adequate remedy in a court," including agency rulemaking. *Id*. §§ 551(13); 704.  Courts

16  routinely review challenges to federal rulemakings under the APA. *See, e.g.*, *City & Cty. of San*

17  *Francisco v. U.S. Citizenship & Immigration Servs.*, 981 F.3d 742, 749 (9th Cir. 2020) (reviewing

18  APA challenge to Department of Homeland Security's "public charge" rule); *California*, 460 F.

19  Supp. 3d at 881–84 (allowing multi-state APA challenge to rules implementing the ESA).

20  _____

21  [2] The arguments CEQ makes in this case closely track the arguments CEQ made in their motion to dismiss Wild Virginia's challenge to Final Rule, Br. in Supp. of Mot. to Dismiss, *Wild*
22  *Virginia v. CEQ*, No. 3:20-cv-00045-NKM (Aug. 25, 2020), ECF No. 53, and arguments federal defendants made in their motion to dismiss the multi-state challenge to rules implementing the
23  ESA, Mot. to Dismiss and Mem. of P. & A., *California v. Bernhardt*, No. 4:19-cv-06013-JST (Dec. 6, 2019), ECF No. 46.  CEQ has filed similar motions to dismiss the three other pending
24  challenges to the Final Rule, including the case related to this action. *See Alaska Cmty. Action on*
25  *Toxics v. CEQ*, No. 3:20-cv-05199-RS (Dec. 1, 2020), ECF No. 43; *Env'tl Justice Health All. v. CEQ*, No. 1:20-cv-06143-CM (Nov. 11, 2020), ECF Nos. 47, 48, 50 (order granting extension of
26  time); *Iowa Citizens for Cmty. Improvement v. CEQ*, No. 1:20-cv-02715-TJK (Oct. 15, 2020), ECF Nos. 8, 8-1.  At the time of this filing, only the Western District of Virginia has ruled on
27  CEQ's motion with a summary denial. *See* Order, *Wild Virginia*, No. 3:20-cv-00045 (W.D. Va. Sept. 21, 2020), ECF No. 98.

28

3

1

## II.     The Endangered Species Act

Congress enacted the ESA "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).  Section 7 of the ESA codifies "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species," elevating concern for the protection of such species "over the primary missions of federal agencies." *Id*. at 185 (quotation omitted).  Pursuant to section 7, unless an exemption has been granted, each federal agency must, in consultation with the Fish and Wildlife Service or the National Marine Fisheries Service (Services), "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" such species' critical habitat. 16 U.S.C. § 1536(a)(2).  "The minimum threshold for an agency action to trigger consultation with FWS is low." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011).  Consultation is required if a prospective agency action may affect a listed species or designated critical habitat. *Id*.; 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(a).

## III.     The National Environmental Policy Act

Congress enacted NEPA at a time of heightened awareness and growing concern about the environment, amid a series of high-profile environmental crises in the late 1960s. Compl. ¶ 136. The national perspective was shifting from "preoccupation with the extraction of natural resources to the more compelling problems of deterioration in natural systems of air, land, and water." *Id*. (quoting S. Comm. on Interior & Insular Affairs and H.R. Comm. on Science and Astronautics, 90th Congress, *Congressional White Paper on a National Policy for the Environment*, at 1 (Oct. 1968)).  Congress was particularly concerned with halting "small but steady" incremental harms to our nation's limited environmental resources, "which perpetuate rather than avoid the recognized mistakes of previous decades. Compl. ¶ 137 (quoting S. Rep. No. 91-296, at 5 (1969)).  NEPA thus emphasizes the "critical importance of restoring and maintaining environmental quality to the overall welfare and development of man" and articulates a national policy of cooperation with state and local governments as well as concerned

4

1   individuals and private organizations "to use all practicable means . . . to create and maintain

2   conditions under which man and nature can exist in productive harmony, and fulfill the social,

3   economic, and other requirements of present and future generations of Americans." 42 U.S.C.

4   § 4331(a).

5        NEPA's core mandate is a detailed environmental review process. NEPA directs federal

6   agencies to implement NEPA "to the fullest extent possible" and to conduct a detailed

7   environmental review for "major Federal actions significantly affecting the quality of the human

8   environment" that analyzes an action's environmental impacts, alternatives to the proposed

9   action, the relationship between short-term uses and long-term productivity, and any irreversible

10  and irretrievable commitment of resources. 42 U.S.C. § 4332. As the Supreme Court has

11  explained, Congress intended NEPA's "action-forcing procedures" to help "insure that the

12  policies [of NEPA] are implemented." *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979) (quoting

13  S. Rep. No. 91-296, at 19 (1969)). NEPA thus requires federal agencies to make well-informed

14  decisions, through a public process that fully accounts for the environmental and public health

15  impacts of federal actions, and by encouraging mitigation or avoidance of those harms before an

16  agency approves an action. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

17  (1989).

18       Cooperation with states and local governments and the public is an essential component of

19  NEPA because public participation is critical to informed decision making. *See* 42 U.S.C.

20  §§ 4331(a), 4332(G). NEPA accordingly requires federal agencies to work in concert with states,

21  local governments, institutions, organizations, and individuals by making available "advice and

22  information useful in restoring, maintaining, and enhancing the quality of the environment." *Id*.

23  § 4332(G). NEPA thus "guarantees that the relevant information will be made available to the

24  larger audience that may also play a role in both the decisionmaking process and the

25  implementation of that decision." *Robertson*, 90 U.S. at 349.

26       Courts have repeatedly recognized that NEPA's procedural requirements are designed to

27  prevent environmental harm. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23,

28  (2008) ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there

5

may be little if any information about prospective environmental harms and potential mitigating measures.").  Stated simply, the harm from an agency's failure to comply with NEPA is a "harm to the environment."  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003) (quotation omitted); *see also Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (when agencies fail to follow NEPA's procedures, "the harm at stake is a harm to the *environment*").

NEPA's scope is far-reaching.  Every federal agency must conduct environmental review for every major federal action significantly affecting the environment.  42 U.S.C. § 4332.  NEPA thus applies in all states, territories, districts, counties, and cities across the country (including in all State Plaintiffs' jurisdictions) where major federal actions occur.  *See* Compl. ¶¶ 25–27, 30, 32–33, 36–37, 41, 43, 44, 46, 48, 50–51, 53-55, 58–60, 62, 65–67, 70–72, 74–75, 77–78, 80, 82–84, 87, 90, 92, 96–97, 99, 101, 105-07, 109–11, 115–16, 119–21, 123–24, 127, 129.  These actions often impact state resources, including impacts on climate change, state public lands, state coastlines, wildlife, threatened and endangered species, water, air, cultural resources, state transportation systems and infrastructure, tourism, recreation, and public health.  *See id.* ¶¶ 33, 37, 44, 51, 67, 75, 79–80, 96–97, 101, 107, 109, 116, 120.  In some states, Guam, and the District of Columbia, federal lands comprise a significant portion of the state, territory, or district lands and federal actions on those lands often affect State Plaintiffs' natural resources, recreation, and tourism.  *See id.* ¶ 71 (federal lands comprise 84.9% of Nevada's lands); ¶ 77 (federally administered lands comprise one-third of New Mexico's land); ¶¶ 91–92 (more than half of Oregon's lands are owned by the federal government); ¶ 120 (U.S. Department of Defense controls over 25% of Guam); ¶ 123 (federal government owns one-third of the land in the District of Columbia, 85% of the District's shoreline, and owns the riverbed of the District's two major rivers).  In other states and communities, federal projects include large-scale pipeline projects that can impact state resources and public health and contribute to the harmful impacts of climate change.  *See id.* ¶¶ 51, 67, 116, 127.

State and territorial agencies, local governments, and the public have long relied on the NEPA process to identify harms from federal actions to state and territorial natural resources

1    (including State Plaintiffs' air, water, public lands, cultural resources, and wildlife) and public

2    health that might otherwise be ignored.  *See id*. ¶¶ 5, 27, 33, 37–38, 44, 48, 55, 60, 64, 72, 75, 80,

3    84, 88, 93, 97, 102, 107, 111, 116, 121.  NEPA's public process also provides vulnerable

4    communities and communities of color disproportionately affected by environmental harms with

5    a critical voice in the decision making process regarding actions that threaten further adverse

6    environmental and health impacts to their communities.  *Id*. ¶ 5.  NEPA's focus on government

7    transparency and public participation thus ensures that states, territories, local governments,

8    businesses, organizations, and individuals have an opportunity to advocate for better decisions

9    that reduce environmental and public health harms.  *See id*.

10       State Plaintiffs engage in the NEPA process in numerous ways.  In some instances, such as

11   with the New York City Department of Housing Preservation and Mayor's Office of Management

12   Budget, State Plaintiff agencies have assumed NEPA responsibilities and are thus themselves

13   subject to the Final Rule.  *Id*. ¶ 129.  In most instances, however, State Plaintiffs participate in the

14   NEPA process as a collaborating or commenting agency or as an agency with special expertise

15   highlighting potential impacts to state natural resources and public health.  *Id*. ¶¶ 27, 33, 37, 44,

16   48, 55, 60, 64, 72, 75, 80, 84, 88, 93, 97, 102, 107, 111, 116, 121, 127.  Often these NEPA

17   processes rely on cooperation between federal and state agencies to reach a fully informed result

18   that benefits state and federal interests, such as the construction of major infrastructure projects

19   like the State Route 99 Alaskan Way viaduct in Washington, a new offshore wind energy project

20   off Rhode Island's coast, a proposed bridge corridor in Wisconsin, and the I-90 Allston highway

21   project in Massachusetts.  *See id*. ¶¶ 33, 97, 107, 111.  However, in other situations, such as

22   certain actions on federal lands or military training exercises, NEPA may be the sole means for

23   state agencies to advocate for protection of state resources and to identify unintended

24   consequences of a proposed federal action.  *Id*. ¶¶ 33, 44, 72, 97, 193, 199.

25       In addition, where appropriate, state agencies have relied on NEPA environmental review

26   documents to inform analyses under state environmental review laws and to ensure compliance

27   with state laws and policies.  *Id*. ¶¶ 84, 112, 125, 129, 147, 198.  In fact, CEQ and several states

28   have long worked together to harmonize the environmental review processes under NEPA and

1  state environmental review laws through state-specific memoranda with the goal of allowing

2  state, local, and federal agencies to share documents, reduce paperwork, and efficiently allocate

3  limited time and resources.  *Id*. ¶ 148.  States rely on this collaboration and the existence and

4  comprehensiveness of federal NEPA documents prepared under CEQ's previous, longstanding

5  regulations to allocate state resources and determine staffing needs and to protect state natural

6  resources and public health.  *Id*. ¶¶ 5, 48, 60, 129, 148, 188–89, 193–95, 197–98.

7  **IV.    CEQ's Previous, Longstanding NEPA Regulations**

8        When Congress enacted NEPA it also created Defendant CEQ and directed it to appraise

9  federal programs and activities in light of NEPA's overarching policies.  *Id*. ¶ 146; 42 U.S.C.

10  § 4342.  In 1977, President Carter issued Executive Order 11,991, directing CEQ to issue

11  regulations governing federal agency implementation of NEPA.  Compl. ¶ 155 (citing Relating to

12  Protection and Enhancement of Environmental Quality, Exec. Order No. 11,991, 42 Fed. Reg.

13  26,967 (May 24, 1977) (amending Exec. Order No. 11,514)).

14        To develop the NEPA regulations, CEQ conducted extensive outreach by soliciting input

15  from private organizations, individuals, state and local agencies, and Federal agencies, holding

16  public hearings, and considering studies of the environmental impact statement process.  *Id*. ¶ 156

17  (citing NEPA—Regulations, Implementation of Procedural Provisions, 43 Fed. Reg. 55,978,

18  55,980 (Nov. 29, 1978)).  CEQ also prepared an environmental assessment of its proposed

19  implementing regulations.  *Id*. ¶ 157 (citing Proposed Implementation of Procedural Provisions,

20  43 Fed. Reg. 25,230, 25,232 (May 31, 1978)).

21        CEQ finalized its NEPA regulations in 1978 (1978 Regulations).  *Id*. ¶ 158.  These

22  comprehensive regulations implemented the "action-forcing" elements of NEPA "to tell federal

23  agencies what they must do to comply with the procedures and achieve the goals of" the statute.

24  40 C.F.R. § 1500.1(a) (1978).  The 1978 Regulations also emphasized NEPA's role as "our basic

25  national charter for protection of the environment" and explained that "[t]he NEPA process is

26  intended to help public officials make decisions that are based on understanding of environmental

27  consequences, and take actions that protect, restore, and enhance the environment."  *Id*.

28  § 1500.1(a), (c) (1978).  Consistent with NEPA, the 1978 Regulations also required transparency

8

in government decision making by ensuring agencies provide information to the public "before decisions are made and before actions are taken" and by directing agencies to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment," *id*. §§ 1500.1(b), 1500.2(d) (1978).  These regulations remained largely unchanged for over 40 years. Compl. ¶ 162.

Federal courts, including the Ninth Circuit, have developed a robust body of case law applying and interpreting NEPA and CEQ's 1978 regulations, holding agencies accountable to NEPA's mandates and providing direction to agencies on how to comply with both the statute and CEQ's regulations.  *See, e.g.*, *Robertson*, 490 U.S. at 351–52; *Barnes v. Dep't of Transp.*, 655 F.3d 1124, 1139–41 (9th Cir. 2011); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004); *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002).

NEPA and the 1978 Regulations have promoted more environmentally protective and transparent agency decisions, without imposing overly burdensome requirements.  Compl. ¶¶ 167, 169.  CEQ and other federal offices and agencies have long celebrated NEPA's success in achieving these purposes, and CEQ has issued a number of studies documenting NEPA's effectiveness.  *Id*. ¶ 167.  For example, in its NEPA Effectiveness Study, a 25-year review of NEPA's implementation, CEQ emphasized that "NEPA is a success—it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute."  *Id*.  Likewise, in its 2007 guide to citizen participation, CEQ recognized that "[s]ome of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS."  AR997103 (Comments of Attorneys General of Washington, et al., at 10 & n.20 (Mar. 10, 2020)).  As the Government Accountability Office explained in 2014, the NEPA process "ultimately saves time and reduces overall project costs by identifying and avoiding problems that may occur in later stages of project development."  Compl. ¶ 169.  Similarly, U.S. Forest Service officials have observed that "NEPA leads to better decisions."  *Id*.

9

1    ## V.    CEQ's Final Rule

2        Despite strong opposition from State Plaintiffs and others to CEQ's misguided proposal to

3    drastically revise its NEPA regulations, CEQ issued the Final Rule on July 15, 2020.  The Final

4    Rule took effect September 14, 2020, and applies to all federal agencies.  Final Rule, 85 Fed. Reg.

5    at 43,372–73 (codified at 40 C.F.R. § 1506.13 (2020)).  Where the Final Rule conflicts with an

6    agency-specific NEPA rule, CEQ directs agencies to apply the Final Rule, which, among other

7    things, establishes a ceiling on the scope of environmental review that agencies can perform.  *Id*.

8    at 43,373 (codified at 40 C.F.R. §§ 157.3(a), (b) (2020)).  In contrast to the environmental

9    assessment CEQ prepared before promulgating the 1978 Regulations, CEQ did not conduct any

10   NEPA environmental review before issuing the Final Rule, and CEQ's cursory discussion of

11   environmental impacts in its Regulatory Impact Analysis does not satisfy NEPA's requirements.

12   Compl. ¶ 179.  CEQ also did not consult with the Services under the ESA regarding the impacts

13   that the Final Rule may have on federally listed endangered and threatened species.  *Id*. ¶ 180.

14       The Final Rule makes arbitrary and unsupported revisions to the 1978 regulations, ignores

15   reliance interests on those longstanding regulations and related guidance, lacks a rational

16   justification, and undermines NEPA's goals of environmental protection, public participation, and

17   informed decision making.  Among other changes, the Final Rule arbitrarily and unlawfully:

18   •   Deletes key language regarding NEPA's role in environmental protection and the

19   importance of public participation in the environmental review process, Compl. ¶ 178(a)–(c);

20   •   Establishes new pathways for federal agencies to avoid environmental review entirely, *id*.

21   ¶ 178(f)–(i);

22   •   Diminishes the scope of actions that will require a detailed environmental review and

23   excludes consideration of important concerns like public health, cumulative effects, and effects

24   on ESA listed species when determining a project's "significance," *id*. ¶ 178(j);

25   •   Expands the use of categorical exclusions, which exempt projects from environmental

26   review, *id*. ¶ 178(k);

27   •   Limits consideration of alternatives to the proposed action, *id*. ¶ 178(l), (m);

28

- Eliminates consideration of cumulative and indirect effects flowing from federal actions, which will limit review of environmental justice and climate impacts, as well as impacts to ESA listed species, *id*. ¶ 178(n);

- Reduces agencies' obligations to obtain additional information about environmental impacts when such information is not immediately available and further allows agencies to unreasonably and arbitrarily refuse to consider scientific evidence if the agency determines, in its sole discretion, that such evidence is not a "reliable data source[]," *id*. ¶ 178(o) (quoting 40 C.F.R. § 1502.23 (2020));

- Imposes unreasonable and unworkable time and page limits for environmental review documents, *id*. ¶ 178(q);

- Limits both public participation and an agency's obligation to carefully consider and respond to public comments, *id*. ¶ 178(r)–(u); and

- Seeks to limit judicial review of agency NEPA compliance, *id*. ¶ 178(v).

Taken together, the changes in the Final Rule (i) severely limit which federal actions require NEPA compliance; (ii) greatly narrow the scope of federal agencies' obligations to consider environmental impacts; (iii) threaten to render NEPA's public participation process a meaningless paperwork exercise; and (iv) unlawfully seek to restrict judicial review of agency actions that violate NEPA.  *Id*. ¶¶ 9, 178.

In addition, the Final Rule purports to restrict federal agencies from adopting NEPA regulations that are more stringent than CEQ's Final Rule.  *Id*. ¶ 178(d); 40 C.F.R. § 1507.3(a), (b) (2020).  The Final Rule further states that where existing agency regulations are inconsistent with the Final Rule, the Final Rule applies, absent a clear and fundamental conflict with the requirements of another statute.  40 C.F.R. § 1507.3(a) (2020)).

CEQ attempts to explain away these changes as merely "modernizing and clarifying" the NEPA regulations to reduce paperwork and delays.  Fed. Defs.' Mot. to Dismiss (Fed. Br.), ECF No. 76, at 8.  To the contrary, the Final Rule will do just the opposite—leading to fewer and less robust environmental reviews, agency decisions inconsistent with NEPA's text and purpose, and increased confusion and delays.  Compl. ¶¶ 9, 178, 217, 234(b).

11

1

**STANDARD OF REVIEW**

2          CEQ and Intervenors mount a facial challenge to State Plaintiffs' claims under Federal

3    Rule of Civil Procedure 12(b)(1) because they contend that State Plaintiffs' allegations are

4    insufficient on their face to invoke this Court's jurisdiction.  *See* Fed. Br. at 9, 10, 20, 23–29; *see*

5    *generally* Intervenors Notice of Mot. and Mot. to Dismiss: Memo. of P. & A. in Supp. (Int. Br.),

6    ECF No. 77; *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (explaining

7    facial challenge).  In reviewing a facial 12(b)(1) motion, a court "must confine its inquiry to the

8    allegations in the complaint."  *California*, 460 F. Supp. 3d at 884.  Courts accept the truth of the

9    plaintiff's allegations in the complaint and draw all reasonable inferences in favor of the plaintiff

10   to determine whether they are sufficient on their face to invoke federal jurisdiction.  *See Wolfe v.*

11   *Strankman*, 392 F.3d 358, 362 (9th Cir. 2004); *Safe Air for Everyone*, 373 F.3d at 1039.  "At the

12   pleading stage, general factual allegations of injury resulting from the defendant's conduct may

13   suffice, for on a motion to dismiss we presume that general allegations embrace those specific

14   facts that are necessary to support the claim."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562

15   (1992) (quotation and alteration omitted).

16

**ARGUMENT**

17         CEQ and Intervenors contest State Plaintiffs' standing to challenge the Final Rule and

18   further argue State Plaintiffs' challenge is not ripe.  Standing concerns "*who* may bring suit,"

19   while ripeness concerns "*when* a litigant may bring suit."  *Habeas Corpus Res. Ctr. v. U.S. Dep't*

20   *of Justice*, 816 F.3d 1241, 1247 (9th Cir. 2016).  As explained below, State Plaintiffs have

21   standing to challenge the Final Rule, which harms State Plaintiffs' sovereign, proprietary, and

22   procedural interests, and their claims are ripe for review.

23   **I.      State Plaintiffs Have Standing to Bring This Action**

24         State Plaintiffs have pleaded sufficient facts to show their standing to challenge the Final

25   Rule.  To establish standing, a plaintiff must "present an injury that is concrete, particularized,

26   and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be

27   redressed by a favorable ruling."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019)

28   (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008)).  "[P]rimarily future

1    injuries . . . 'may suffice if the threatened injury is certainly impending, or there is a substantial

2    risk that harm will occur.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158

3    (2014)). That "the injury be 'threatened' rather than 'actual' does not defeat the claim. Nor need

4    the risk of injury be certain, as opposed to contingent." *Idaho Conserv. League v. Mumma*, 956

5    F.2d 1508, 1515 (9th Cir. 1992) (citation omitted). Causation and redressability are satisfied

6    where the challenged action contributes to plaintiffs' injuries and those injuries would be reduced

7    if plaintiffs receive the relief they seek. *Massachusetts v. EPA*, 549 U.S. 497, 523–28 (2007).

8           States are not typical litigants when they seek to protect their sovereign interests. *Id.* at

9    518. As this Court recently recognized, "[a] state's 'well-founded desire to preserve its sovereign

10   territory' supports standing in cases implicating environmental harms." *California*, 460 F. Supp.

11   3d at 884 (quoting *Massachusetts*, 549 U.S. at 519). For that reason, "States are 'entitled to

12   special solicitude'" in the court's standing analysis. *California v. Trump*, 963 F.3d 926, 936 (9th

13   Cir. 2020), *cert. granted sub nom. Trump v. Sierra Club*, No. 20-138, 2020 WL 6121565 (U.S.

14   Oct. 19, 2020) (quoting *Massachusetts*, 549 U.S. at 520).[3] In addition, courts broadly recognize

15   that standing for one plaintiff is standing for all. *Rumsfeld v. Forum for Academic & Inst. Rights,*

16   *Inc.,* 547 U.S. 47, 52, n.2 (2006).

17

18   _____

19          [3] Intervenors unsuccessfully attempt to distinguish *Massachusetts v. EPA* by arguing that
     it represents a "limited exception" to state standing. Int. Br. at 8. To the contrary, the plain

20   language of *Massachusetts v. EPA* and its subsequent application demonstrate that the special
     solicitude afforded to states is not so narrowly drawn and applies with equal force to challenges

21   under the APA. *See e.g.*, *Massachusetts*, 549 U.S. at 518–19; *Texas v. United States*, 809 F.3d
     134, 152 (5th Cir. 2015), as revised (Nov. 25, 2015) ("The Clean Air Act's review provision is

22   more specific than the APA's, but the latter is easily adequate to justify 'special solicitude'
     here."). Moreover, Intervenors' argument rests on a misunderstanding of state environmental

23   review laws, which complement but do not take the place of federal NEPA review. Whereas
     NEPA applies to *federal* actions, 42 U.S.C. § 4332, state environmental review laws apply to

24   *state* actions, *see e.g.*, WASH. REV. CODE § 43.21C.020(2); WASH. ADMIN. CODE §§ 197-11-704,
     714; N.Y. ENV'T. CONSERV. LAW § 8-0105(3)-(4); N.Y. COMP. CODES R. & REGS. tit. 6,

25   § 617.2(b), (c). Where a project requires both federal and state approval, state agencies may be
     able to fill some of the gaps left by deficient federal reviews, but not all projects have such

26   overlap, and in some instances, including for states that lack their own environmental review
     laws, federal environmental review under NEPA is the sole means for states to advocate for

27   protection of their natural resources and public health. *See* Compl. ¶¶ 33, 44, 72, 97, 193, 199.

28

Here, State Plaintiffs sufficiently allege that the Final Rule will harm them and that this harm will be redressed by vacatur of the Final Rule.  Compl. ¶ 186.  State Plaintiffs have thus satisfied their burden under Article III.  *See W. Watersheds Project*, 632 F.3d at 484–86 (plaintiffs had standing to challenge agency rulemaking); *California*, 460 F. Supp. 3d at 884 ("State Plaintiffs allege facts sufficient to invoke federal jurisdiction" to challenge agency rulemaking).

      A.    <u>The Final Rule Harms State Plaintiffs</u>

      1.    State Plaintiffs' concrete interests will be harmed by the Final Rule

The Complaint sufficiently alleges that State Plaintiffs have multiple unique, concrete, and particularized interests that will be harmed by the Final Rule.

First, State Plaintiffs have a specific and concrete sovereign and proprietary interest in their natural resources, including state owned and regulated lands, air, water, and wildlife that will be harmed by the Final Rule as a result of fewer and less robust environmental reviews and diminished public participation.  Compl. ¶¶ 24–27, 29–33, 34–37, 40–44, 46, 48, 50–51, 53-55, 57–60, 62–63, 64–67, 69–72, 74–75, 76–78, 80, 81–84, 86–87, 90–93, 95–97, 99–102, 104–07, 108–11, 114–16, 118–21, 123–24, 126–27, 128–29, 187–201.  Federal actions subject to the Final Rule, ranging from federal land management to energy projects, will impact state-owned and/or state-regulated resources.  *Id.* ¶¶ 26–27, 32–33, 36–37, 41, 43–44, 46, 48, 51, 53–55, 58–60, 62, 65–67, 70–72, 74–75, 77–80, 82–84, 87–88, 90–93, 96–97, 101, 105–07, 109–11, 116, 119–21, 123, 127, 129, 188–197.  For example, California has a sovereign interest in its natural resources and is the sovereign and proprietary owner of the state's fish and wildlife resources.  *Id.* ¶ 24.  These state resources are affected by federal actions, including major federal water infrastructure projects that are subject to NEPA, such as the operation of the Central Valley Project or the proposal to raise the level of the Shasta Reservoir in northern California.  *Id.* ¶¶ 25, 26.  Similarly, Washington owns over six million acres of land and holds proprietary rights in wildlife, fish, shellfish, and tidelands.  *Id.* ¶ 29.  These state natural resources are affected by federal activities in Washington, which include federal land management, military training activities, the operation of the Hanford Nuclear Reservation, and more than 145 federally owned dams, all of which are

1    subject to NEPA. *Id.* ¶¶ 29, 32, 197.  Guam also has a sovereign interest in its natural resources

2    and wildlife, which are adversely impacted by Department of Defense actions that threaten to

3    contaminate Guam's groundwater aquifer and affect Guam's limestone forests, which provides

4    important habitat for numerous endangered species. *Id.* ¶¶ 118–21.

5         The Final Rule increases the risk of harm to State Plaintiffs' natural resources by

6    decreasing the environmental protections afforded by a robust environmental review process for

7    major federal actions affecting federal lands, facilities, and infrastructure in the undersigned

8    states. *Id.* ¶¶ 178, 188–97, 199–200.  Courts have repeatedly recognized that increased risk of

9    harm to state natural resources from decreased environmental protections satisfies Article III

10   standing. *Massachusetts*, 549 U.S. at 521 ("EPA's steadfast refusal to regulate greenhouse gas

11   emissions presents a risk of harm to Massachusetts that is both 'actual' and 'imminent'") (citing

12   *Lujan*, 504 U.S. at 560); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir.

13   2002) ("[P]laintiffs need not wait until the natural resources are despoiled before challenging the

14   government action leading to the potential destruction."); *California*, 460 F. Supp. 3d at 887 (An

15   enhanced risk of harm to state environmental resources establishes standing).  Among other

16   things, the Final Rule will increase the number of federal actions that avoid environmental review

17   and diminish the scope of NEPA reviews that occur.  Compl. ¶¶ 178, 189.  For example, the Final

18   Rule expands the number of situations in which federal agencies can avoid NEPA review entirely

19   by narrowing the definition of major federal action, establishing six new "NEPA thresholds" for

20   agencies to avoid any environmental review, and expanding the use of previously limited

21   categorical exclusions from NEPA review. *Id.* ¶ 178(f), (g), (k).  Where environmental review

22   occurs, the Final Rule truncates it by, among other things, redefining what agencies consider

23   when determining an action's "significance," limiting the analysis of alternatives to the agency

24   action, eliminating consideration of indirect and cumulative impacts, and imposing arbitrary and

25   unworkable time and page limits for environmental review documents. *Id.* ¶¶ 178(j), (m), (n),

26   (q), 189–90, 192.  The Final Rule took effect September 14, 2020, and explicitly states that it

27   prohibits federal agencies from adopting more stringent environmental review measures than the

28   Final Rule or conducting inconsistent environmental review. *Id.* ¶ 178(d); 40 C.F.R. § 1507.3(a)

(2020).  Among other things, changes in the Final Rule will both reduce federal agencies'
understanding of potential harms on the environment from agency actions and limit opportunities
through the NEPA process for State Plaintiffs to advocate for alternatives to the proposed action
or other measures to avoid or mitigate adverse impacts to state natural resources and public
health.  Compl. ¶¶ 178, 189–90, 192–94, 199–200.

Second, State Plaintiffs allege that the Final Rule will cause specific and concrete harms
to their economic and financial interests.  *Id.* ¶¶ 24, 27, 29, 31, 35, 40, 42, 47–48, 50, 53, 57, 63,
65, 69, 73–74, 91, 95, 100, 109, 121, 190–91, 194–96, 198, 201.  Harms to a state's economic and
financial interests are sufficient to confer standing.  *California v. Azar*, 911 F.3d 558, 571–72 (9th
Cir. 2018) (California had standing in challenge to federal rule exempting employers from
covering contraceptive care in group health plans because "women who lose coverage will seek
contraceptive care through state-run programs or programs that the states are responsible for
reimbursing," resulting in "economic harm" to the state); *Air All. Houston v. EPA*, 906 F.3d 1049,
1059–60 (D.C. Cir. 2018) ("Monetary expenditures to mitigate and recover from harms that could
have been prevented absent the [federal rule] are precisely the kind of 'pocketbook' injury that is
incurred by the state itself."); *Texas*, 809 F.3d at 155 (impact on state resources provides basis for
standing); *California*, 460 F. Supp. 3d at 886–87.  As a result of the Final Rule's diminished
environmental review process, State Plaintiffs will face an increased cost and burden to protect
against environmental and public health harms, including harms resulting from increased
greenhouse gas emissions and associated climate change impacts.  *See* Compl. ¶¶ 7, 47, 63, 79,
80, 100, 178(n), 190–91, 194, 198, 220, 248.  Fewer and less robust environmental reviews and
diminished opportunities for public participation also increase the burden on State Plaintiffs to
address through expenditures of state and territorial funds public health disparities caused by
uninformed federal decisions that adversely affect vulnerable communities.  *Id.* ¶¶ 194–95.  In
some states, diminished federal environmental reviews will also disrupt a longstanding practice of
preparing joint environmental review documents to satisfy both NEPA and state environmental
review statutes or of incorporating NEPA environmental review documents into state

environmental review documents, causing inefficiencies and requiring states to expend greater resources than under the 1978 regulations.  *Id*. ¶¶ 33, 83, 97, 107, 111, 198.

Third, State Plaintiffs suffer procedural harms related to CEQ's failure to comply with the APA, NEPA, and the ESA in promulgating the Final Rule.  *Id*. ¶ 202.  To demonstrate standing based on procedural harm, a plaintiff "must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *W. Watersheds Project*, 632 F.3d at 485 (citation omitted).  Stated another way, State Plaintiffs "need only show that" if CEQ followed proper procedures the Final Rule "*could* better protect" State Plaintiffs' concrete interests.  *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc).  Here, proper application of the procedural requirements in the APA, NEPA, and the ESA not only could but would in fact better protect State Plaintiffs' concrete sovereign and proprietary interests in conserving State Plaintiffs' natural resources and public health described above.  *See California*, 460 F. Supp. 3d at 891 (plaintiffs' procedural harms under the APA and NEPA sufficient to demonstrate injury-in-fact when plaintiffs established both "a geographical nexus" between their states and locations subject to the challenged rules and "a reasonable probability of the [challenged rules'] threat to their concrete interest in conserving their natural resources"); *see also Cottonwood Env'tl Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1083 (9th Cir. 2015) (recognizing scientific, conservation, and economic injury to interests in the survival of endangered species from agency's failure to consult).  State Plaintiffs suffer procedural harms resulting from CEQ's promulgation of the Final Rule that is arbitrary and capricious, failed to respond to State Plaintiffs' comments, and failed to comply with the procedural requirements of NEPA and the ESA.  *See* Compl. ¶ 202.[4]  CEQ's failure to comply with the procedural requirements of these statutes has thus harmed State Plaintiffs' concrete interests.

---

[4] Contrary to CEQ's arguments, Fed. Br. 29 n.10, 30 n.11, the Ninth Circuit recognizes procedural harms under the ESA.  *Nat. Res. Def. Council*, 749 F.3d at 783 ("We have held that alleged violations of Section 7(a)(2)'s consultation requirement constitute a procedural injury for standing purposes.").

1      For each of these reasons, State Plaintiffs have established an injury-in-fact sufficient to

2   confer standing.

3                    2.      State Plaintiffs need not wait for specific applications of the Final
                             Rule to challenge its unlawful promulgation
4

5      Despite State Plaintiffs' concrete interests, CEQ and Intervenors wrongly argue that State

6   Plaintiffs—or any plaintiff—may not challenge the Final Rule until an agency applies the Final

7   Rule in a way that constitutes final agency action.  *See* Fed. Br. at 10; Int. Br. at 6.  Under this

8   theory of standing, no party could ever bring a facial challenge the Final Rule and instead must

9   wait until a "specific application in final agency action" that causes "actual, concrete 'real world'

10  harm."  Fed. Br. at 10, 19–22.  That assertion contradicts Ninth Circuit precedent, which has

11  repeatedly "held that a plaintiff has standing to challenge programmatic management direction

12  without also challenging an implementing project that will cause discrete injury."  *Cottonwood*

13  *Env'tl Law Ctr.*, 789 F.3d at 1081; *see also Sierra Forest Legacy v. Sherman*, 646 F.3d. 1161,

14  1179 (9th Cir. 2011) (California has standing to assert facial NEPA claim against programmatic

15  BLM's regional management guidelines).  CEQ's position further ignores the well-established

16  principle that increased risk of harm is sufficient to establish standing.  *See Susan B. Anthony's*

17  *List*, 573 U.S. at 158 ("An allegation of future injury may suffice if the threatened injury is

18  'certainly impending,' or there is a 'substantial risk' that the harm will occur.") (quoting *Clapper*

19  *v. Amnesty Intern. USA*, 568 U.S. 398, 414 n.5 (2013)); *Cent. Delta Water Agency v. United*

20  *States*, 306 F.3d at 947 ("threatened injury constitutes injury in fact") (quotation and citation

21  omitted).

22     CEQ and Intervenors wrongly rely on *Summers v. Earth Island Institute*, 555 U.S. 488,

23  495–97 (2009), *and Wilderness Society v. Rey*, 622 F.3d 1251 (9th Cir. 2010), and ignore more

24  recent precedent that supports State Plaintiffs' position.  Fed. Br. at 19–22; Int. Br. at 9–12.  The

25  Ninth Circuit's decisions in *Cottonwood* and *Sierra Forest Legacy*, which were decided after

26  *Summers*, demonstrate that *Summers* did not eliminate standing to challenge programmatic

27  decisions.  *Sierra Forest Legacy* is instructive.  In that case, the Ninth Circuit held that California

28

1    "unquestionably asserted a well-founded desire to protect both its territory and its proprietary

2    interests from both direct harm and from spill-over effects resulting from action on federal land,

3    including ownership and trusteeship over 'wildlife, water, State-owned land, and public trust

4    lands'" in and around areas impacted by the challenged Bureau of Land Management's

5    programmatic management decision. *Sierra Forest Legacy*, 646 F.3d at 1178–79. The Ninth

6    Circuit distinguished "California's protected interests" from the interests of the plaintiffs in

7    *Summers*, noting that California differs from those plaintiffs because it "maintains concrete

8    interests spanning its entire territory" and those "unique proprietary interests will invariably be

9    affected" by the challenged decision. *Id*. at 1178. The Ninth Circuit explained that this standing

10   "is not defeated" by the fact that California had not identified site-specific applications of the

11   challenged decision because it was inevitable that the decision governing over 10 million acres of

12   federal land would impact California's interests. *Id*. at 1179. Here, too, State Plaintiffs have

13   standing to challenge the Final Rule rather than its future site-specific application because it is

14   inevitable that the Final Rule, which applies to all federal agencies and all proposed major federal

15   actions, will harm State Plaintiffs' sovereign and proprietary interests.

16          Moreover, CEQ and Intervenors' arguments ignore the material facts that distinguish

17   *Summers* and *Rey* from the instant case. In *Summers*, the Supreme Court held that an individual's

18   declaration was inadequate to confer organizational standing where the single supporting

19   declaration generally alleged the declarant's intent to visit Forest Service lands but did not specify

20   any intentions to visit particular lands impacted by the challenged regulation. *Summers*, 555 U.S.

21   at 495–97. Similarly in *Rey*, the Ninth Circuit held that a single declaration was insufficient to

22   confer standing when it did not show the declarant was likely to encounter an area of the Forest

23   Service affected by the challenged regulation and concerned facts that did not exist at the time of

24   filing the complaint. 622 F.3d at 1256–57. The single declarant in each of these cases differs

25   significantly from the State Plaintiffs here that will suffer sovereign, proprietary, and procedural

26   harms as a result of the Final Rule. Unlike those declarants' general intentions to visit Forest

27   Service lands, State Plaintiffs have identified numerous federal lands, resources, and facilities in

28   their jurisdictions that will be impacted by the Final Rule, causing State Plaintiffs harm. *See*

19

*supra* Part IA.1.; *see also* Compl. ¶¶ 25–27, 30, 32–33, 36–37, 41, 43, 44, 46, 48, 50–51, 53–55, 58–60, 62, 65–67, 70–72, 74–75, 77–78, 80, 82–84, 87, 90, 92, 96–97, 99, 101, 105-07, 109–11, 115–16, 119–21, 123–24, 127, 129, 188–201.   These harms to State Plaintiffs' sovereign and proprietary interests are more than the "mere conjecture" rejected in *Summers and Rey* and instead are the kinds of harms that courts have repeatedly held to satisfy standing.  *See. e.g.*, *Massachusetts*, 549 U.S. at 521–23 (finding that increased risk of climate impacts to state territory due to federal agency's refusal to regulate greenhouse gas emissions constituted injury in fact for standing purposes); *Sierra Forest Legacy*, 646 F.3d at 1178–79; *California*, 460 F. Supp. 3d at 885–88.  *Summers* and *Rey* are inapposite and therefore do not foreclose the states' action.

CEQ also contends that State Plaintiffs' case is precluded because they are not the "object" of the Final Rule.  Fed. Br. at 19–22.  CEQ overlooks that certain State Plaintiff agencies have assumed NEPA responsibilities and are thus directly subject to the Final Rule, Compl. ¶ 129; *see also* Final Rule, 85 Fed. Reg. at 43,344 (discussing CEQ's decision to broaden the definition of "Federal agency" to include States and units of local government to the extent they have assumed NEPA responsibilities from a Federal agency pursuant to statute).  Under CEQ's own rationale, this delegated NEPA authority is sufficient to confer standing.  *See* Fed. Br. at 19; *see also Lujan*, 504 U.S. at 561–62 (where a party is the object of an action, "there is ordinarily little question that the action or inaction has caused [it] injury.").  Moreover, State Plaintiffs are subject to the NEPA regulations as they engage in joint federal-state projects and comment on federal actions that will impact state resources.  Compl. ¶¶ 27, 33, 37–38, 44, 48, 55, 60, 64, 67, 72, 75, 80, 84, 88, 93, 97, 102, 107, 111, 116, 121, 129, 193, 198.  State Plaintiffs' ongoing participation in the NEPA process and reliance on NEPA documents to identify environmental and public health issues impacting State Plaintiffs' interests satisfy standing.

        3.      CEQ and Intervenors' other arguments against State Plaintiffs' harms lack merit

CEQ and Intervenors make a number of arguments in response to State Plaintiffs' specific standing allegations, which either rehash the general theme that State Plaintiffs must challenge a

site-specific application of the Final Rule or are otherwise meritless. Notably, CEQ and Intervenors' standing arguments address only some of the provisions of the Final Rule that will impact State Plaintiffs, *see* Fed. Br. 22–31, Int. Br. 3–13, and ignore numerous other changes that will harm State Plaintiffs, including CEQ's new NEPA threshold requirement that eliminate certain actions from NEPA review entirely and its changes to the significance analysis. *See* Compl. ¶¶ 178, 188, 189, 196, 259.

Most of CEQ's standing arguments turn on CEQ's characterization of the Final Rule and are thus not a proper basis for dismissing State Plaintiffs' case. Specifically, CEQ disputes that State Plaintiffs' natural resources will suffer concrete harms because CEQ contends that the Final Rule does not preclude consideration of climate change impacts, Fed. Br. at 23–24, reduce consideration of alternatives or mitigation measures, *id*. at 26, expand the use of categorical exclusions, *id*. at 26–27, or diminish opportunities for public comments, *id*. at 27–28, despite the fact that the Final Rule makes significant changes to provisions addressing each of these analyses, Compl. ¶ 178. Not only do CEQ's protestations contradict its central claim that the Final Rule will speed up projects, including major infrastructure development, Fed. Br. at 7–8,[5] but they also cut against the legal reality that at the motion to dismiss stage this court must "take the allegations in [State Plainitffs'] complaint as true," *Wolfe*, 392 F.3d at 362. Indeed, courts have rejected similar attempts to foreclose judicial review of an agency regulation based on ambiguities in how the rule will be applied when the disputed issues are "purely legal." *See Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 757–58 (D.C. Cir. 2003).

State Plaintiffs' standing to challenge the Final Rule does not rise or fall on whether CEQ agrees with State Plaintiffs' characterization of the Final Rule and its impacts. These issues go to the merits of State Plaintiffs' claims and cannot justify dismissing State Plaintiffs' case. As a general rule, when "'[t]he question of jurisdiction and the merits of [the] action are intertwined,'

---

[5] Similarly, Intervenors filed several declarations in support of their intervention motion stating that the Final Rule will reduce the regulatory burden on their members and make the NEPA process less costly and more efficient, including by limiting consideration of indirect and cumulative effects. *See, e.g.*, Decl. of Ryan Yates, ¶¶ 8–9, ECF No. 60-1; Decl. of William Imbergamo, ¶¶ 12–13, ECF No. 60-2; Decl. of Richard Moskowitz, ¶¶ 8–9, ECF No. 60-3.

1    dismissal for lack of subject matter jurisdiction is improper." *Williston Basin Interstate Pipeline*

2    *Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean,*

3    *Geological Formation*, 524 F.3d 1090, 1094 (9th Cir. 2008) (quoting *Safe Air for Everyone*, 373

4    F.3d at 1039); *see also In re Facebook, Inc., Consumer Privacy User Profile Litig*., 402 F. Supp.

5    3d 767, 788 (N.D. Cal. 2019) ("In determining whether plaintiffs have standing, we must assume

6    that on the merits they would be successful in their claims.") (citation omitted).  Moreover, State

7    Plaintiffs are under no obligation to prove the environmental impacts of the Final Rule when CEQ

8    failed to analyze them as required by NEPA and the ESA.  *Thomas v. Peterson*, 753 F.2d 754,

9    765 (9th Cir. 1985), *abrogated on other grounds as recognized by Cottonwood Env'tl L. Ctr.*, 789

10   F.3d at 1092 ("It is not the responsibility of the plaintiffs to prove, nor the function of the courts

11   to judge, the effect of a proposed action on an endangered species when proper procedures have

12   not been followed.").

13        CEQ likewise cannot seek to dismiss State Plaintiffs' case by stating that the Final Rule

14   simply codifies the Supreme Court's decision *Department of Transportation v. Public Citizen*,

15   541 U.S. 752 (2004).  Fed. Br. 24, 26.  This argument too goes to the merits of State Plaintiff's

16   claims and is not a proper basis on which to grant the motion to dismiss.  *See Williston Basin*

17   *Interstate Pipeline Co.*, 524 F.3d at 1094; Compl. ¶¶ 207, 214 (discussing State Plaintiffs' legal

18   claims).  Moreover, CEQ's argument applies to only a narrow subset of changes in the Final Rule

19   and thus does not address most of the changes that cause State Plaintiffs harm.  *See id.* ¶¶ 178,

20   207 (explaining that the Final Rule, among other things, restricts the number of projects subject to

21   NEPA review, revises the significance analysis, severely reduces the scope of environmental

22   effects considered during NEPA review, limits the number of alternatives and the depth of

23   analysis that an agency will perform in conducting its environmental analysis, and constrains the

24   public comment process).  Thus, even if CEQ's arguments had merit, and they do not, they would

25   not be sufficient to deny State Plaintiffs' standing.[6]

26        ───────────────

27        [6] Contrary to CEQ's position, the Final Rule did far more than merely codify *Public Citizen*.  In *Public Citizen*, the Supreme Court held that the Federal Motor Carrier Safety

28   Administration was not required under NEPA to consider the environment effects of cross border

22

CEQ and Intervenors also contend that State Plaintiffs have not suffered procedural injury. Fed. Br. 28–31; Int. Br. 9–13.  This argument echoes CEQ's contentions that State Plaintiffs have not suffered an injury-in-fact because they have not challenged a specific project.  As demonstrated above, *see supra* Part I.A.2, that argument lacks merit.  Intervenors also mischaracterize State Plaintiffs' procedural injuries, which stem from CEQ's procedural failures in promulgating the Final Rule, Compl. ¶ 202, not future procedural injuries stemming from a lost opportunity to comment during NEPA reviews.  Int. Br. at 11.  State Plaintiffs suffer procedural harms because CEQ did not comply with its procedural obligations under the APA, NEPA, and the ESA, and these failures impact State Plaintiffs' concrete sovereign and proprietary interests. *See supra* Part I.A.1.

Finally, Intervenors wrongly argue that harms in expending resources to fill the gaps left by deficient NEPA environmental review to ensure protection of state resources are self-inflicted. Int. Br. 6–8; 12.  To the contrary, federal policies that require states to expend additional financial resources to protect their interests are sufficient to establish standing.  *See supra* Part I.A (citing several cases).  Nevertheless, Intervenors suggest that State Plaintiffs can fix any harm resulting from gaps between state environmental review requirements and federal requirements by amending state environmental review laws to match the reduced environmental review processes

---

Mexican motor carrier operations given the case's specific circumstances, including a unique statutory structure limiting the agency's action.  541 U.S. at 766–68.  Given this narrow holding, the Ninth Circuit has declined to apply *Public Citizen* to limit agency NEPA obligations in other circumstances, explaining that to do so would be contrary to the mandate that agencies apply NEPA "to the fullest extent possible."  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1213–14 (9th Cir. 2008).  In the Final Rule, CEQ applies *Public Citizen* beyond its narrow holding, *see* Final Rule, 85 Fed. Reg. at 43,343, 43,375, using it to justify adopting new regulatory language that contradicts NEPA's fundamental environmental review mandate.  *See* Compl. ¶ 207(c).  Moreover, CEQ overstates *Public Citizen*'s discussion of waiver. Fed. Br. 26; *Public Citizen*, 541 U.S. at 765 (explaining that an environmental review's "flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action"); *Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1093 (9th Cir. 2006) (distinguishing *Public Citizen* and rejecting argument that plaintiffs waived their right to challenge the sufficiency of the agency's consideration of alternatives).

in the Final Rule.  Int. Br. at 7.  In other words, Intervenors' solution to the harm State Plaintiffs

face in filling the gaps left by deficient federal environmental review is for State Plaintiffs to

expend resources amending their own laws and regulations to be *less* protective of the

environment.  But making state environmental review laws weaker will not only cause financial

harm to the State Plaintiffs, it will do nothing to protect state resources from the harms caused by

the Final Rule.  Moreover, State Plaintiffs cannot always fill gaps left by deficient federal

reviews, including in instances where states do not have jurisdiction over any aspect of the federal

action and in states that lack their own environmental review laws.  Compl. ¶¶ 33, 44, 72, 97,

193, 199, 200.[7]

                       **B.**      State Plaintiffs Have Demonstrated Causation and Redressability

State Plaintiffs also satisfy causation and redressability under both the general standard

and the relaxed standard applied to procedural injuries.  Under the general standard, causation and

redressability are easily satisfied because State Plaintiffs' injuries are "fairly traceable" to CEQ's

Final Rule and "likely to be redressed by a favorable ruling."  *Dep't of Commerce*, 139 S. Ct. at

2565 (quotation and citation omitted).  The Final Rule and its weakening of the environmental

review process cause State Plaintiffs' injuries by increasing the risk of harm to the environment

and public health.  *California*, 460 F. Supp. 3d at 888–89, 892.  "At a minimum," CEQ's Final

Rule "contributes" to State Plaintiffs' injuries.  *Massachusetts*, 549 U.S. at 523.  State Plaintiffs'

---

[7] CEQ and Defendant Intervenors also contest State Plaintiffs' "informational standing." Fed. Br. at 24–26; Int. Br. 9–12.  However, State Plaintiffs do not plead informational standing. Rather State Plaintiffs allege that the lack of information due to fewer and less robust NEPA processes harms their sovereign, proprietary, and financial interests.  Compl. ¶¶ 193, 194, 199, 200.  The harm that flows from insufficient environmental review under NEPA is a harm to the environment, *Citizens for Better Forestry*, 341 F.3d at 971, which injures state interests in their natural resources and requires states to expend additional financial resources, *see* Compl. ¶¶ 24–27, 29–33, 35–38, 40–44, 46–48, 50–51, 53–55, 57–60, 62–63, 64–67, 69–72, 74–75, 77–80, 81–84, 86–88, 90–93, 95–97, 99–102, 104–07, 109–112, 114–16, 118–21, 123–25, 127–29, 189–201. Defendants also overlook that "public disclosure is a central purpose of NEPA," *Sierra Club v. Marsh*, 976 F.2d 763, 770 (1st Cir. 1992); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008) (one of NEPA's objectives is for an agency to "inform the public that it has indeed considered environmental concerns in its decisionmaking process").

1   requested relief that this Court declare the Final Rule unlawful and vacate it would reduce or

2   eliminate this risk of injury, satisfying redressability.  *Id*.; Compl. ¶ 186.

3        Additionally, State Plaintiffs satisfy the relaxed standard for causation and redressability

4   for their procedural claims.  *Lujan*, 504 U.S. at 572 n.7 (a "person who has been accorded a

5   procedural right to protect his concrete interests can assert that right without meeting all the

6   normal standards for redressability and immediacy.").  State Plaintiffs' procedural claims include

7   their claim that CEQ violated the APA by promulgating an arbitrary and capricious Final Rule

8   and failing to respond to comments, Compl. ¶¶ 209–221, 227–236; that CEQ failed to conduct a

9   NEPA review for the Final Rule, *id*. ¶¶ 237–51; and that CEQ failed to engage in interagency

10   consultation under the ESA; *id*. ¶¶ 252–62.  This Court has observed that "where plaintiffs allege

11   that an agency's action is arbitrary and capricious under § 706(2)(A) *because* of the agency's

12   failure to follow the basic procedural requirement of providing any reasoned explanation

13   whatsoever, a procedural standing analysis is appropriate."  *City and Cnty. of S.F. v. Whitaker*,

14   357 F. Supp. 3d 931, 942 (N.D. Cal. 2018) (quotation and citation omitted); *see also Encino*

15   *Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("One of the basic procedural

16   requirements of administrative rulemaking is that an agency must give adequate reasons for its

17   decisions."); *California*, 460 F. Supp. at 886–87 (analyzing APA challenges under a procedural

18   standing framework).  Similarly, in evaluating standing to bring NEPA claims, "[o]nce a plaintiff

19   has established an injury in fact under NEPA the causation and redressability requirements are

20   relaxed," and plaintiffs "must show only that they have a procedural right that, if exercised, could

21   protect their concrete interests."  *W. Watersheds Project*, 632 F.3d at 485 (internal quotations and

22   citations omitted).  Likewise, in cases challenging a failure to engage in Section 7 consultation

23   under the ESA, "a plaintiff need not meet all the normal standards for redressability and

24   immediacy."  *Cottonwood Env'tl Law Ctr.*, 789 F.3d at 1082 (citations and alterations omitted).

25   Here, State Plaintiffs satisfy the procedural causation and redressability requirements because

26   CEQ's compliance with its procedural obligations under the APA, NEPA, and the ESA could

27   have influenced CEQ's promulgation of the Final Rule.  *See California*, 460 F. Supp. 3d at 892.

28

CEQ contends that any harms from the Final Rule are not traceable to CEQ because they will be caused by other federal agencies.  Fed. Br. at 19–22.  CEQ's position "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."  *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (rejecting federal government's argument that plaintiffs lacked standing to challenge biological opinion because the harm depended on a yet unidentified decision by the Bureau of Reclamation regarding water allocation).  Here, State Plaintiffs' sovereign and proprietary injuries are fairly traceable to CEQ's actions because the Final Rule alters the NEPA review process for all federal agencies in a way that will directly and immediately diminish the scope and application of NEPA review by federal agencies.  *See* 40 C.F.R. § 1506.13 (2020) (requiring agencies to "apply to any NEPA process begun after September 14, 2020"); 40 C.F.R. § 1507.3(a) (2020) (directing that agencies "shall apply" the Final Rule instead of inconsistent existing agency NEPA procedures).  Even if State Plaintiffs' suffer additional harms from subsequent agency action, the harm begins with CEQ's unlawful promulgation of the Final Rule.  State Plaintiffs' "theory of standing does not rest on mere speculation about the decision of third parties" but rather the predictable actions of federal agencies comporting with federal regulations.  *Dep't of Commerce*, 139 S. Ct. at 2566.  CEQ's position also relies on a fundamental mischaracterization of State Plaintiffs' procedural harms, which result from CEQ's failure to follow proper procedures under the APA, NEPA, and the ESA in promulgating the Final Rule.  Compl. ¶¶ 204–62.  State Plaintiffs' Complaint pleads sufficient facts to establish causation and redressability for State Plaintiffs' claims.

**II.      State Plaintiffs' Challenge Is Ripe for Review**

CEQ and Intervenors also contend that State Plaintiffs' challenge to the Final Rule is not ripe because State Plaintiffs do not challenge a specific application of the Final Rule.  Fed. Br. at 10–11; Int. Br. at 3–5.  CEQ's motion to dismiss primarily focuses on prudential ripeness, which seeks to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).  The Supreme Court recently cast significant doubt on consideration of prudential ripeness where plaintiffs allege a sufficient Article III injury, stating that prudential

1   ripeness stands "in some tension with our recent reaffirmation of the principle that a federal

2   court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan*

3   *B. Anthony List*, 573 U.S. at 167 (quotation omitted).  Similarly, the Ninth Circuit and this Court

4   have recognized that prudential ripeness is a discretionary consideration that need not be reached

5   as long as constitutional ripeness is satisfied.  *See, e.g., Thomas v. Anchorage Equal Rights*

6   *Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000) (en banc) ("Prudential considerations of ripeness

7   are discretionary."); *California*, 460 F. Supp. 3d at 893; *California ex rel. Becerra v. Sessions*,

8   284 F. Supp. 3d 1015, 1031 (N.D. Cal. 2018) (noting that "[t]he Ninth Circuit has previously

9   declined to reach prudential ripeness when constitutional ripeness is satisfied").  Because State

10   Plaintiffs satisfy constitutional ripeness, this Court need not consider prudential ripeness.

11   Nevertheless, State Plaintiffs also satisfy prudential ripeness.

12         A.    State Plaintiffs Satisfy Constitutional Ripeness

13         State Plaintiffs' allegations demonstrating injury in fact under the standing analysis also

14   satisfy constitutional ripeness.  As the Ninth Circuit has explained, the constitutional minimum of

15   ripeness "coincides squarely with standing's injury in fact prong," and where, as here, a plaintiff's

16   injury in fact satisfies Article III, State Plaintiffs meet the constitutional requirement of ripeness.

17   *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018) (quoting *Bishop Paiute Tribe v. Inyo*

18   *Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017).  "Because State Plaintiffs have adequately alleged an

19   injury in fact, their claims are constitutionally ripe." *California*, 460 F. Supp. 3d at 893.

20         B.    State Plaintiffs Satisfy Prudential Ripeness

21         Although the Court need not reach the issue, State Plaintiffs also satisfy prudential

22   ripeness.  To determine ripeness when reviewing agency action, the court considers whether:

23   (1) delayed review would cause hardship to the plaintiff; (2) judicial intervention would

24   inappropriately interfere with further administrative action; and (3) the court would benefit from

25   further factual development of the issues presented.  *Cottonwood Env'tl Law Ctr.*, 789 F.3d at

26   1083–84 (citing *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998)).  Courts

27   sometimes combine the second and third factors into a single inquiry regarding a case's fitness for

28   judicial review.  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  Courts

have also declined to reach the hardship factor where a case is fit for review.  *See Energy Future Coal. v. EPA*, 793 F.3d 141, 146 (D.C. Cir. 2015) (Kavanaugh, J.) ("If 'there are no significant agency or judicial interests militating in favor of delay' a lack of hardship 'cannot tip the balance against judicial review.'") (quoting *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 465 (D.C. Cir. 2006)).  Here, State Plaintiffs' claims are ripe because they are fit for judicial review and withholding review would impose hardship on State Plaintiffs.

> 1.     State Plaintiffs' challenge is fit for judicial review

State Plaintiffs' challenge is fit for judicial review because further factual development is unnecessary and State Plaintiffs' claims present purely legal issues.  *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 708 (9th Cir. 2009) ("A claim is usually ripe 'if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'") (quoting *U.S. West Commc'n v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir.1999)).

First, the Final Rule is CEQ's "last word on the matter," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001), and thus constitutes a final agency action that is at its "administrative resting place" and fit for judicial review, *Cottonwood Env'tl Law Ctr.*, 789 F.3d at 1084 (quoting *Citizens for Better Forestry*, 341 F.3d at 977).  As a result, judicial review will not interfere with further administrative action and is appropriate now.  *Id*.  This case thus compares to the many cases in which courts, including this Court, have reviewed facial challenges to final rules.  *See id*.; *see also W. Watersheds Project*, 632 F.3d at 485; *Ctr. for Biological Diversity*, 588 F.3d at 708 (identifying cases where court found purely legal facial challenges to federal regulations ripe); *California*, 460 F. Supp. 3d at 881.

For State Plaintiffs' procedural claims, the conclusion is even starker.  It is well established that procedural claims are ripe at the time of the procedural injury.  *Ohio Forestry*, 523 U.S. at 737 ("[A] person with standing who is injured by a failure to comply with the NEPA procedures may complain of that failure at the time the failure takes place, for the claim can never get riper."); *Citizens for Better Forestry*, 341 F.3d at 977 (observing that "a NEPA challenge was

28

1    ripe because the injury occurred when the allegedly inadequate EIS was promulgated") (quotation

2    omitted).  Courts have also applied this reasoning to ESA section 7 consultation claims,

3    *Cottonwood Env'tl Law Ctr.*, 789 F.3d. at 1084 (applying *Ohio Forestry* to find ESA consultation

4    claim ripe), and claims arising under the APA, *see Ctr. for Biological Diversity*, 588 F.3d at 708

5    ("arbitrariness and capriciousness is a legal question fit for review").

6         Second*,* State Plaintiffs' challenges to the Final Rule are purely legal and delaying judicial

7    review of those claims will not result in any additional clarity on the issues.  State Plaintiffs bring

8    six claims against the Final Rule, all of which are purely legal in nature and will turn on the

9    administrative record before this Court.  *See* Compl. ¶¶ 204–62.  Each of these claims can be

10   resolved by reviewing the Final Rule, the complete administrative record, and relevant law.  None

11   of these claims requires further factual development for this Court to rule on the merits of these

12   claims.  *See Whitman*, 531 U.S. at 479 (questions of statutory interpretation do not benefit from

13   further factual development); *Ohio Forestry*, 523 U.S. at 737 (procedural injuries ripe when

14   failure occurs); *Energy Future Coal.*, 793 F.3d at 146 ("It is well-established that claims that an

15   agency's action is arbitrary and capricious or contrary to law present purely legal issues.")

16   (quotation omitted). *State of Cal. ex rel. State Water Res. Control Bd. v. FERC*, 966 F.2d 1541,

17   1562 (9th Cir. 1992) (denying ripeness challenge because "[i]t is difficult to postulate an issue

18   more proper for judicial decision than that of the statutory authority of an administrative

19   agency").  That agencies other than CEQ subsequently will apply the Final Rule does not make

20   State Plaintiffs' challenge unripe because future applications of the Final Rule will "not render

21   more concrete" State Plaintiffs' challenge to whether CEQ lawfully promulgated the Final Rule.

22   *Western Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 808 (9th Cir. 1980).  In short, these claims are

23   ripe now and ready for this court's review on the merits.

24        The cases CEQ cites do not support denying State Plaintiffs judicial review.  In particular,

25   *Lujan v Nat'l Wildlife Federation*, which held that plaintiffs' declarations did not establish

26   standing at summary judgment, does not control the result here.  497 U.S. 871, 885–94 (1990).

27   As the Ninth Circuit has explained, "[i]n spite of the *Lujan* rule, we have found purely legal facial

28   challenges of regulations to be ripe."  *Ctr. for Biological Diversity*, 588 F.3d at 708 (collecting

cases). In *Center for Biological Diversity*, the Ninth Circuit held that plaintiffs' APA challenge to agency regulations was fit for judicial review because the legal questions turned "on the administrative record as it existed when the regulations were adopted" and would not benefit from additional factual development. *Id*. The same is true here. State Plaintiffs' claims turn on the administrative record, particularly CEQ's inadequate justifications in the Final Rule, and will not benefit from additional factual development.

The other cases cited by CEQ are distinguishable. Some cases did not address a binding rulemaking akin to the Final Rule. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 809–11 (2003) (challenged interpretative regulation was "nothing more than a 'general statemen[t] of policy'" and plaintiffs' "suffer[ed] no practical harm" as a result of the regulation) (quoting 5 U.S.C. § 553(b)(3)(A)). Other cases differ because, unlike here where factual development would not assist the Court's resolution of the merits, the challenged action presented unique circumstances impacting individuals where further factual development would be helpful to clarify the issues. *See Reno v. Cath. Soc. Servs. Inc.*, 509 U.S. 43, 58–59 (1993) (plaintiffs' challenge to immigration regulations was not ripe because plaintiffs needed to take additional affirmative steps for the agency to apply the regulation to them and plaintiffs had other avenues for review); *Habeas Corpus*, 816 F.3d at 1252–54 (plaintiffs' claims were not ripe when further factual development would address plaintiffs' confusion about application of the challenged rule and the rule did not immediately alter federal habeas procedural rights or require prisoners to act). No amount of site-specific application of CEQ's rules will remedy the legal deficiencies identified in State Plaintiffs' Complaint, which turn on purely legal issues and the record before CEQ when it promulgated the Final Rule. *Cf. Sierra Forest Legacy*, 646 F.3d at 1179–80 (site-specific environmental review could not cure flaws in programmatic decision). State Plaintiffs' case further differs in that it is not a "pre-enforcement" challenge because State Plaintiffs are not the target of a federal enforcement action. *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011) (distinguishing "pre-enforcement cases" in reviewing challenge to service's application of provisions of the ESA). State Plaintiffs' claims are fit for judicial review.

1
2

     2.  Withholding judicial review would impose hardship on State Plaintiffs

3    State Plaintiffs would be harmed by withholding judicial review of their challenge to the

4 Final Rule.  The Final Rule, which became effective on September 14, 2020, directs federal

5 agencies to apply the new rules to projects that begin after the effective date.  Final Rule, 85 Fed.

6 Reg. at 43,373 (codified at 40 C.F.R. §§ 1506.13, 1507.3(a) (2020)).  The Final Rule also restricts

7 agencies from conducting more detailed review than authorized in the Final Rule, *id.* (codified at

8 40 C.F.R. § 1507.3(b) (2020)), and explicitly states that to the extent agency NEPA regulations

9 are inconsistent with the new regulations, the Final Rule controls, *id.* (codified at § 1507.3(a), (b)

10 (2020)).  The regulations are thus in effect and apply to major federal actions across the country.

11 If State Plaintiffs are precluded from bringing this judicial challenge, state sovereign and

12 proprietary interests, including state natural resources, will be harmed before any legal review can

13 occur.  *See supra* Part I.A.1 (discussing state harms from the Final Rule); *Ctr. For Biological*

14 *Diversity*, 588 F.3d at 708 ("Hardship may result from past or imminent harm caused by the

15 agency's adoption of the regulations.").  This hardship is particularly strong in light of CEQ's

16 position that the only point to challenge a site-specific application of the Final Rule is *after* it has

17 been applied to a proposed action by a *different* federal agency and that agency's review becomes

18 final.  Fed. Br. 10.  By then, the harm to State Plaintiffs' interests from CEQ's unlawful

19 promulgation of the Final Rule already will be done.  *See Washington Toxics Coal. v. U.S. Dep't*

20 *of Interior*, 457 F. Supp. 2d 1158, 1175 (2006) ("[W]ithholding review would exacerbate the

21 hardship that already exists.").

22    Requiring State Plaintiffs to wait to challenge a site-specific application of the Final Rule

23 would be inefficient and not facilitate this Court's ability to review the unlawfulness of the Final

24 Rule.  State Plaintiffs challenge a myriad of harmful revisions in the Final Rule, including

25 provisions that allow agencies to escape NEPA review altogether and provisions that limit the

26 scope of NEPA review when it does occur.  Compl. ¶ 178.  Because the Final Rule authorizes

27 different pathways for NEPA review, agencies will not apply all those regulations to the same

28 action, precluding State Plaintiffs from bringing a single challenge to address all their claims and

1    forcing numerous piecemeal lawsuits to address all the deficiencies in the Final Rule.  As a result,

2    this case is unlike *Ohio Forestry*, where plaintiffs could likely raise all facial challenges in a

3    subsequent, single as-applied challenge.  523 U.S. at 734–35.  Reviewing State Plaintiffs' claims

4    now thus serves judicial efficiency.[8]

5        In addition, delaying judicial review until the Final Rule is applied at the site-specific

6    level necessarily would foreclose State Plaintiffs' ability to seek review of the Final Rule's

7    nationwide scope and effect.  State Plaintiffs' challenge closely resembles the challenge in

8    *Western Watersheds Project v. Kraayenbrink*, in which the Ninth Circuit found ripe plaintiffs'

9    procedural and substantive challenge to the Bureau of Land Management's final regulations

10   governing BLM's oversight of livestock grazing on federal public lands.  632 F.3d at 486.  In

11   doing so, the court noted that "Plaintiffs are taking advantage of what may be their only

12   opportunity to challenge [the agency regulations] on a nationwide, programmatic basis."  *Id*. at

13   486 (quoting *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1011 (9th Cir.

14   2009) (alterations in original)).  Similarly, in *California ex rel. Lockyer*, the Ninth Circuit held

15   that a multi-state challenge to the Forest Service's rule repealing the Roadless Rule was ripe as

16   the states' "only opportunity" to challenge the rule on a nationwide and programmatic sale.  575

17   F.3d at 1011.  The same holds true of State Plaintiffs' challenge to the Final Rule.

18       CEQ wrongly contends that denying State Plaintiffs judicial review of their challenge to

19   the Final Rule will cause "absolutely no hardship."  Fed. Br. at 16.  CEQ's arguments against

20   hardship once again misunderstand State Plaintiffs' claims.  State Plaintiffs challenge CEQ's

21   unlawful promulgation of the Final Rule, which harms State Plaintiffs' sovereign, proprietary,

22   and procedural interests.  *Supra* Part I.A.  State Plaintiffs are entitled to remedy those harms now.

23       In addition, CEQ's argument that agencies need time to refine their policies is both

24   irrelevant and wrong.  Fed. Br. at 16–17.  Here, State Plaintiffs challenge CEQ's unlawful

25   promulgation of the Final Rule, not its application.  The Court's review of the merits of State

26   Plaintiffs' claims, which focus on deficiencies in CEQ's actions in promulgating the Final Rule,

---

27       [8] Efficiency also is served by allowing State Plaintiffs to challenge the Final Rule before
28   all federal agencies promulgate new regulations implementing the Final Rule.

1  will not be aided by other agencies' subsequent actions.  CEQ's argument also ignores the Final

2  Rule's plain language, which purports to restrict agencies' abilities to revise their own NEPA

3  regulations.  Final Rule, 85 Fed. Reg. at 43,373 (codified at 40 C.F.R. §§ 157.3(a), (b) (2020)).  In

4  this way, the Final Rule commands federal agencies to take certain actions and refrain from

5  others, which are signs of ripeness.  *See Habeas Corpus*, 816 F.3d at 1253 (concluding plaintiffs'

6  claims were not ripe where such commands did not exist); *see also Abbott Labs.*, 387 U.S. at

7  151–52 (rejecting government's contention that challenge to agency rule was not ripe because its

8  application required the Attorney General to authorize certain actions).

9      Finally, CEQ's contention that application of the Final Rule presents a "black box" is

10  contradicted by the Final Rule itself.  Fed. Br. at 17–18.  This argument essentially restates

11  CEQ's position on standing that State Plaintiffs can only challenge site-specific applications of

12  the Final Rule, not the Final Rule itself.  But there is nothing "unmanageable" or "speculative"

13  about this Court's review of State Plaintiffs' claims.  *Id*.  To adjudicate State Plaintiffs' claims,

14  this Court will need to review the Final Rule, the administrative record, and the relevant law.

15  Further on-the-ground application of the Final Rule is not necessary or relevant to this Court's

16  determination of whether CEQ violated the law in promulgating the Final Rule.

17      Although the Court need not reach the issue, CEQ and Intervenors' arguments on

18  prudential ripeness are without merit.

19          C.     A Facial Challenge to the Final Rule is Consistent with the APA

20      The Final Rule is a final agency action that is properly subject to APA review.  State

21  Plaintiffs' claims fall squarely within the judicial review provisions of the APA, and State

22  Plaintiffs are entitled to review of their claims.  *See Texas*, 809 F.3d at 152 ("In enacting the

23  APA, Congress intended for those 'suffering legal wrong because of agency action' to have

24  judicial recourse, and the states fall well within that definition.").  As explained above, *supra* Part

25  I.A.1, State Plaintiffs challenge a final agency action that adversely affects them by harming state

26  sovereign, proprietary, and procedural interests.  *See also* Compl. ¶ 17.  This is all that the APA

27  requires.  5 U.S.C. § 702.  That NEPA lacks a "specialized review procedure," Fed. Br. 14, for a

28  direct challenge to the Final Rule is of no significance.  *See Texas*, 809 F.3d at 152 (explaining

33

1   that where a state seeks to challenge an agency's action, rather than a decision to remain inactive,

2   specialize review procedures are unnecessary).  Moreover, the ESA provides for review of an

3   agency's violation of the ESA, including an agency's failure to consult under section 7 of the

4   ESA when promulgating regulations. 16 U.S.C. §§ 1536(a)(2), 1540(g); 50 C.F.R. § 402.02

5   (defining actions subject to the ESA).

6          CEQ's efforts to advance a presumption *against* judicial review of challenges to agency

7   regulations should be rejected.  Fed. Br. at 11, 14.  CEQ's position contradicts the "basic

8   presumption of judicial review" under the APA's "generous review provisions" that "must be

9   given a hospitable interpretation." *Abbot Labs.*, 387 U.S. at 140–41 (quotations omitted); *see also*

10  *id.* (stating the general principle that "judicial review of a final agency action by an aggrieved

11  person will not be cut off unless there is a persuasive reason to believe that such was the intent of

12  Congress."); *Reno*, 509 U.S. at 63–64 (recognizing the "well-settled presumption favoring

13  interpretations of statutes that allow judicial review of administrative action,").  As the Supreme

14  Court has explained in the context of the APA's review provision, "[t]here is no presumption

15  against judicial review and in favor of administrative absolutism . . . ." *Ass'n of Data Processing*

16  *Serv. Orgs., Inc.*, 397 U.S. at 157 (citation omitted).

17         Nevertheless, CEQ uses the language of the APA's broad judicial review provision to

18  contend that State Plaintiffs are not entitled to judicial review because they have an "adequate

19  remedy" in court through a site-specific challenge.  Fed. Br. at 15.  But, as explained above, *see*

20  *supra* Part II.B.2, a site-specific challenge would force inefficient, piecemeal challenges to

21  various applications of the Final Rule that would not adequately remedy State Plaintiffs' claims.

22  CEQ also wrongly contends that State Plaintiffs' lawsuit somehow is not fit for review under the

23  APA, Fed. Br. 2, 11, 15–16, despite the fact that the Final Rule is a final agency action developed

24  through the APA's notice-and-comment procedure.  *See Abbot Labs.*, 387 U.S. at 149, 151

25

26

27

28

1    (discussing final agency action under the APA in the context of ripeness); Compl. ¶ 17; *see*

2    *generally* Final Rule, 85 Fed. Reg. at 43,304–76.[9]

3         To the extent CEQ argues that State Plaintiffs' APA claims fall outside the zone-of-

4    interest test, that argument fails.  *See* Fed. Br. 15–16.  The zone-of-interest test is distinct from

5    Article III justiciability,  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118,

6    126–27 (2014), and requires that a party's interests be "'arguably within the zone of interests to

7    be protected or regulated by the statute' that he says was violated," *Match-E-Be-Nash-She-Wish*

8    *Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data*

9    *Processing Serv. Orgs., Inc.*, 397 U.S. at 153).  This test "is not meant to be especially

10   demanding" and "the benefit of any doubt goes to the plaintiff."  *Id.* at 225 (quotation omitted).

11   For actions under the APA, courts analyze "the zone of interests of the statute the agency is

12   alleged to have violated, not any zone of interests of the APA itself."  *Sierra Club v. Trump*, 929

13   F.3d 670, 702 (9th Cir. 2019).  Here, State Plaintiffs' interests in protecting their natural resources

14   fall squarely within NEPA's zone of interests.  *See WildEarth Guardians v. Provencio*, 923 F.3d

15   655, 668 (9th Cir. 2019) ("[I]f a group is trying to protect the environment, then its suit lies well

16   within NEPA's zone of interests.") (quotation omitted); *Kootenai Tribe of Idaho v. Veneman*, 313

17   F.3d 1094, 1113–14 (9th Cir. 2002) (Tribe's interest in preventing harm to the "environmental

18   health of their lands" falls "in the zone of interests that NEPA aims to protect"), *abrogated on*

19   *other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).  The zone-

20   of-interest test does not apply to State Plaintiffs' ESA claim.  *Bennett v. Spear*, 520 U.S. 154, 164

21   (1997) (ESA citizen-suit provision "negates the zone-of-interests test" for claims arising under

22

23

24

25

26   ⁹ Notably, when asked by the Western District of Virginia Court whether CEQ was
     "suggesting the Court lacks the ability to assess whether or not the CEQ complied with the APA
27   in issuing these new rules," counsel for CEQ responded, "No."  Transcript of Motion Hearing,
     *Wild Virginia. v CEQ*, 3:20-cv-00045-JPJ-PMS (Sept. 2, 2020), ECF No. 73-2.

28

1   the provision).[10]  CEQ's efforts to constrain judicial review of its Final Rule lack merit and

2   should be rejected.

3                                                    **CONCLUSION**

4             For the reasons stated, State Plaintiffs have standing, and their claims are ripe.  CEQ and

5   Intervenors' Motions to Dismiss should be denied.[11]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   _____

24        [10] Even if this standard applies, State Plaintiffs' interests also fall within the ESA's zone of interest. *Env'tl Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1079 (9th Cir. 2001)

25   (plaintiff seeking to protect threatened species within zone of interest of ESA).

26        [11] In the event the court grants CEQ or Intervenors' motions, State Plaintiffs request leave to amend their complaint. *California v. Ross*, 362 F. Supp. 3d 727, 735 (N.D. Cal. 2018) ("When
      a plaintiff has failed to state a claim upon which relief can be granted, leave to amend should be
27   granted unless the complaint could not be saved by any amendment.") (quoting *Gompper v. VISX,*

28   *Inc.*, 298 F.3d 893, 898 (9th Cir. 2002)) (internal quotation omitted).

1    Dated:  January 15, 2021

2

                                                      ROBERT W. FERGUSON

3    XAVIER BECERRA                           Attorney General of Washington
   Attorney General of California

4

5    */s/ Jamie Jefferson*                       */s/ Aurora Janke*
   SARAH E. MORRISON, SBN 143459       AURORA JANKE, *Pro Hac Vice*

6    Supervising Deputy Attorney General       ELIZABETH HARRIS, *Pro Hac Vice*
   JAMIE B. JEFFERSON, SBN 197142        Assistant Attorneys General

7    JOSHUA R. PURTLE, SBN 298215         Washington Attorney General's Office
   JULIA K. FORGIE, SBN 304701          Environmental Protection Division

8    LANI M. MAHER, SBN 318637           800 5th Ave Ste. 2000 TB-14
   Deputy Attorneys General                Seattle, Washington 98104-3188

9    1515 Clay Street, 20th Floor            (206) 233-3391
   P.O. Box 70550                        Aurora.Janke@atg.wa.gov

10    Oakland, CA 94612-0550            Elizabeth.Harris@atg.wa.gov
   (510) 879-1002

11    Jamie.Jefferson@doj.ca.gov         *Attorneys for Plaintiff State of Washington*
   Joshua.Purtle@doj.ca.gov

12

13    *Attorneys for Plaintiff State of California*    WILLIAM TONG
                                          Attorney General of Connecticut

14

15    PHILIP J. WEISER                   */s/ Robert Snook*
   Attorney General of Colorado          ROBERT SNOOK, *Pro Hac Vice*

16                                           Assistant Attorney General
                                          Attorney General's Office

17    */s/ Scott Steinbrecher*                 165 Capitol Avenue
   SCOTT STEINBRECHER, *Pro Hac Vice*    Hartford, Connecticut, 06106

18    Assistant Deputy Attorney General       (860) 808-5250
   Ralph C. Carr Colorado Judicial Center    Robert.Snook@ct.gov

19    1300 Broadway, Seventh Floor
   Denver, Colorado 80203

20    (720) 508-6287                         *Attorneys for Plaintiff State of Connecticut*

21

22    *Attorneys for Plaintiff State of Colorado*

23

24

25

26

27

28

KATHERINE S. DYKES
Commissioner Connecticut Department
of Energy and Environmental Protection

*/s/ Kirsten S. P. Rigney*
KIRSTEN S. P. RIGNEY
Director, Legal Office
Department of Energy and
Environmental Protection
10 Franklin Square
New Britain, CT 06051
(860) 827-2984

*/s/ Robert Snook*
ROBERT SNOOK
Assistant Attorney General
10 Franklin Square
New Britain, CT 06051
(860) 827-2620
Robert.Snook@ct.gov

*Attorneys for Plaintiff Connecticut &
Department of Energy and
Environmental Protection*

KWAME RAOUL
Attorney General of Illinois

*/s/ Jason E. James*
JASON E. JAMES, *Pro Hac Vice*
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental
Enforcement/Asbestos Litigation
Division
Office of the Attorney General
Environmental Bureau
69 West Washington St., 18th Floor
Chicago, IL 60602
(312) 814-0660
jjames@atg.state.il.us

*Attorneys for Plaintiff State of Illinois*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Kayli H. Spialter*
KAYLI H. SPIALTER
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8508
kayli.spialter@delaware.gov

*Attorneys for Plaintiff State of Delaware*

AARON FREY
Maine Attorney General

*/s/ Jillian R. O'Brien*
JILLIAN R. O'BRIEN, SBN 251311
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
jill.obrien@maine.gov
(207) 626-8582

*Attorneys for Plaintiff State of Maine*

DANA NESSEL
Attorney General of Michigan

*/s/ Elizabeth Morrisseau*
ELIZABETH MORRISSEAU, *Pro Hac Vice*
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

*Attorney for Plaintiff the People of the State
of Michigan*

BRIAN E. FROSH
Attorney General of Maryland

*/s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*


KEITH ELLISON
Attorney General of Minnesota

*/s/ Peter N. Surdo*
PETER N. SURDO, *Pro Hac Vice*
Special Assistant Attorney General
445 Minnesota Street Suite 900
Saint Paul, MN 55101
(651) 757-1061

*Attorneys for Plaintiff State
of Minnesota*


GURBIR S. GREWAL
Attorney General of New Jersey

*/s/ Lisa Morelli*
LISA MORELLI
Deputy Attorney General
Environmental Permitting and
Counseling
R.J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ 08625
(609) 376-2804

*Attorneys for Plaintiff State of New
Jersey*


AARON D. FORD
Attorney General of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN, *Pro Hac Vice*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*


HECTOR BALDERAS
Attorney General of New Mexico

*/s/ William Grantham*
WILLIAM GRANTHAM
Assistant Attorney General
201 Third Street NW, Suite 300
Albuquerque, New Mexico 87102
(505) 717-3520
wgrantham@nmag.gov

*Attorneys for the State of New Mexico*


JOSHUA H. STEIN
Attorney General of North Carolina

DANIEL S. HIRSCHMAN
Senior Deputy Attorney General

*/s/ Asher P. Spiller*
ASHER P. SPILLER, *Pro Hac Vice*
Assistant Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
aspiller@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

39

LETITIA JAMES
Attorney General of New York

*/s/ Claiborne E. Walthall*
CLAIBORNE E. WALTHALL, *Pro Hac Vice*
Assistant Attorney General
New York State Office of
the Attorney General
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov

*Attorneys for Plaintiff State of New
York and New York State Department
of Environmental Conservation*


ELLEN ROSENBLUM
Attorney General of Oregon

*/s/ Paul Garrahan*
PAUL GARRAHAN, *Pro Hac Vice*
Attorney-in-Charge
STEVE NOVICK, *Pro Hac Vice*
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Gregory S. Schultz*
GREGORY S. SCHULTZ, *Pro Hac Vice*
Special Assistant Attorney General
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
gschultz@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Emily M. Ertel*
EMILY M. ERTEL, *Pro Hac Vice*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0432
ertelem@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*

JOSH SHAPIRO
Attorney General of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General

*/s/ Ann R. Johnston*
ANN R. JOHNSTON, *Pro Hac Vice*
Senior Deputy Attorney General
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
(717) 705-6938

*Attorneys for Plaintiff Commonwealth of
Pennsylvania*

40

1   THOMAS J. DONOVAN, JR.
2   Attorney General of Vermont

3   */s/ Nicholas F. Persampieri*
    NICHOLAS F. PERSAMPIERI, *Pro Hac Vice*
4   Assistant Attorney General
    Office of the Attorney General
5   109 State Street
    Montpelier, VT 05609
6   (802) 828-3171
7   nick.persampieri@vermont.gov

8   *Attorneys for Plaintiff State of Vermont*

9
10  MAURA HEALEY
    Attorney General of Massachusetts
11
    */s/ Turner Smith*
12  TURNER SMITH, *Pro Hac Vice*
    MATTHEW IRELAND, *Pro Hac Vice*
13  Assistant Attorneys General
    Office of the Attorney General
14  Environmental Protection Division
    One Ashburton Place, 18th Floor
15  Boston, MA 02108
    (617) 727-2200
16  Turner.Smith@mass.gov
17  Matthew.Ireland@mass.gov

18  *Attorneys for Plaintiff Commonwealth
19  of Massachusetts*

20

21

22

23

24

25

26

27

28

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

*/s/ Alacoque Hinga Nevitt*
ALACOQUE HINGA NEVITT,
SBN 268768
WESLEY ROSENFELD
Assistant Attorneys General
District of Columbia Office of the Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 717-1368
alacoque.nevitt@dc.gov

*Attorneys for Plaintiff District of Columbia*

JAMES E. JOHNSON
Corporation Counsel of the
City of New York

*/s/ Nathan Taylor*
NATHAN TAYLOR
New York City Law Department
100 Church Street, Rm 6-144
New York, NY 10007
(646) 940-0736 (m)
(212) 356-2315
NTaylor@law.nyc.gov

*Attorneys for Plaintiff City of New York*

41

LEEVIN TAITANO CAMACHO
Attorney General of Guam

*/s/ Joseph A. Perez*
JOSEPH A. PEREZ, *Pro Hac Vice*
Assistant Attorney General
Consumer Protection Division
590 South Marine Corps Drive,
Suite 901, ITC Building
Tamuning, Guam 96913 ▪ USA
Telephone: (671) 475-3324
Facsimile: (671) 472-2493
jperez@oagguam.org

*Attorneys for Plaintiff Territory of Guam*

CHRISTIAN D. MENEFEE
Harris County Attorney

*/s/ Sarah Jane Utley*
SARAH JANE UTLEY, *Pro Hac Vice*
Director
Environmental Division
Harris County Attorney's Office
1019 Congress, 15th Floor
Houston, Texas 77057
(713) 274-5124
Sarah.Utley@cao.hctx.net

*Attorneys for Plaintiff Harris County, Texas*